## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DALI WIRELESS, INC.,           )

                               )

        Plaintiff,          )

                               )   C.A. No. 19-952-MN

      v.                )

                               )   **JURY TRIAL DEMANDED**

COMMSCOPE TECHNOLOGIES LLC, and )

COMMSCOPE HOLDING COMPANY,     )

INC.,                           )   **PUBLIC VERSION**

                               )

        Defendants.       )

## DALI'S MEMORANDUM OF LAW IN SUPPORT OF
## PARTIAL MOTION FOR SUMMARY JUDGMENT OF NO INVALIDITY

OF COUNSEL:

Cristofer I. Leffler
David Schumann
Michael Saunders
Cliff Win, Jr.
S.H. Michael Kim
Palani Pradeep Rathinasamy
Steven T. Skelley
Stefan Szpajda
FOLIO LAW GROUP PLLC
1200 Westlake Ave. N., Ste 809
Seattle, WA 98109
Tel: (206) 880-1802

Joseph M. Abraham
LAW OFFICE OF JOSEPH M. ABRAHAM PLLC
13492 Research Boulevard, Suite 120
No. 177
Austin, TX 78750
Tel: (737) 234-0201

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Plaintiff Dali Wireless, Inc.*

Dated: October 5, 2021
7403608 / 47952

Public Version Dated: October 14, 2021

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................... 1

   A.  The '338 Patent Discloses a Novel Reconfigurable Distributed Antenna System (DAS) Providing Radio Resources Where and When They are Needed ............................................... 1

     1.  Configuring and Reconfiguring Remote Radio Unit Using Load Percentage ................ 3

     *2.* Routing and Switching Step According to a Result of Reconfiguring .......................... 7

   B.  CommScope's Elected References .................................................................. 8

   C.  IPR2020-01466 Decision Denying Institution of the '338 Patent ...................................... 9

III. LEGAL STANDARDS ....................................................................................... 10

   A.  Summary Judgment ............................................................................... 10

   B.  Anticipation ....................................................................................... 10

   C.  Obviousness ....................................................................................... 10

   D.  Section 102(f) Derivation ........................................................................ 11

IV. ARGUMENT ..................................................................................................... 12

   A.  Hettstedt Does Not Anticipate the Asserted Claims of the '338 Patent ............................ 12

     1.  Hettstedt Does Not Perform Configuring and Reconfiguring ................................. 12

     2.  Hettstedt Does Not Perform Routing and Switching ....................................... 20

     3.  Hettstedt Does Not Provide an Enabling Disclosure to Configure or Reconfigure Radio Heads RH1-5 Based on Load Percentage ........................................ 20

   B.  Hettstedt Alone Does Not Render Obvious the '338 Patent ........................................ 21

   C.  Dr. Acampora's Derivation Theory Fails as a Matter of Law ..................................... 21

   D.  Dr. Acampora's Section 112 Theories Ignore the '338 Patent's Claim Language and Embodiments .................................................... 23

     1.  Dr. Acampora's Section 112 Theories Apply an Incorrect Claim Construction .......... 24

2.   Dr. Acampora's Section 112 Theories Ignore "As Appropriate" in the Claims and DAU1-DAU2 Embodiments ............................................................................................ 25

3.   Dr. Acampora's Written Description and Enablement Theories Repeat His Indefiniteness Error .......................................................................................................... 26

V.   CONCLUSION ............................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

CASES

**Page(s)**

*Adv. Display Sys., Inc. v. Kent State Univ.*,
    212 F.3d 1272 (Fed. Cir. 2000)...................................................................................16

*Amgen Inc. v. F. Hoffman-La Roche Ltd*,
    580 F.3d 1340 (Fed. Cir. 2009)...................................................................................11

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................................................10

*Baxalta Inc. v. Bayer Healthcare LLC*,
    513 F. Supp. 3d 426 (D. Del. 2021).................................................................11, 20, 22

*Blue Calypso, LLC v. Groupon, Inc.*,
    815 F.3d 1331 (Fed. Cir. 2016)...................................................................................18

*Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*,
    725 F.3d 1341 (Fed. Cir. 2013).........................................................................10, 13, 15

*Crown Operations Int'l, Ltd. v. Solutia Inc.*,
    289 F.3d 1367 (Fed. Cir. 2002)...................................................................................10

*Cumberland Pharm. Inc. v. Mylan Institutional LLC*,
    846 F.3d 1213 (Fed. Cir. 2017).............................................................................12, 22

*Eaton Corp. v. Rockwell Int'l Corp.*,
    323 F.3d 1332 (Fed. Cir. 2003).............................................................................11, 22

*Exmark Mfg. Co. v. Briggs & Stratton Corp.*,
    830 F. App'x 305 (Fed. Cir. 2020) .............................................................................11

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
    110 F.3d 1573 (Fed. Cir. 1997).............................................................................11, 23

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966).................................................................................................11, 21

*In re Cronyn*,
    890 F.2d 1158 (Fed. Cir. 1989)...................................................................................18

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1998)....................................................................................20

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)...................................................................................................11

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
  545 F.3d 1340 (Fed. Cir. 2008)..........................................................................18, 20

*Medtronic, Inc. v. Barry*,
  891 F.3d 1368 (Fed. Cir. 2018)................................................................................18

*Merck & Co. v. Teva Pharms. United States*,
  228 F. Supp. 2d 480 (D. Del. 2002).........................................................................17

*Microsoft Corp. v. i4i Ltd.*,
  564 U.S. 91 (2011)...................................................................................................10

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014).............................................................................................25

*Rohm & Haas Co. v. Brotech Corp.*,
  127 F.3d 1089 (Fed. Cir. 1997)................................................................................13

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
  927 F.2d 1565 (Fed Cir. 1991)................................................................................17

*Shire LLC v. Amneal Pharm., LLC*,
  802 F.3d 1301 (Fed. Cir. 2015)................................................................................11

*U.S. v. Bansal*,
  663 F.3d 634 (Fed. Cir. 2011)..................................................................................19

*Wis. Alumni Research Found. v. Apple Inc.*,
  905 F.3d 1341 (Fed. Cir. 2018)................................................................................10

**STATUTES**

35 U.S.C. § 102(b)...........................................................................................................18

35 U.S.C. § 102(f)..................................................................................................... passim

35 U.S.C. § 282...............................................................................................................10

FED. R. CIV. P. 56(a) .......................................................................................................10

## I.     INTRODUCTION

Plaintiff Dali Wireless, Inc. ("Dali") accuses Defendants CommScope Technologies LLC and CommScope Holding Company, Inc. (collectively "CommScope") of infringing the methods of Claims 1-3 of U.S. Patent No. 8,682,338 (Ex. 1, "the '338 patent"). Dali respectfully moves for partial summary judgment of no invalidity with respect to CommScope's theories based on each of (1) anticipation based on Hettstedt; (2) obviousness in light of Hettstedt; (3) derivation under Pre-AIA Section 102(f); and (4) indefiniteness, written description, and enablement under Section 112. Granting the present motion will reduce CommScope's invalidity defenses for the '338 patent to a manageable number and streamlines this case for trial.

## II.     FACTUAL BACKGROUND

### A.     The '338 Patent Discloses a Novel Reconfigurable Distributed Antenna System (DAS) Providing Radio Resources Where and When They are Needed

This case involves a reconfigurable distributed antenna system (DAS). The '338 patent, as explained by inventor Dr. Stapleton, covers an inventive concept—disruptive at the time—i.e., "the ability of distributed antenna system to be able to route capacity to where it's needed and when it's needed." CSUF[1] ¶ 1; Ex. 2 at 23:15-24:16; *see also* Ex. 1 at 6:34-39, 8:21-24, Figs. 1-2. Prior DAS approaches were inefficient and inflexible for handling user movement and dynamically changing capacity needs at different locations and times of day, e.g., when large number of users visit a cafeteria during the lunch hour. CSUF ¶ 2; Ex. 1 at 1:28-44. The '338 patent's disruptive technology overcomes the inadequacies of prior DAS approaches by configuring and reconfiguring remote radio units (RRUs) using settings and parameters within each RRU to meet the changing capacity needs. CSUF ¶ 2; Ex. 1 at 3:50-67, 5:52-56, 6:56-51.

For example, the inventors disclosed a reconfigurable DAS system in Fig. 1 (annotated

---

[1] Citations to "CSUF" refer to Dali's Concise Statement of Undisputed Facts, filed herewith.

below) illustrating a flexible simulcast downlink example with configurable and reconfigurable RRU1-4. Here, an application for RRU1 is at a cafeteria during lunch hour that can have its software settings configured such that all eight Carriers 1-8—from two different composite downlink signals 107 and 108—are present in the combined downlink output signal 109. This allows for RRU1 to have *full* capacity access to Carriers 1-8. Ex. 1 at 6:31-39. In this way, before lunch hour, RRU1 can be configured with access to less than eight carriers for lower user capacity needs, and then reconfigured at lunch hour with access to all eight carriers to properly handle increased capacity needs for large number of users gathering in the cafeteria. *Id*.



Figure 1:   Flexible Simulcast Downlink Example

Similarly, the reconfigurable DAS system can provide for a dynamic rearrangement—i.e., reconfiguration—of capacity for other RRUs:

> The application for such a **dynamic rearrangement of RRU capacity** would be, e.g., if a company meeting were **suddenly** convened in the area enterprise corresponding to the coverage area **RRU2**.

Ex. 1 at 8:21-24 (emphasis added). As such, RRU2 can be reconfigured dynamically with additional carriers to be routed to it using software settings embedded in RRU2 to meet the sudden

increase in capacity needs at RRU2.

### 1.    Configuring and Reconfiguring Remote Radio Unit Using Load Percentage

The novel features of configuring and reconfiguring each remote radio unit are captured by the method of Claims 1-3 that recite a configuring step followed by a reconfiguring step:

> configuring each remote radio unit to receive or transmit a respective subset of the plurality of carriers, each respective subset of the plurality of carriers including a number of carriers;
> reconfiguring each remote radio unit by:
>     determining a load percentage for each remote radio unit; and
>     increasing or decreasing the number of carriers in the respective subset of the plurality of carriers based on the load percentage; and

CSUF ¶ 3; Ex. 1 at 13:13-22 (construed terms emphasized). The Court gave the plain and ordinary meaning of "reconfiguring each remote radio unit" as "changing the configuration of each remote radio unit." CSUF ¶ 3; D.I. 122 at 1. The Court further ruled the plain language of "reconfigure" means to "change the configuration," and the "'reconfiguring' step of claim 1 follows a 'configuring step.'" CSUF ¶ 3; D.I. 122 at 8. Specifically, the Court indicated "remote radio units are first configured, and then at a later point the configuration is changed (i.e., they are reconfigured)." D.I. 122 at 8. The Court construed "load percentage" as "a value representing the portion of available capacity this is in use." *Id*. at 1, 9.

### a.    Changing the Configuration of Each Remote Radio Unit

As mentioned above, the inventive concept of the '338 patent is the ability to route capacity where it's needed, when it's needed. This concept is captured in the claims as the "reconfiguring" step, which was unequivocally construed by the court to be "chang[ing] the configuration" of each remote radio unit. This construction is clearly supported by the intrinsic record of the '338 patent. As shown in Figs. 1 and 7 (annotated below with selective carriers output from RRU1-4), each

RRU1-4 includes an embedded software control module, which controls software-programmable frequency selective digital up-converters (DUCs) and digital down-converters (DDCs) having settings (e.g., gain control parameters) that can change the configuration of RRU1-4 to select desired radio resources (e.g., carriers). Ex. 1 at 4:8-11, 6:47-51; 7:16-20.



The amount of radio resources (e.g., RF carriers, CDMA codes or TDMA time slots) assigned to an RRU or group of RRUs (e.g., RRU1-RRU4) can be set via embedded software control modules for each DUC and DDC. Ex. 1 at 4:1-8. For example, software settings within each RRU can be configured or reconfigured to disable or enable specific radio resources (e.g., Carriers) that will be present in each respective downlink output signal 109, 110, 111, and 112 (e.g., Carriers 1-8 for RRU1; Carriers 1, 3, 4 and 6 for RRU2; Carriers 2 and 6 for RRU3; and Carriers 1, 4, 5 and 8 for RRU4). Ex. 1 at 6:31-65, 11:32-39; Figs. 1-2. CommScope expert Dr. Acampora admits that changing settings inside a remote unit is changing its configuration. Ex. 6 at 39:12-17. This serves to meet desired capacity and throughput for changing wireless user needs.

The intrinsic record for the '338 patent includes the PTAB's IPR2020-01466 Decision Denying Institution dated February 9, 2021. Ex. 7; Ex. 5 at DCS2-00094100-123. In finding no reasonable likelihood of unpatentability, the PTAB followed this Court's construction for

"reconfiguring each remote radio unit" as "changing the configuration of each remote unit." Ex. 7 at 9. The PTAB further noted that:

> We additionally note that the claim term requires that it is the **remote radio unit itself that is changed** because the "remote radio unit" is the direct object of the verb "reconfiguring." This is consistent with the specification of the '338 patent, which describes **reconfiguring the RRUs themselves**. *See e.g.,* Ex. 1001 7:16–31 (describing that Digital Up-Converters located within the **RRU are dynamically software-programmable** and can be **re-configured to transport any specific frequency band, RF carriers, or RF channels which are available**), 8:8–21. . .

Ex. 7 at 10 (emphasis added).

### b.        Determining the Load Percentage for Each Remote Radio Unit

Another novel aspect of the reconfiguring step is determining a *load percentage* for each remote radio unit. CSUF ¶ 4. The Court construed "load percentage" to mean "a value representing the portion of available capacity that is in use," determined for each remote radio unit. CSUF ¶ 4; D.I. 122 at 1. The parties do not dispute that "percent" is simply a fraction $\frac{Part}{Whole}$. Under the Court's construction for "load percentage," a value representing the portion of available capacity in use would be the fraction $\frac{Capacity\ in\ Use}{Available\ Capacity}$, using an identifiable quantity for the numerator and denominator.

Dr. Acampora agrees that determining a value representing the portion of available capacity in use is a fraction. Ex. 6 at 57:20-22, 62:9-15. At his deposition, Dr. Acampora gave an example of a fraction indicating "load percentage," referring to a system having 100 channels with 100 circuits available. Specifically, Dr. Acampora testified that if 10 of those circuits were in use, "[t]he portion of available capacity in use would be 10%." Ex. 6 at 60:13-16

Dr. Acampora also admits there is a distinction between "load" and "load percentage," and

that the "number of circuits" in use would be an indication of "load." Ex. 6 at 72:9-17.[2] CommScope in its briefing on claim construction also noted a difference between measuring "load" and a determination of "load percentage." D.I. __ at 11. Dr. Acampora further testified that "the load percentage as the court told us would be given what's in use, **relative to what's available**, that's the load percentage, the value representing the portion of capacity that's in use." Ex. 6 at 73:2-7 (emphasis added).

c.    **Increasing or decreasing carriers based on the load percentage**

Another important feature of the reconfiguring step is "increasing or decreasing the number of carriers in the respective subset of the plurality of carriers based on the **load percentage**." CSUF ¶ 5; Ex. 1 at 13:20-22 (emphasis added). This use of "load percentage" is meaningful because it allows the reconfigurable DAS to know at a granular level when to provide more or take away radio resources at a particular RRU. That is, because load percentage is a value representing the portion of available capacity in use for each RRU, the reconfigurable DAS system knows the amount of resources available for an RRU, and if the RRU should receive more resources. Ex. 1 at 11:44-46.

For example, the '338 patent discloses an algorithm that "detects which carriers and corresponding time slots for each carrier are active for each RRU," to help identify "when, e.g., a **particular downlink carrier is loaded by a percentage** greater than a **predetermined threshold**." Ex. 1 at 11:44-46 (emphasis added). Based on determining a load percentage being

---

[2] Using Dr. Acampora's example of a system using 10 circuits out of 100 available circuits, the 10 circuits that are used is considered the load. Ex. 6 at 72:9-17. The information of 10 circuits *alone* does not indicate the portion of *available* capacity in use or how much capacity is still available to use, which requires consideration of the 100 available circuits—i.e., the denominator—to determine load percentage. That is, load percentage is the fraction of $10/100 = 10\%$, and the 10% indicates a value representing a portion of the available capacity in use. From this value, the system knows that 90% of capacity is still available for use referring to 90 circuits.

greater than the predetermined threshold, the reconfigurable DAS system "**adaptively modifies**" system configuration to deploy additional radio resources (e.g., RF carriers) "for use by a particular RRU which need those radio resources within its coverage area." Ex. 1 at 11:48-53. An application can be, e.g., if an RRU is using 96% of its available capacity and the threshold is 95%, the RRU can be reconfigured to receive additional resources accordingly. This is accomplished by changing the configuration settings or transmission parameters within each RRU to receive additional resources based on the load percentage. Ex. 1 at 11:18-39; 12:5-10.

### 2.    Routing and Switching Step According to a Result of Reconfiguring

Another feature of the method of Claims 1-3 is:

> routing and switching the packetized signals among the one or more remote radio units <u>via</u> the at least one digital access unit according to a result of the reconfiguring.

CSUF ¶ 6; Ex. 1 at 13:23-25 (disputed term emphasized). The Court did not construe this step, but the plain and ordinary meaning of "via" simply means that "packetized signals" are routed and switched "among the one or more remote radio units" by way of "the at least one digital access unit." *Id*.

The '338 patent teaches that composite downlink signals 107 and 108 are "digitized, packetized, routed and switched to the desired RRU." CSUF ¶ 27; Ex. 1 at 8:29-32. Based on the reconfiguring, packetized signals with capacity can be routed to individual RRUs based on where and when they are needed. Ex. 2 at 23:15-24:16. For example, referring to RRU1 (Fig. 1) at a cafeteria during lunch time, Carriers 1-4 from composite downlink signal 107 can be routed through DAU1 to RRU1, and Carriers 5-8 from composite downlink signal 108 can be routed through DAU2 and DAU1 to RRU1, allowing RRU1 to be reconfigured to use all eight carriers during the lunch hour. Ex. 1 at 8:21-32; Fig. 1. In this way, downlink signals are routed through

DAU1 and DAU2.

### B.    CommScope's Elected References

Dr. Acampora's June 23 invalidity report alleges anticipation, obviousness, and derivation for seven grounds of alleged invalidity. Following CommScope's September 17 final election of prior art references (Ex. 14), Dr. Acampora relies on six primary references—Hettstedt (Ex. 10), Zadeh, Comba I, Sabat '426, Wu, and the so-called "China Mobile Spec"[3]:

| No. | Dr. Acampora's Invalidity Expert Report (6/23/2021) |
| --- | --- |
| 1. | Anticipation based on U.S. Patent No. 8,032,148 (Hettstedt) |
| 2. | Obviousness based on Hettstedt |
| 3. | Obviousness based on Hettstedt in combination with U.S. Patent No. 6,266,531 (Zadeh, Ex. 11) or C.N Patent App. Pub. No. 101621806A (Comba II) |
| 4. | Obviousness based on U.S. Patent Appl. Publ. No. 2009/0180426 (Sabat '426) in combination with U.S. Patent Appl. Publ. No. 2010/0128675 (Wu) |
| 5. | Obviousness based on Sabat and Wu in combination with Zadeh or Comba II |
| 6. | Obviousness based on Uncertified English Translation of C.N. Patent App. Pub. No. 101453799A (Comba I) in combination with Comba II, Zadeh, or Hettstedt |
| 7. | Derivation based on the China Mobile Spec |

CSUF ¶ 7; Ex. 8 ¶¶ 4, 380.[4] In addition to the above primary references, CommScope identifies nine additional alleged "Background References":

---

[3] The "China Mobile Spec" that CommScope identifies actually consists of multiple documents, including the GSM Digital RF Remote System (Frequency Selection) Specification (Ex. 13, "the GSM Specification"). Ex. 8 ¶ 155 n.13. Dali anticipates raising this issue via the Court's discovery dispute procedures following completion of ongoing meet-and-confer discussions.

[4] Italicized references above designate CommScope's obviousness-combination invalidity theories, which fall outside the scope of this motion.

**B.    Background References in addition to the Main Election**

1. The CPRI standard (i.e., CPRI standard v4.0)
2. The OBSAI standard (i.e., as defined by Reference Point 3 Specification, Version 3.1 with reference to BTS System Reference Document, Version 2.0) (published in 2006)
3. The UMTS standard (i.e., 3GPP TS 25.423 / ETSI TS 125 423)
4. 8,369,272 ("Barbaresi")
5. 7,474,891 ("Toms")
6. 7,286,507 ("Oh")
7. 7,224,977 ("Cavalli")
8. 8,346,160 ("Kummetz")
9. 8,204,544 ("Beaudin")

CSUF ¶ 8; Ex. 14. Dr. Acampora relies on these references to fill in gaps to circumvent the six-reference limit. For example, Dr. Acampora relies on the V.5.6.0 ETSI Specification to fill determination of "load percentage" missing in Hettstedt, as well as on Oh for the missing routing and switching according to the reconfiguring step in Hettstedt. Ex. 8 ¶¶ 131, 138-147.

### C.    IPR2020-01466 Decision Denying Institution of the '338 Patent

In IPR2020-01466, the PTAB rejected, *inter alia*, Hettstedt and the alleged ETSI Technical Specification TS 125 423 V.5.6.0 (2003-06) (Ex. 15)—referred to by CommScope as the UMTS standard document—in denying institution. CSUF ¶ 10; Ex. 7 at 6-7. Before this Court, to avoid using Oh and the V.5.6.0 ETSI Specification as one of its six allowed primary references, CommScope now classifies them as background. Ex. 14 at 1. In rejecting these references, the PTAB followed this Court's construction for "reconfiguring each remote unit" as "changing the configuration of each remote unit," and further noted that the claim term "requires that it is the **remote radio unit itself that is changed** because the 'remote radio unit' is the direct object of the verb 'reconfiguring.'" Ex. 7 at 9-10 (emphasis added). The PTAB observed critical deficiencies in CommScope's Hettstedt reference:

> Indeed, we agree with Patent Owner that Hettstedt specifically discloses that the CMU provides **transparent operation** of the radio heads and **does not disclose making any changes to the radio heads**.

CSUF ¶ 10; Ex. 7 at 15 (emphasis added).

## III.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[A] moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party . . . failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1378 (Fed. Cir. 2002). Absent clear and convincing evidence, a patent challenger fails to satisfy its burden and an issued patent's presumption of validity cannot be overcome. *See* 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 95 (2011).

### B.    Anticipation

"Anticipation requires clear and convincing proof that a single prior art reference 'not only disclose[s] all of the elements of the claim within the four corners of the document, but . . . also disclose[s] those elements arranged as in the claim.'" *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1351 (Fed. Cir. 2013) (alteration in original). If a prior art reference does not expressly disclose a limitation, an expert's "speculation regarding how [a prior art limitation] *might* be implemented" is "insufficient to create a genuine dispute of material fact." *Wis. Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, 1353 (Fed. Cir. 2018) (emphasis in original). A party arguing a reference inherently discloses a limitation "bears an evidentiary burden to establish that the limitation was necessarily present." *Crown Operations*, 289 F.3d at 1377.

### C.    Obviousness

A claim is invalid for obviousness if, to one of ordinary skill, "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole

would have been obvious at the time the invention was made." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406-07 (2007). Obviousness is a legal conclusion based on underlying factual findings, including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence such as commercial success, long felt but unsolved need, and the failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

For a patent to be obvious, "some kind of motivation must be shown" as to "why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented method." *Shire LLC v. Amneal Pharm., LLC*, 802 F.3d 1301, 1306 (Fed. Cir. 2015). "An obviousness determination requires that a skilled artisan would have perceived a reasonable expectation of success in making the invention in light of the prior art." *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1362 (Fed. Cir. 2009). "[C]onclusory expert assertions" about these requirements "do not give rise to a genuine issue of material fact." *Exmark Mfg. Co. v. Briggs & Stratton Corp.*, 830 F. App'x 305, 313 (Fed. Cir. 2020).

### D.      Section 102(f) Derivation

A party raising Pre-AIA 35 U.S.C. § 102(f) must demonstrate (1) prior conception and (2) communication to the patentee by clear and convincing evidence. *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997); *see also Baxalta Inc. v. Bayer Healthcare LLC*, 513 F. Supp. 3d 426, 443-45 (D. Del. 2021). This communication must "enable one of ordinary skill in the art to make the patented invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1344 (Fed. Cir. 2003). It is insufficient to convey only "so much of the claimed invention as would have made it obvious to one of ordinary skill in the art." *Gambro*, 110 F.3d at 1578 (previous caselaw "did not incorporate an obviousness test into the § 102(f) analysis"). The communication must be of the "entire conception." *Id.* at 1577. "Conception is keyed to the

*claimed* invention: A conception must encompass all limitations of the claimed invention." *Cumberland Pharm. Inc. v. Mylan Institutional LLC*, 846 F.3d 1213, 1218 (Fed. Cir. 2017).

## IV.    ARGUMENT

### A.    Hettstedt Does Not Anticipate the Asserted Claims of the '338 Patent

#### 1.    Hettstedt Does Not Perform Configuring and Reconfiguring

For the method of claims 1-3, the Court found the "reconfiguring" step follows the "configuring" step such that "remote radio units are first configured, and then at a later point the configuration is changed (i.e., they are reconfigured)." D.I. 122 at 1, 8. But Hettstedt does not change the configuration of any of the remote radio heads. Unlike Hettstedt, the '338 patent discloses remote radio units having an *embedded software control module within each RRU*, which controls, e.g., software-programmable frequency selective digital up-converters (DUCs) and digital down-converters (DDCs). These DUCs and DDCs have settings to change the configuration of each RRU and select desired radio resources (e.g., carriers). Ex. 1 at 4:8-11, 6:47-51; 7:16-20.

CommScope, through Dr. Acampora, contends that the radio heads RH1-5 in Hettstedt are supposedly configured and reconfigured as claimed. CSUF ¶ 9; Ex. 8 ¶¶ 125-26. Dr. Acampora, however, does not identify any teaching in Hettstedt that makes actual changes to the radio heads (RH1-5) themselves. Tellingly, Hettstedt teaches a "cell management unit CMU that provides **transparent operation of the radio heads RH1 to RH5** from the base station." Ex. 10 at 4:21-23 (emphasis added).[5] Without a disclosure of configuring and changing the configuration of each radio head RH1-5, Hettstedt cannot anticipate the '338 patent. Ex. 10 at 2:6-6:2.

---

[5] In IPR2020-01466, the PTAB agreed with Dali that Hettstedt does not disclose making any changes to the radio heads. CSUF ¶ 10; Ex. 7 at 15.

a.     **Dr. Acampora's Assertions of Configuring and Reconfiguring Radio Heads are Unsupported in Hettstedt**

Hettstedt does not configure each radio head to "receive or transmit a respective subset of the plurality of carriers." Ex. 1 at 13:13-14. Dr. Acampora asserts that "Hettstedt's remote radio heads are configured to be frequency selective and are configured to receive in the uplink, for example, only up to four carriers." CSUF ¶ 9; Ex. 8 ¶ 125. But this unsupported assertion is not found in Hettstedt. *See Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) ("Nothing . . . requires [the fact finder] to credit the unsupported assertions of an expert witness."). Dr. Acampora cites just one statement from Hettstedt for support:

> The remote radio heads are **equipped to transmit four carriers** over the full RF bandwidth of **each service** but channel-selective at least in uplink.

CSUF ¶ 9; Ex. 10 at 5:6-8 (emphasis added). This statement simply indicates a radio head that "transmit[s] four carriers" per service—but does not recite "configure" or "configuring," and also does not disclose configuring any radio head to receive or transmit a "*subset*" of the four carriers to raise a disputed issue of fact to meet the configuring step. CSUF ¶ 9; Ex. 10 at 5:6-8.

Notably, Hettstedt states "equipped"—not "configured"—and makes no mention of "frequency selective." *Id*. Dr. Acampora's reference to "channel-selective" in Hettstedt is not a result of any configuration of radio heads RH1-5 themselves. Rather, Hettstedt teaches that "a remote radio head can operate individually for dedicated operators only," and the "remote radio heads" are "dedicated for "individual services" of four carriers. Ex. 10 at 5:6-9; 5:65-6:2. Without a clear and unambiguous teaching that Hettstedt configures each radio head RH1-5 to receive or transmit a subset of the four carriers, "a jury could only speculate, hardly a compelling case for anticipation." *Cheese Sys.*, 725 F.3d at 1352.

The '338 patent inventors disclosed configuration changes to each remote radio unit, e.g.,

13

that "**software settings** within RRU1 are **configured** either manually or automatically such that Carriers 1-8 are present in the downlink output signal 109 at the antenna port of RRU1." Ex. 1 at 6:31-34 (emphasis added). Importantly, Hettstedt describes nothing inside radio heads RH1-5, such as settings or parameters, to configure them to receive or transmit a respective *subset* of the plurality of carriers. Ex. 8 ¶ 125; Ex. 10 at Figs. 1-6. Dr. Acampora also does not advance a theory of inherency for the configuring step to support anticipation. Ex. 8 ¶ 125.

Rather than identifying a change at the radio heads, Dr. Acampora refers to "changing the MAC address" of a specific carrier to a radio head **at the central management unit (CMU)**. Ex. 8 ¶ 127. Here, Dr. Acampora does not raise a disputed issue of fact because no change of configuration is made **at the radio heads**. Ex. 8 ¶¶ 126-27. Hettstedt teaches that the CMU "provides **transparent operation of the radio heads** RH1 to RH5 from the base station," and describes means only inside the CMU to perform this transparent operation—not at the radio heads. Ex. 10 at 4:21-23 (emphasis added). Specifically, Hettstedt teaches that the CMU comprises:

> means for providing efficient **load balancing at and between base stations** through **adaptive cell reconfiguration**, including shifting un-used carriers from remote radio heads inside areas of low traffic load to remote radio heads inside areas of high traffic load.

Ex. 10 at 6:14-18 (emphasis added). The CMU further comprises:

> **mapping means** from carriers or time, frequency or time frequency allocations to **individual radio heads, as identified e.g. through their MAC addresses** or the connectors of the respective digital lines to which the radio heads are connected.

Ex. 10 at 4:56-60 (emphasis added). Dr. Acampora identifies no means in the radio heads RH1-5, yet still alleges that remote radio heads in Hettstedt are "channel selective" and "tuned" in the uplink **by the CMU** as a form of reconfiguration without reconfiguring step being implemented

14

"to receive or transmit a respective subset of the plurality of carriers." Ex. 8 ¶¶ 133-34; Ex. 10 at

5:3-14. This allegation does not meet the high burden of proof for anticipation because it does not

teach an actual configuration change made at the radio heads RH1-5 themselves.

### b. Dr. Acampora Did Not Find Determining *Load Percentage*

For the step of "determining load percentage for each remote radio unit," Dr. Acampora

refers to "individual load identification for each carrier" in Hettstedt, while admitting that

"percentage" is *not* described with respect to that load identification. CSUF ¶ 11; Ex. 8 ¶¶ 128-29.

Dr. Acampora also admits there is a *distinction* between "load" and "load percentage." CSUF ¶ 11;

Ex. 6 at 72:9-17. Dr. Acampora does not opine that Hettstedt discloses "a value representing the

portion of available capacity that is in use," as defined by the Court. CSUF ¶ 11; *cf.* D.I. 122 at 1;

Ex. 8 ¶¶ 128-29.

In view of this gap in Hettstedt, Dr. Acampora simply issues an unsupported opinion that

"one of skill in the art would recognize Hettstedt that load measurements ***would be* commonly**

**expressed as a percentage** representing the portion of the total capacity presently in use." CSUF

¶ 11; Ex. 8 ¶ 129 (emphasis added). Dr. Acampora thus admits that Hettstedt does not express load

as a percentage, and thus fails to disclose "all of the elements of the claim . . . arranged as in the

claim," as necessary to show anticipation. CSUF ¶ 11; *Cheese Sys.*, 725 F.3d at 1352.

### c. Dr. Acampora Improperly Relies on the V.5.6.0 ETSI Specification for Anticipation

As foundation for his opinion that load would be "commonly expressed" as a percentage,

Dr. Acampora cites to a passing reference to "UMTS" in Hettstedt (Ex. 10 at 1:18) to allege that

the UMTS standard supports "defining load as a percentage was standard terminology." CSUF

¶ 12; Ex. 8 ¶ 131. Specifically, Dr. Acampora cites to Section 9.2.1.33A of ETSI Technical

Specification TS 125 423 V.5.6.0 (2003-06)—V.5.6.0 ETSI Specification consisting of 559 pages

(Ex. 15)—as the *sole* source that defines "Load Value" to be a "percentage. CSUF ¶ 12; Ex. 8 ¶ 131. Reliance on the V.5.6.0 ETSI Specification is improper for the following reasons.

### i.     The V.5.6.0 ETSI Specification Is Not Incorporated into Hettstedt

Hettstedt refers to "UMTS" once, as an example of a "wireless communications service." CSUF ¶ 13; Ex. 10 at 1:18. Hettstedt does not refer to any specific UMTS document or that any UMTS document is incorporated by reference, especially the "ETSI Technical Specification TS 125 423 V.5.6.0 (2003-06)." CSUF ¶ 13. The cover page of the specification on which Dr. Acampora relies indicates a specific version and release number—3GPP TS 42.423 version 5.6.0 Release 5. CSUF ¶ 12. Ex. 15 at 1. CommScope's Barbaresi "Background Reference" discloses the existence of multiple 3GPP standards (e.g., 3GPP TS 25.304, 3GPP TS 25.331, etc.), but Barbaresi does not cite 3GPP TS 42.423 version 5.6.0 Release 5. CSUF ¶ 15; Ex. 17 at 1:40-59, 7:10-25.

Because Hettstedt does not identify the ETSI Technical Specification TS 125 423 V.5.6.0 (2003-06) with particularity and where "Section 9.2.1.33A" is located, the V5.6.0 ETSI Specification is not incorporated into Hettstedt. *See Adv. Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1283 (Fed. Cir. 2000) ("To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicates where that material is found in the various documents."). Thus, as a matter of law, the V.5.6.0 ETSI Specification is not part of the four corners of Hettstedt to be considered for anticipation.

### ii.     Dr. Acampora Improperly Uses an Additional Reference

Dr. Acampora contends that based on the reference to UMTS in Hettstedt "a POSA would read that reference [V.5.6.0 ETSI Specification] with **full background knowledge** of the UMTS standard that necessarily follows from employing UMTS." CSUF ¶ 14; Ex. 9 ¶ 48 (emphasis

added). But the V.5.6.0 ETSI Specification is **559 pages**, and CommScope presents no evidence that a POSA would have full knowledge that document beyond Dr. Acampora's conclusory assertion. CSUF ¶ 14; Ex. 15. Rather, relying on alleged "background knowledge" of the V.5.6.0 ETSI Specification is an improper use of an additional reference. *See Merck & Co. v. Teva Pharms. United States*, 228 F. Supp. 2d 480, 499 (D. Del. 2002) (defendants "improperly utilized additional references" to prove anticipation by offering "extrinsic evidence to demonstrate the understanding of those skilled in the art"). Dr. Acampora is attempting to build anticipation argument based on a combination of references. *See Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576-77 (Fed Cir. 1991) ("If it is necessary to reach beyond the boundaries of a single reference to provide missing disclosure . . . , the proper ground is not § 102 anticipation, but § 103 obviousness.").

In *Merck*, the court held defendants failed to establish anticipation and noted that "[d]efendants are improperly buttressing anticipation argument by utilizing multiple prior art references while trying to *disguise them as sources for knowledge of skill in the art*." *Id.* (emphasis added); *see also Scripps*, 927 F.2d at 1576-77 ("The role of extrinsic evidence [in the context of an anticipation analysis] is to educate the decision-maker to what the reference meant to persons of ordinary skill in the field of the invention, not to fill gaps in the reference."). As in *Merck*, Dr. Acampora's reliance on the V.5.6.0 ETSI Specification is not background, but rather an attempt to fill a hole in Hettstedt that does not teach determining a load percentage.[6]

### iii.    Dr. Acampora Has Not Shown the V.5.6.0 ETSI Specification Was Publicly Available

In the IPR2020-01466, CommScope actually combined Hettstedt with the V.5.6.0 ETSI

---

[6] Even if a POSA knew of Section 9.2.1.33A of the V.5.6.0 ETSI Specification, the document does not refer to a "load percentage for each remote unit," but rather to "the load percentage of the Cell Capacity Class." Ex. 15 at 209.

Specification for obviousness grounds. Ex. 7 at 7. In this case, CommScope elects the V.5.6.0 ETSI Specification as a "Background Reference." Ex. 14 at 1. In his rebuttal report, Dr. Foty noted that Dr. Acampora did not show the V.5.6.0 ETSI Specification was publicly available before the '338 patent. Ex. 3 ¶ 157. After Dr. Foty raised this challenge, in his reply report, Dr. Acampora submitted conclusory statements that are insufficient to show the V.5.6.0 ETSI Specification was publicly available before the '338 patent. Ex. 9 ¶ 56.

Under 35 U.S.C. § 102(b), to qualify as a printed publication, a reference "must have been sufficiently accessible to the public interested in the art." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016). A reference will be considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008). Dissemination must have occurred before the critical date of the patent. *Blue Calypso*, 815 F.3d at 1048-49. "[T]he patent challenger[] bears the burden of establishing that a particular document is a printed publication." *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1380 (Fed. Cir. 2018) (*citing Blue Calypso*, 815 F.3d at 1348).

In attempting to carry CommScope's burden to prove public availability (albeit belatedly, and solely in his reply report), Dr. Acampora first states that 3GPP and ETSI make their standards available for public download. Ex. 9 ¶ 56. But proof of online availability does not demonstrate that a reference is "sufficiently accessible to the public interested in the art" before the critical date. *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989). Tellingly, Dr. Acampora alleges that corroborating sources (e.g., Wayback Machine) establish public availability, but does not indicate whether any of those sources made the specific V.5.6.0 ETSI Specification available online to the

interested public one year before the priority date of the '338 patent—i.e., September 14, 2010. CSUF ¶ 15. At deposition, Dr. Acampora admitted he did not seek a declaration from ETSI to authenticate the V.5.6.0 ETSI Specification or a declaration on how the Wayback Machine determined if the document was available at a certain time. CSUF ¶ 15; Ex. 6 at 180:12-181-21. Without such declarations, Dr. Acampora's arguments alleging download availability are insufficient to prove public availability before the critical date. *See U.S. v. Bansal*, 663 F.3d 634, 667-68 (Fed. Cir. 2011).

Second, Dr. Acampora cites Barbaresi and Rudolf, which allegedly refer to the V5.6.0 ETSI specification, to demonstrate public accessibility. Ex. 9 at ¶¶ 47, 56, 58-59. Rudolf was not elected by CommScope as a background reference and should be discarded. Ex. 14. As a threshold matter, the mere reference by a document that itself was publicly accessible before the critical date does not demonstrate that a separate internal reference was also publicly available. As it happens, Barbaresi cites a later version of the v5.6.0 ETSI Specification—3GPP TS 25.3GPP TS 25.423 v6.10.0—that does not bear on the separate public availability of the V5.6.0 ETSI Specification. CSUF ¶ 15.

Additionally, the "UMTS Standard"—as actually mentioned in Hettstedt—and the ETSI Technical Specification are different: the "UMTS Standard" is the overall standard, while ETSI Technical Specification TS 125 423 V5.6.0 (2003-06) is a unique document that specifies a subset of the standard's parameters. Hettstedt's reference to UMTS does not mean that any individual ETSI Technical Specification was publicly accessible before the time of invention. Finally, that Rudolf (which, again, is not on CommScope's background references) lists the V5.6.0 ETSI Specification merely indicates the applicant submitted the document to the Patent Office. This does not demonstrate that the V5.6.0 ETSI Specification was actually "disseminated or otherwise

made available to the extent that persons interested . . . can locate it," as required to prove it up as prior art to the '338 patent. *Kyocera Wireless Corp.*, 545 F.3d at 1350 (Fed. Cir. 2008).

### 2.    Hettstedt Does Not Perform Routing and Switching

Dr. Acampora opines the CMU in Hettstedt shifts carriers from one remote to another based on a load value—**not** "load percentage." CSUF ¶ 16; Ex. 8 at 136. Further, as noted above, Hettstedt fails to determine a load percentage for each radio head RH1-5, nor does Hettstedt configure or reconfigure—i.e., making configuration changes at the radio heads to increase or decrease carriers. Dr. Acampora has thus failed to raise a disputed issue of fact.

### 3.    Hettstedt Does Not Provide an Enabling Disclosure to Configure or Reconfigure Radio Heads RH1-5 Based on Load Percentage

Hettstedt does not provide an enabling disclosure for anticipation. Enablement assesses whether "one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation." *Baxalta*, 2021 U.S. Dist. LEXIS 8993, at *42. Importantly, Dr. Acampora admits Hettstedt does not use "percentage" with load measurements. Ex. 8 ¶ 129. In light of that admission, it is unsurprising that Dr. Acampora fails to show inner components of any radio heads RH1-5 in Hettstedt that exemplify how to configure or reconfigure radio heads RH1-5 based on load percentage. *See In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1998) (identifying as enablement factor (3) "the presence of absence of working examples" for consideration). Dr. Acampora similarly fails to show any internal means or components inside radio heads RH1-5 of Figs. 1-6, such as parameters or settings, that enable them to be configured or reconfigured to increase or decrease carriers. CSUF ¶ 17. Ex. 10 at 2:6-6:2. Without a disclosure or means of how to change the configuration of radio heads RH1-5, Hettstedt simply fails to provide an enabling disclosure.

In contrast, the '338 patent teaches and enables software-programmable remote radio units

(RRUs) that have individual parameters that can be programmed within, e.g., a digital up converter or digital down-converter to configure and reconfigure the RRU to transport any specific frequency band, RF carriers, or RF channels which are available. Ex. 1 at 4:1-13, 7:16-31, 8:8-55, Fig. 7.

### B. Hettstedt Alone Does Not Render Obvious the '338 Patent

Dr. Acampora's obviousness opinion based on Hettstedt alone is defective for failing to provide factual findings for *Graham* factors (1) and (3)—i.e., "the scope and content of the prior art" and "the differences between the claimed invention and the prior art." *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). For example, Dr. Acampora's opinions fail to set forth the proper scope of Hettstedt and its discernable differences with the claims by opining that:

- . . . **to the extent** it is argued that Hettstedt does not sufficiently disclose that the load determination used as the basis to shift carriers to different remote radio heads is a load 'percentage' then it would have been obvious to calculate the load as a percentage. CSUF ¶ 18; Ex. 8 ¶ 152.

- . . . **to the extent** the patentee argues the claim requires the remote radio itself be reconfigured or changed to change the number of carriers in the downlink direction, as explained above, changing the carrier to be translated from baseband to a different RF frequency requires mixing with a different local oscillator frequency, necessitating a change in the configuration of the remote radio itself. CSUF ¶ 18; Ex. 8 ¶ 161.

Dr. Acampora's "to the extent" opinions do not follow the *Graham* factors (1) and (3), by not properly setting forth whether Hettstedt even discloses the claimed limitations.

Additionally, Dr. Acampora improperly refers to additional references (Zadeh, Barbaresi, V.5.6.0 ETSI Specification) and the deposition testimony of non-inventor Andrew Leung to support his obviousness analysis supposedly based on Hettstedt alone. Ex. 8 ¶¶ 152-161. Thus, as a matter of law, Dr. Acampora did not meet the basic requirements of obviousness based on Hettstedt alone.

### C. Dr. Acampora's Derivation Theory Fails as a Matter of Law

CommScope's theory of derivation based on the GSM Specification does not rise to the

high level of clear and convincing evidence required to satisfy 35 U.S.C. § 102(f). Dr. Acampora's Section 102(f) derivation theory (Ex. 8 ¶¶ 380-381) shows neither (1) prior conception or (2) communication of the prior conception that would enable a person of ordinary skill to make the invention. *Eaton Corp.*, 323 F.3d at 1344.[7] The only document that Dr. Acampora relies on to prove a limitation-by-limitation analysis is the GSM Specification (Ex. 13). CSUF ¶ 19; Ex. 8 ¶ 384. But the GSM Specification is not directed to the same field-of-endeavor as the '338 patent, and omits at least the "configuring" and "reconfiguring" based on a "load percentage" elements. Dr. Acampora thus fails to show a communication to Dali of the "entire conception" that encompasses all limitations of the claimed invention. *Cumberland*, 846 F.3d at 1218.

First, the GSM Specification discloses a "wideband digital optical repeater" unrelated to the reconfigurable DAS disclosed and claimed in the '338 patent. Ex. 13 at 8; Ex. 2 (Stapleton Dep.) at 32:16-21 ("Q. How does the digital optical repeater product relate to the invention in the '338 Patent? . . . A. . . . . [T]his doesn't have anything to do with moving capacity around."), 33:24-34:6. *See Baxalta*, 513 F. Supp. at 444 (granting summary judgment of no invalidity for derivation, agreeing that "communication of such a generalized concept cannot meet the standard required for derivation.").

Second, regarding the "configuring" step, Dr. Acampora cites page 14 of the GSM Specification, which describes a Table for Key Performance Index of the Digital Optical Repeater that refers to a "carrier frequency channel." Ex. 13 at 13-15; Ex. 8 at 211. But this page and Table of the GSM Specification makes no mention of "configuring each remote radio unit to receive or transmit a respective **subset** of the plurality of carriers" required by the configuring step. CSUF

---

[7] Dali's co-pending *Daubert* motion directed to Dr. Acampora's opinions demonstrates that Dr. Acampora's reliance on Dali's alleged admissions should be excluded.

¶ 19; Ex. 13 at 13-14. In fact, "carrier frequency channel" is referring to the GSM system and has nothing to do with the selection (or de-selection) of individual carriers (at a radio head or elsewhere) to meet the conception of the configuring step. Ex. 3 ¶¶ 434, 439.

Third, Dr. Acampora does not identify any description of "reconfiguring" each remote radio unit in the GSM Specification. Dr. Acampora cites to "carrier scheduling" (Ex. 8 at 212-13), but this has nothing to do with the selection (or de-selection) of individual carriers at a radio head or elsewhere, which is necessary to meet the conception of "increasing or decreasing the number of carriers in the respective subset of the plurality of carriers based on the load percentage" required by claim 1 of the '338 patent. CSUF ¶ 20; Ex. 3 ¶ 439.

Finally, regarding the "load percentage" element of the "reconfiguring' step, Dr. Acampora refers to traffic load as in the GSM Specification as being measured in "Erlangs," i.e., a measure of load for voice traffic. CSUF ¶ 21; Ex. 8 ¶ 212. But Dr. Acampora admits that traffic load is an amount of traffic and distinct from "load percentage." CSUF ¶ 21; Ex. 6 at 72:4-17. Based on Dr. Acampora's admission, traffic load measured in Erlangs is different from "load percentage," so the GSM Specification cannot show conception of this necessary element of the reconfiguring step of claim 1.

As a result, there is no set of facts under which Dr. Acampora's theory of derivation could rise to the level of clear and convincing evidence required to establish invalidity under 35 U.S.C. § 102(f). *See Gambro*, 110 F.3d at 1576 (applying clear and convincing evidence standard to derivation).

### D.    Dr. Acampora's Section 112 Theories Ignore the '338 Patent's Claim Language and Embodiments

Dr. Acampora advances multiple theories of invalidity under Section 112.

1.     **Dr. Acampora's Section 112 Theories Apply an Incorrect Claim Construction**

First, Dr. Acampora opines in support of his indefiniteness theory that "Dali's interpretation of 'as appropriate'"—as used in the claim term "translating the uplink and downlink signals between RF and base band as appropriate"—"contradicts claim limitations of claim 1 and therefore renders claim 1 indefinite." CSUF ¶ 22; Ex. 8 ¶ 340. But to reach that conclusion, Dr. Acampora removes "as appropriate" from the phrase and imputes a requirement of a "downlink RF signal," such that the claim requires "a DAU that . . . has access to a **downlink RF signal** . . . [and] translates it **from RF to baseband** . . ." CSUF ¶ 23; Ex. 8 ¶ 354.

In addition, Dr. Acampora advances invalidity positions based on alleged lack of written description or enablement, on the grounds that Dali allegedly "reinterpret[s] claim 1 [to be] directed to a fundamentally different type of system and method from what is disclosed in the '338 patent"—specifically, that the '338 patent specification allegedly "does not provide any disclosure of a system that only receives a data signal from the operator's core network." CSUF ¶ 26; Ex. 8 ¶¶ 374-375. Dr. Acampora's theories on lack of written description and enablement are similarly premised on an assumed construction that would "require[] the claimed DAU to (a) at least have access to a **downlink RF signal** [and] translate it from **RF to baseband** . . ." CSUF ¶ 26; Ex. 8 ¶ 367.

Dr. Acampora's above Section 112 theories are most critically flawed—as detailed in Dali's co-pending *Daubert* motion directed to Dr. Acampora's opinions—by the fact that Dr. Acampora affirmatively disregards this Court's claim construction for "downlink signals," which does not require RF in the construction of downlink signals: "I . . . will construe the term to mean 'signals transmitted in the downlink direction' **without requiring those signals to be RF signals**." CSUF ¶ 24; D.I. 122 at 1, 9. And at his deposition, Dr. Acampora admitted that the "[t]he court's

claim construction did not say downlink RF signal." CSUF ¶ 24; Ex. 6 at 42:23-25. Because he rewrites the Court's construction for his Section 112 theories, Dr. Acampora's opinions should be rejected.

### 2. Dr. Acampora's Section 112 Theories Ignore "As Appropriate" in the Claims and DAU1-DAU2 Embodiments

In addition to the flawed claim construction that he applies, as above, CommScope's expert does not apply the appropriate test to determine indefiniteness. That test is whether "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). But Dr. Acampora's indefiniteness theory is instead premised his opinion that "Dali's interpretation of 'as appropriate' (recited in Element D) contradicts claim limitations of claim 1 and therefore renders claim 1 indefinite." Ex. 8 ¶ 340. Dr. Acampora did not review the specification or file history to determine whether there was support for interpreting "as appropriate" consistent with Dali's position—i.e., "when needed or necessary," instead simply relying on the alleged "contradict[ory]" positions he accuses Dali of taking.

Dr. Acampora also does not dispute that '338 patent discloses a DAU1 connected to DAU2 as shown in Figs. 1-2 connected via an optical cable 113. CSUF ¶ 25. Ex. 6 at 53:13-16. This DAU1-DAU2 embodiment is captured in Claim 4 of the '338 patent. CSUF ¶ 25. Ex. 1 at 13:31-34. In the DAU1-DAU2 embodiment of Figs. 1-2, DAU2 receives downlink signals in baseband from DAU1, which would not require translation for output to RRUs 3-4. CSUF ¶ 25. Ex. 1 at 3:51-67, 4:1-44, 5:52-9:31, 13:1-25, and 13:31-34; Ex. 18 at 39:13-41:2. Specifically, DAU2 can receive downlink signals that are already digitized and packetized, which can then be routed and switched to RRUs 1-4. CSUF ¶¶ 25, 27; Ex. 1 at 5:64-66, 6:25-26, 8:55-57, Figs. 1 & 2. Dr. Acampora fails to acknowledge the translation step in view of these disclosed embodiments of the

'338 patent that support translating between baseband and RF when a translation is needed or necessary. Dr. Acampora thus fails to meet the *Nautilus* test.

### 3. Dr. Acampora's Written Description and Enablement Theories Repeat His Indefiniteness Error

The results of a proper written description and enablement analysis are quite similar to those immediately above. Following the Court's construction for "downlink signals" as simply "signals transmitted in the downlink direction," the '338 patent supports and enables the switching and routing according to the reconfiguring step. For example, the '338 patent teaches that downlink signals are "digitized, packetized, routed and switched to the desired RRU." CSUF ¶ 27; Ex. 1 at 8:29-32. The '338 patent teaches that in the downlink path, RF signals are down-converted, digitized, and converted to baseband. CSUF ¶ 27; Ex. 1 at 5:64-66. The '338 patent also teaches that "DAUs and RRUs frame the individual data packets corresponding to their respective radio signature." CSUF ¶ 27; Ex. 1 at 8:55-57. In Figures 1 and 2, DAU1 is connected to DAU2 that can receive downlink signals that are digitized, packetized, and routed and switched to RRUs 1-4. CSUF ¶ 27; Ex. 1 at 6:25-26. As clearly shown to a POSA by all of the preceding evidence, DAU2 can receive digitized and packetized downlink signals that are then routed and switched to one of the RRUs 1-4 via DAU2.

## V. CONCLUSION

For the reasons detailed above, Dali respectfully requests that the Court enter partial summary judgment of no invalidity with respect to CommScope's theories based on each of (1) anticipation based on Hettstedt; (2) obviousness in light of Hettstedt; (3) derivation under Pre-AIA Section 102(f); and (4) indefiniteness, written description, and enablement under Section 112.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Cristofer I. Leffler
David Schumann
Michael Saunders
Cliff Win, Jr.
S.H. Michael Kim
Palani Pradeep Rathinasamy
Steven T. Skelley
Stefan Szpajda
FOLIO LAW GROUP PLLC
1200 Westlake Ave. N., Ste 809
Seattle, WA 98109
Tel: (206) 880-1802

Joseph M. Abraham
LAW OFFICE OF JOSEPH M. ABRAHAM PLLC
13492 Research Boulevard, Suite 120
No. 177
Austin, TX 78750
Tel: (737) 234-0201

Dated: October 5, 2021
7403110 / 47952
 Public Version Dated: October 14, 2021

By:  */s/ Bindu A. Palapura*
      David E. Moore (#3983)
      Bindu A. Palapura (#5370)
      Stephanie E. O'Byrne (#4446)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE 19801
      Tel: (302) 984-6000
      dmoore@potteranderson.com
      bpalapura@potteranderson.com
      sobyrne@potteranderson.com

*Attorneys for Plaintiff Dali Wireless, Inc.*