**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

DALI WIRELESS, INC., a Delaware ⟩
corporation, ⟩
⟩
Plaintiff, ⟩
⟩
v. ⟩
⟩
COMMSCOPE TECHNOLOGIES LLC, a ⟩
Delaware company, and COMMSCOPE ⟩
HOLDING COMPANY, INC., a Delaware ⟩
corporation, ⟩
⟩
Defendants. ⟩

C.A. No.: 19-952-MN

**JURY TRIAL DEMANDED**

**PUBLIC VERSION**

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE THE OPINIONS AND TESTIMONY OF JAMES J. DONOHUE

OF COUNSEL:
CARLSON, CASPERS,
  VANDENBURG & LINDQUIST PA
Philip P. Caspers
Samuel A. Hamer
Tara Norgard
William F. Bullard
 225 South Sixth Street
Minneapolis, MN 55402
612-436-9600

Kelly E. Farnan (#4395)
Valerie A. Caras (#6608)
RICHARDS, LAYTON & FINGER, PA
One Rodney Square
920 North King Street
Wilmington, DE 19801
302-651-7700
farnan@rlf.com
caras@rlf.com

*Attorneys for Defendants CommScope*

Dated: October 5, 2021

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................ 1

LEGAL STANDARD....................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.     OneCell does not infringe because Claim 1 requires translating a downlink signal
from RF to baseband, which there is no dispute OneCell does not do. .............................. 2

     A.    Antecedent basis in claim 1 requires translating a downlink signal
from RF to base band. .......................................................................................2

     B.    There is no dispute that OneCell does not ████████████████
████████████████████████████...........8

     C.    The phrase "as appropriate" does not make the method step conditional, nor
would such an interpretation avoid summary judgment of non-infringement.......10

II.    CommScope does not practice the "routing and switching" step .................................... 14

     A.    The antecedent basis requirement in this step........................................................14

     B.    The "via the at least one digital access unit" requirement ...................................16

          1.    Relevant context......................................................................................... 17

          2.    The proper construction of the "via" requirement ..................................... 20

          3.    Dali's DOE theory is either moot or fails as a matter of law................... 25

     C.    If the Court denies summary judgment, the Court should still strike
Dali's expert testimony for the routing and switching step .................................. 27

III.   The Court should grant summary judgment of no willful infringement........................... 28

     A.    Dali's willfulness theory fails to allege any facts showing CommScope
had any knowledge of infringement ......................................................................29

     B.    Dali's unsupported argument fails........................................................................30

     C.    The case record refutes willfulness.......................................................................31

IV.   Claims 1-3 are Invalid.................................................................................................. 32

A.     Dali's interpretation of "as appropriate" renders the claims indefinite. ..............32

B.     Dali derived the invention.....................................................................................34

V.   The Opinion of Dali's Damages Expert Must Be Excluded Because it is at Odds with Dali's Infringement Allegations, Unreliable, and Unsupported by Facts.................38

A.     Law ........................................................................................................................38

B.     Background ............................................................................................................39

      1.     One Cell, Smart Reuse/Cell Virtualization, and the Accused Functionality ...................................................... 39

      2.     Donohue's Damages Opinion .................................................. 41

C.     Argument ..............................................................................................................44

      1.     Donohue's cost savings analysis is fundamentally unsound and must be excluded................................................................ 44

      2.     Donohue's use of CommScope's licensing policy and the Kathrein license is improper and unreliable and must be excluded.......... 46

CONCLUSION........................................................................................................... 49

# TABLE OF AUTHORITIES

**Cases**

*Allen Eng'g Corp. v. Bartell Indus.*,
299 F.3d 1336 (Fed. Cir. 2002)..............................................................................33, 35

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014)......................................................................................39

*Apple Inc. v. Wi-Lan, Inc.*,
No. 14cv2235 DMS (BLM), 2019 WL 4253832 (S.D. Cal. Mar. 26, 2019).....................47, 48

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)  ...................................................................................................1

*Bayer HealthCare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021).......................................................................................28

*Bourjaily v. United States*,
483 U.S. 171 (1987)  ....................................................................................................38

*Commonwealth Sci. & Indust. Research Organization  v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015).......................................................................................39

*Contour IP Holding, LLC v. GoPro, Inc.*,
No. 3:17-cv-04738-WHO, 2020 WL 5106845 (N.D. Cal. Aug. 31, 2020) .......................45, 46

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)  ....................................................................................................39

*Degussa v. Materia, Inc.*,
305 F. Supp. 3d 563 (D. Del. 2018)..................................................................................28

*Energizer Holdings v. ITC*,
435 F.3d 1366 (Fed. Cir. 2006)........................................................................................3

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722, 122 S. Ct. 1831 (2002)..............................................................................26

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
344 F.3d 1359 (Fed. Cir. 2003)......................................................................................26

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970)...................................................................46

*Hytera Communs. Co. v. Motorola Sols., Inc.*,
841 Fed. App'x 210 (Fed. Cir. 2021).............................................................12, 13

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
734 F.3d 1352 (Fed. Cir. 2013)........................................................................27

*Interdigital Tech. Corp. v. Lenovo Holding Co.*,
No. 19-1590-LPS, 2021 WL 1856937 (D. Del. May 10, 2021) ...........................12

*Intuitive Surgical, Inc. v. Auris Health, Inc.*,
No. 18-1359-MN, 2021 WL 3033396 (D. Del. July 19, 2021) .............................28

*Kenexa Brassring, Inc. v. Taleo Corp.*,
751 F. Supp. 2d 735 (D. Del. 2010).................................................................37

*Laser Dynamics, Inc. v. Quanta Comput., Inc.*,
694 F.3d 51 (Fed. Cir. 2012)...........................................................................47

*Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*,
609 F.3d 1364 (Fed. Cir. 2010)...................................................................12, 13

*Looksmart Grp., Inc. v. Microsoft Corp.*,
No. 17-cv-04709-JST, 2019 WL 4009263 (N.D. Cal. July 12, 2019)....................45

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ......................................................................................1

*Mirror Worlds, LLC v. Apple Inc.*,
692 F.3d 1351 (Fed. Cir. 2012).......................................................................22

*Motorola Mobility LLC v. ITC*,
553 Fed. App'x 971 (Fed. Cir. 2014)............................................................4, 15

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) .....................................................................................33

*Network Appliance Inc. v. Sun Microsystems Inc.*,
No. C-07-06053 EDL, 2008 U.S. Dist. LEXIS 76713 (N.D. Cal. Sept. 10, 2008) ...........33, 35

*NTP, Inc. v. Research In Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005)........................................................................3

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)........................................................................21

*PSC Comput. Prods., Inc. v. Foxconn Int'l*,
355 F.3d 1353 (Fed. Cir. 2004)........................................................................27

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364, 1376 (Fed. Cir. 2008)..............................................................15

*Toro Co. v. White Consol. Indus.*,
383 F.3d 1326 (Fed. Cir. 2004)........................................................................27

*TQ Delta, LLC v. Adtran, Inc.*, No.1:14-cv-00954-RGA,
2018 WL 2298342 (D. Del. May 18, 2018)......................................................37

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011).................................................................39,46,48

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)........................................................................39

*Warner-Lambert Co. v. Apotex Corp.*,
316 F.3d 1348 (Fed.Cir. 2003)..........................................................................3

**Statutes and Rules**

Fed. R. Civ. P. 56(a) ........................................................................................1

Fed. R. Civ. P. 702 ........................................................................................ 38

35 USC §102(f) (pre-AIA)................................................................................35

## INTRODUCTION

For the reasons provided below, Defendants CommScope Technologies LLC and CommScope Holding Company, Inc. (collectively herein "CommScope") move for summary judgment that claims 1-3 of the '338 patent are not infringed, have not been willfully infringed, and are invalid.  Further, CommScope moves to exclude the opinions and testimony of Dali's damages expert James J. Donohue.

## LEGAL STANDARD

A party is entitled to summary judgment if a court determines that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In doing so, the Court must review all of the evidence and draw all reasonable inferences in the light most favorable to the non-moving party, and should not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The moving party must demonstrate the absence of a genuine issue of material fact and the entitlement to judgment as a matter of law. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10, 586 (1986).

If the moving party has carried its burden, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586.  The nonmovant "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 587 (quoting Fed. R. Civ. P. 56). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"; a factual dispute is "genuine" only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 247-48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50.

1

## ARGUMENT

**I.    OneCell does not infringe because Claim 1 requires translating a downlink signal from RF to baseband, which there is no dispute OneCell does not do.**

The dispositive issue to be decided is a legal question: does the claim step of "packetizing **the** uplink and downlink base band signals" refer back to base band signals that result from the prior step of "translating the uplink and downlink signals between RF and base band as appropriate." That is, does the use of the definite article "the" in the phrase "packetizing **the**…downlink base band signals" have antecedent basis in the base band signals produced in the prior translating step, or is there no antecedent basis for the term "**the**…downlink base band signals." The answer to this legal question determines whether the base band downlink signals that are packetized must have been translated from RF to base band. ███████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████.

**A.    Antecedent basis in claim 1 requires translating a downlink signal from RF to base band.**

Claim 1 recites multiple steps of a method "for routing and switching RF signals."  It includes a "translating…" step in which downlink signals are translated between RF and base band.  It then recites a "packetizing…" step which recites "packetizing **the** uplink and downlink base band signals."  (emphases added).  Finally, it includes a "routing…" step which recites "routing and switching the packetized signals…".  Claim 1 is shown below with the relevant steps highlighted.[1]

---

[1] See Ex. 1 to the Declaration of William Bullard submitted herewith at 13:2-25 (hereinafter Exhibits to this declaration will be referred to as "Ex. __").  Element designations, e.g., A, B, C etc., have been added at left for ease of reference.

2

| | |
|---|---|
| A | **1**. A method for routing and switching RF signals comprising: |
| B | providing one or more remote radio units, each remote radio unit configured to transmit one or more downlink RF signals and to receive one or more uplink RF signals; |
| C | providing at least one digital access unit configured to communicate with the one or more remote radio units; |
| D | translating the uplink and downlink signals between RF and base band as appropriate; |
| E | packetizing the uplink and downlink base band signals, wherein the packetized signals correspond to a plurality of carriers; |
| F | reconfiguring each remote radio unit by: determining a load percentage for each remote radio unit; and |
| G | increasing or decreasing the number of carriers in the respective subset of the plurality of carriers based on the load percentage; and |
| H | routing and switching the packetized signals among the one or more remote radio units via the at least one digital access unit according to a result of the reconfiguring. |

It is important to note that element E in claim 1 uses the definite article "the" in its phrase "packetizing the uplink and downlink base band signals."  It is well established that the use of the definite article "the" is limiting and refers back to a specific antecedent basis.  *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1306 (Fed. Cir. 2005) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes.  It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" (citing *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003)).  The only antecedent basis in claim 1 for "the…downlink base band signals" are the signals referred to in the previous "translating" step (element D) which refers to downlink signals that are translated between RF and base band.  It is not required that the antecedent basis use the exact same words or phrase. *See, e.g., Energizer Holdings v. ITC*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) (finding that the antecedent basis for "said zinc anode" was the previously recited "anode gel comprised of zinc"). Therefore, by using the definite article "the" in element E, claim 1 requires that the downlink

3

base band signals that are packetized in element E must be the specific downlink signals that have been translated between RF and base band from element D.  *See Motorola Mobility LLC v. ITC*, 553 Fed. App'x. 971, 975 (Fed. Cir. 2014) (finding that because there was no other antecedent basis for "the change" other than the previously recited "a change", the limitations for "a change" and "the change" must be satisfied by the same change).  Therefore, the claims require: (1) a downlink signal that is at RF, (2) that RF signal is translated to base band, and (3) that translated base band signal is packetized.  It is not sufficient to packetized just any downlink base band signals.  Instead, the claim requires packetizing "the" downlink base band signals that have been translated between RF and base band in the prior "translating…" step.

Before looking to other confirming language in the claim and in the specification it is significant to note Dali's position is that there is **no** antecedent basis for the phrase "the…downlink base band signals."  Dali's expert on infringement, Dr. Bims, admits that he is interpreting the phrase at issue ("the…downlink base band signals") to have no antecedent basis in the claim and also admitted that, if antecedent basis is required, there is no other alternative for antecedent basis in the claim other than the base band signals resulting from the prior step of translating between RF and base band.  Ex. 3 at 106:21-108:22 ("Q. Is there an antecedent basis in claim 1 for the phrase 'the uplink and downlink baseband signals' in the packetizing step as a yes-or-no question. A. No.")("Q. If the Court determines that the phrase, quote, the uplink and downlink baseband signals in the packetizing steps requires an antecedent basis in the claim, what would that antecedent basis be? … A. I would imagine that the Court would, in its ruling, decide what the antecedent basis is.  Q.  Do you have any other candidate in claim 1 that you would identify as providing the antecedent basis for the phrase 'the uplink and downlink

baseband signals' in the packetizing step instead of the translating step? …A. I don't have any substitute antecedent basis in mind.") (objections omitted).

This requirement that a downlink signal be translated from RF to baseband is consistent with the claim's preamble.  The preamble introduces the claimed method as "A method for routing and switching RF signals comprising…".  Ex. 1 at 13:2-3.  Whether or not the preamble is limiting, based on the plain meaning of the preamble that is reinforced by the specification, a POSA would expect to find in the body of the claim an RF signal that eventually (perhaps after some processing steps) gets routed and switched to a remote unit where the RF signal is recovered (i.e., by performing the reversal of any processing steps).  This is exactly what we find in the claim where "the" downlink base band signal that gets packetized then routed and switched in elements E and H are recited as "the" downlink signals that were translated from RF to base band in element D.

The specification's description of the invention is also consistent with and supports the requirement in Claim 1 that a downlink signal is translated from RF to base band before that base band signal is packetized and then routed to the remote units.  In the embodiment disclosed in the "Detailed Description of the Invention," the system receives a downlink RF signal which is processed in the DAU prior to being routed to the remote units of the system.  The processing in the DAU includes digitizing the signal and translating (i.e. converting) the RF signal to digital base band.  The DAU then packetizes those digitized, translated base band signals.  The DAU then routes and switches those packetized signals to the remote units.  *See* Ex. 1 at 5:64-6:4:

> For the downlink (DL) path, RF signals received from the BTS are separately down-converted, digitized, and converted to baseband (using a Digital Down-Converter). Data streams are then I/Q mapped and framed. Specific parallel data streams are then independently serialized and translated to optical signals using pluggable SFP modules, and delivered to different RRUs over optical fiber cable.

(emphases added).  There is no description in the specification of any downlink carrier signals being received by the system for wireless transmission by the remote units that are not received as RF signals by the system.  In Figure 1, for example, the input carrier signals 107 and 108 are described as RF signals received from base stations (BTS) which are digitized and converted to base band signals prior to being routed to remote units.  Ex. 1 at Fig. 1; 5:64-6:4 ("RF signals received from the BTS")(emphasis added); 6:13-15 ("downlink input signal 107…enters DAU1…at the DAU1 RF input port.")(emphasis added).  The specification discloses no other alternative form for the downlink carrier signals to enter the system of DAUs and RRUs other than as an RF signal.

As shown in Figure 1, once the downlink RF input signal is digitized, translated to base band and packetized, the signal can be routed from DAU1 to remote units directly (e.g., to RRU1) or it can be routed to remote units indirectly through DAU2.  Ex. 1 at Fig. 1.  In the latter case, even though DAU2 receives a downlink packetized base band signal from DAU1, that packetized base band signal entered the system as an RF signal and was translated to base band by DAU1 prior to routing through DAU2.  In other words, routing base band signals that have been translated from RF to base band through multiple DAUs is not an example of a method that omits the step of translating a downlink RF signal to base band.  All the carrier signals described in the specification enter the system as RF signals and are translated to base band prior to being routed through the system to remotes or other DAUs.

That the claims require translating a downlink RF signal to base band is consistent with the Court's claim construction of "downlink signal."  The Court construed "downlink signal" to mean "signals transmitted in the downlink direction."  D.I. 122 at 1.  In its ruling, the Court found that the phrase "downlink signal" *by itself* did not require the signal to be an RF signal, but

the Court noted that claim 1 of the '338 patent already recited that the downlink signal was at times RF and was at other times at base band, e.g., it becomes base band after translation "between RF and base band." Id. at 8-9. The requirement at issue in this motion is based on the claims reciting packetizing "the" base band signals produced by the step of translating downlink signals "between RF and base band" and is not based merely on the recital of a "downlink signal."

Both the Court and Dali's own counsel at the claim construction hearing acknowledged that the <u>downlink</u> signals in the '338 patent claim are <u>initially RF signals</u> that then get translated to baseband. See Ex. 4 (Transcript of Dec. 15, 2020 Claim Construction Hearing) at 37:4-38:4 (emphases added):

> THE COURT: … So tell me what your point is.
>
> [Dali's Counsel]: My point is, if you look at where downlink signals appear at each of the patents in issue, the term, if you add radio frequency signals to downlink signals, some of the claims become completely nonsensical which is why we had to readjust our position –
>
> THE COURT: Is it that they become nonsensical or that the language is redundant? Because, for example, in the '338 Patent it specifies that the downlink signals at least initially are RF signals; right?
>
> [Dali's Counsel]: Correct. And then they go on –
>
> THE COURT: I know then they get translated into baseband signals. But it specifies that the first time downlink signals come in, they specify they're RF, right?
>
> [Dali's Counsel]: It does, yes.
>
> THE COURT: And it's your position that if you said all downlink signals are RF signals that that language saying that they're RF is redundant?
>
> [Dali's Counsel]: In that particular claim that would be redundant, but because downlink signals as we agree that downlink signals means the same thing in each and every claim, the claims will lose meaning if you have just downlink signals that are RF in all of them. So in claim 1, downlink signals are initially RF signals, then when they're converted to baseband, they're still downlink signals while baseband while traveling from the DAU to the remotes.

Both the Court and Dali's counsel here recognized that in claim 1 of the '338 patent, the downlink signals are initially RF signals which are then translated to base band before traveling downstream from the DAU to the remotes.  Dali's new infringement position contradicts what it already told the court about the scope of these claims.

In summary, the language of claim 1 in which "the" baseband signals to be packetized have antecedent basis in the signals that have been translated to baseband from RF, the preamble of the claim that recites a method for routing "RF" signals, the patent specification describing in every embodiment that the downlink RF signals get translated to baseband before packetization and routing to the remotes, the admissions of Dali's own counsel at the claim construction hearing, and even this Court's own understanding as expressed during the claim construction hearing all recognized that in claim 1 of the '338 patent a downlink signal in the DAU that is at RF gets translated to baseband before it is packetized and routed to the remote units.

8

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

Dali's infringement expert admits that if the claim requires translating a downlink RF signal to base band so that that translated signal can be packetized as recited in the claim, he provided no opinion of infringement under this interpretation.  SOF ¶3; Ex. 3 (Deposition of Dr. Bims) at 81:3-19; 76:2-77:13.  For example, Dr. Bims does not identify any downlink RF signal in the OneCell baseband controller that is translated from RF to base band and then packetized. Instead, Dr. Bims merely argues that the claims do not require translating a downlink signal from RF to base band.

**C.    The phrase "as appropriate" does not make the method step conditional, nor would such an interpretation avoid summary judgment of non-infringement.**

Dali through its expert asserts that the phrase "as appropriate" at the end of the translating step means that the entire step of translating is conditional or optional.  Dr. Bims stated that "as appropriate" means "translating between RF and base band when the signal is at RF and needs to be translated to base band in order to meet the claim limitation."  Ex. 7 at ¶108.  In his reply report Dr. Bims reiterated, "Claim1, Element D plainly requires translation 'as appropriate', suggesting that translating the translating step is optional."  Ex. 8 at ¶6.  Accordingly, Dali through its expert asserts that if the downlink signal is already at base band it meets the translating step limitation even if no translating occurs.  Ex. 7 at ¶109.  Dali's argument is flawed for multiple reasons.

First, "as appropriate" does not state any such condition.  The phrase "as appropriate" does not refer to <u>whether or not</u> translation is performed.  Dali is trying to change the phrase "as appropriate" to mean "<u>if</u> appropriate."  The phrase uses "as" not "if."  The phrase "<u>as</u> appropriate" suggests a limitation about being "to the same degree or amount" or "the way or manner" of the translating, not whether or not translating is performed at all.  *See, e.g.*, Ex. 9 (MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2003)) at 66 (**as**   "to the same degree or amount…in the way or manner that").

The specification uses "appropriate" in the context of frequency translation to refer to translating (i.e. converting) to the "appropriate RF frequency band." Ex. 1 at 6:7-9 ("Data streams are then independently converted to the analog domain and up-converted *to the appropriate RF frequency band*.") (emphasis added).  This use in the specification is an example of using "as appropriate" to refer to translating "to the same degree, amount", or the "manner of" the translation.  The ordinary meaning of "as" referring to "to the same degree or amount" would

be particularly relevant in this context because of the way a DAS operates. In a DAS, the down-conversion at one end of the DAS is designed to match the up-conversion at the other end of the DAS. That is, the down-conversion that is performed prior to transport by the DAS is eventually undone after transport by performing a matching but opposite up-conversion at the other end of the system. In this way, for example, downlink RF signals present at a DAU's input port will eventually be at the same RF frequency when it is ultimately wirelessly transmitted by the RRU output port. See, e.g., Ex. 1 at 7:5-24 ("The present invention facilitates conversion and transport of several discrete relatively narrow RF bandwidths. … Digital Up Converters located within the RRU… can be re-configured to transport from the DAU input <u>to any specific RRU output</u> any specific narrow frequency band or bands, RF carriers or RF channels <u>which are available at the respective RF input port</u> of either DAU. This capability is illustrated in FIG. 1 where only specific frequency bands or RF carriers appear at the output of a given RRU. ") (emphases added).

"Appropriate" or "as appropriate" is never used in the specification to describe the translating step as optional. There is no support in the specification for the idea that translating or converting a downlink RF signal to baseband is optional or may not be performed. None of the embodiments omit translating a downlink RF signal to baseband before routing that signal over the network.

Third, making the translating step optional would contradict and frustrate a stated aim and benefit of "the present invention" which the specification states is to convert narrow <u>RF bandwidths</u> for more efficient use of the transport fiber.

> **<u>The present invention</u>** facilitates **<u>conversion</u>** and transport **<u>of</u>** several discrete relatively narrow **<u>RF bandwidths</u>**. This approach allows conversion of only those multiple specific relatively narrow bandwidths which carry useful or specific information. This approach also allows more efficient use of the available optical fiber transport bandwidth

for neutral host applications, and allows transport of more individual operators' band segments over the optical fiber.

Ex. 1 at 7:5-12 (emphases added).

Further, Dali's new interpretation of the translating step as optional contradicts the earlier construction advanced by Dali.  During claim construction briefing, Dali argued that the phrase "translating…as appropriate" means "Down-converting RF downlink signals to baseband downlink signals and up-converting baseband uplink signals to the appropriate RF frequency band."  D.I. 67 (Joint Claim Construction Chart) at 3-4.  Dali's prior construction is significant for multiple reasons (1) it contradicts Dali's current position that the step is optional (2) it recognized that a downlink RF signal needed to be translated to base band, and (3) it recognized that "as appropriate" was being used according to its plain meaning, i.e., "to the same degree or amount" or "the way or manner" of translating by asserting "appropriate" referred translating to the appropriate "RF frequency band."  Further, Dali's prior interpretation in combination with Dali's new, dramatically different interpretation demonstrates that there is no clear answer to what is meant by "as appropriate" underscoring that the phrase "as appropriate" is indefinite since Dali itself cannot keep from advancing multiple very different meanings for the phrase.

 Finally, even if "as appropriate" somehow made the limitation conditional, the law is clear that to fall within the scope of such a claim it must be shown that a system is capable of performing the conditional step if the condition is satisfied.  *Interdigital Tech. Corp. v. Lenovo Holding Co.*, No. 19-1590-LPS, , 2021 WL 1856937, at *6 (D. Del. May 10, 2021) (holding that where the patentee uses conditional claiming based on alternative conditions, infringement requires showing that the system is "**capable of** addressing each alternative, regardless of which alternative occurs at any particular point.") (emphasis in original); *id.* citing *Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*, 609 F.3d 1364 (Fed. Cir. 2010) and *Hytera Communs.*

12

*Co. v. Motorola Sols., Inc.*, 841 Fed. App'x 210 (Fed. Cir. 2021)); *Hytera*, 841 Fed. App'x at 216 ("Like the claim at issue in *Lincoln*, the 'selecting' step in claim 7 is not met unless the TDMA system is configured to perform each claimed responsive action in response to each corresponding claimed prerequisite condition.").

In *Lincoln*, the claim recited a computerized method that included the step of periodically paying an annuity plan owner "even if" the account value is exhausted.  The Federal Circuit reversed the lower court's denial of the alleged infringer's motion for JMOL of non-infringement.  The Federal Circuit found that a showing of infringement required the patentee to establish that the computerized system would make a payment even if the account were exhausted.  *Lincoln Nat'l.*, 609 F.3d at 1369.  It was immaterial whether the condition had ever occurred.  *Id.* at 1368-69.  In other words, the conditional language of the claim required the patentee to show that the accused system was configured to perform the recited step if the condition had been satisfied.  It was not enough to show that the condition was never satisfied. *See also*, *Hytera*, 841 Fed. App'x 215-18 (following *Lincoln National* and requiring for invalidity that the art teach each step of the claim including the responsive action to each condition in a conditional step).

This means that, even under Dali's flawed reading of the translating step as a "conditional" step, Dali must show that when the baseband controller is presented with an RF downlink signal, the OneCell system is capable of and configured to translate that RF downlink signal to baseband for subsequent packetization and routing to remote units.  It is not enough for infringement merely to show that the condition is not satisfied when OneCell is actually deployed and, therefore, unnecessary.  Dali must show that the system is capable of performing the conditional step when the condition is satisfied.  Specifically, Dali must show that when a

downlink RF signal is input to the OneCell system, OneCell's baseband controller is configured to translate that RF signal to base band.  There is no such evidence.  Dali and its expert have not identified any evidence that when presented with an RF downlink signal, the OneCell baseband controller is capable of translating that RF signal to baseband.  ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████.

## II.    CommScope does not practice the "routing and switching" step

The Court should grant summary judgment that CommScope does not practice the routing and switching step.  Here is the full step with the relevant parts highlighted: "routing and *switching the packetized signals* among the one or more remote radio units *via the at least one digital access unit* according to a result of the reconfiguring."  First, antecedent basis for "the packetized signals" requires performing the routing and switching step for two types of signals (uplink and downlink), which CommScope does not do.  Second, the claim requires the switching be done "via" the digital access unit, which CommScope does not do.  Third, Dali's doctrine of equivalents theory is either moot or fails as a matter of law.  Finally, if the Court denies summary judgment, the Court should still strike Dali's expert testimony because Dali's expert relies on incorrect claim constructions.

### A.    The antecedent basis requirement in this step

The parties have a dispositive legal dispute about whether this step refers to (a) uplink and downlink signals (CommScope's position) or (b) only downlink signals (Dali's position).  This is dispositive because it is undisputed the accused product does not perform any routing and switching for uplink signals.  SOF ¶5.

First, the antecedent basis in the step refers to both uplink and downlink signals. Importantly, the parties agree the "routing and switching" step has its antecedent basis in the prior packetizing step. SOF ¶4. Here are the two steps showing the antecedent basis:

> **packetizing** the uplink **and** downlink base band signals, wherein the packetized signals correspond to a plurality of carriers;
>
> configuring …
>
> reconfiguring…
>
> **routing and switching the packetized signals** among the one or more remote radio units via the at least one digital access unit according to a result of the reconfiguring.

Ex. 1 at Claim 1. The packetizing specifies "uplink *and* downlink baseband signals." Thus, by antecedent basis, the phrase "routing and switching the packetized signals" means "routing and switching [the uplink *and* downlink baseband signals]." Thus, the plain language of the claim requires routing and switching uplink and downlink signals.

This is consistent with the specification and prosecution history. The specification teaches routing and switching for both uplink and downlink signals. Ex. 1 at Fig. 1 ("…downlink example"); Fig. 2 ("…uplink example"). During prosecution, Dali distinguished prior art that "only supports downlink traffic," i.e., did not support uplink and downlink signals. Ex. 2 at DCS2-00000200.

Second, Dali's alternative position is entirely arbitrary. Dali's expert opined that this step refers to "only packetized downlink signals." Ex. 8 ¶21 ("A POSA would understand that this claim limitation is referring to routing and switching *only packetized downlink signals* in the downlink direction, not the uplink direction.") (emphasis added). The claims do not say "only" packetized downlink signals, and there is no principled reason in the plain language of the claim to conclude the routing and switching step only applies to downlink signals. The Federal Circuit has repeatedly recognized that "and" states a conjunctive requirement in the claim. *Motorola Mobility LLC v. Int'l Trade Comm'n*, 553 F. App'x 971, 975 (Fed. Cir. 2014) ("[T]he claim uses

the term 'and' and not 'or' . . . thereby indicating a conjunctive requirement within the claim."); *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376 (Fed. Cir. 2008) ("The claim uses the conjunction 'and,' indicating that the dial tone actuating switch must be electronically connected to the phone line *and* it must be electronically connected to the circuit board.") (emphasis in original).

████████████████████████████████████████

████████████████████████████████████████ Dali's expert unequivocally conceded he offered no opinion the accused product performs the routing and switching step for uplink signals.

> Q. So just to be clear, you're not offering an opinion that the OneCell system performs routing and switching for uplink packetized signals via the alleged DAU, correct?
>
> A. With regards to the uplink direction, I have not offered an opinion about the accused products switching -- routing and switching in the uplink direction.

SOF ¶5; Ex. 3 at 218:11-219:4.

### B.    The "via the at least one digital access unit" requirement

The parties have a second, separate dispositive legal dispute about the "via the at least one digital access unit" requirement in this step.  The routing and switching step specifies that two functions (routing and switching) are performed "via the at least one digital access unit":

> **routing and switching** the packetized signals among the one or more remote radio units **via the at least one digital access unit** according to a result of the reconfiguring.

The Court deferred construing this requirement until the parties provided more context at summary judgment.  D.I. 122 at 10.

The issue has narrowed to: Does the proper construction of routing and switching "via the at least one digital access unit" require *at least some* of the switching be performed by the digital

access unit?  The answer is yes, and the Court should grant summary judgment because the accused digital access unit does not perform any switching.

### 1.    Relevant context

The '338 patent and CommScope's product uses different techniques for the via requirement.  The '338 patent teaches using two types of units: (a) digital access units (DAUs) and (b) remote radio units (RRUs).  *See* Ex. 1 at Figs. 1-2.  Claim 1 recites these two types of units.  Ex. 1 at Claim 1("providing one or more remote radio units. . . providing at least one digital access unit").  The specification teaches the digital access unit switches the signals among the remote radio units.  It teaches that the composite downlink input signals (107, 108) "enters" the DAUs and then these signals are "switched to the desired RRU."  *See* Ex. 1 at 6:13-18, 8:24-32.  Figure 1 shows, for example, that signal 108 enters DAU2 and then DAU2 has two different outputs (green and red):



Figure 1:    Flexible Simulcast Downlink Example

17

Ex. 1 at Fig. 1.  The numbered boxes (1,2, 3, 4) represent the carrier signals within the composite signal 108 that are routed and switched throughout the system.  Using these different outputs, the DAU can switch (i.e., change) how it outputs the packetized signals.  Compare the below figures where the DAU (a) routes the signal (carrier 6) to RRU1 and (b) then *switches* and routes the signal (carrier 6) to RRU3.



Ex. 1 at Fig. 1 (annotated).  Dali's literature touts that its patented technology is superior because it has a "simplified" architecture composed of only hosts (meaning DAUs) and remotes, not other network equipment such as network switches.  Ex. 60 at 1; Ex. 61 at DCS2-00001220.  The '338 patent *criticizes* prior systems that used network switches (not DAUs):

> The second type of DAS is equipped with a type of *network switch* which allows the location and quantity of DAS remote units associated with any particular centralized base station to be changed manually. Although this approach would seem to allow dynamic reconfiguration based on the needs of the enterprise or based on time of day, it frequently requires deployment of additional staff resources for real-time management of the network.

Ex. 1 at 2:11-18 (emphasis added).

In contrast, CommScope uses other network switches. These other network switches perform the switching of the signals among the radio points:



Ex. 6 at COMMDALIDEL-00013036. This is not Dali's "simplified" architecture having only DAUs and remote units. The gray boxes are additional network switches. "Ethernet" is the type of switch. Dali's expert testified a POSA would recognize the "network switch" being criticized in the '338 patent included Ethernet switches, i.e., the precise type of switch used by the OneCell system. Ex. 3 at 197:20-25. In this way, CommScope's product employs an alternative technique where the switching is done "via" the network switches, not "via" the digital access unit as recited in the claim. Note that it is impossible for the accused digital access unit (the baseband controller) to switch the signals among the remotes as it only has one output:



Ex. 6 at COMMDALIDEL-00013036; SOF ¶8.

### 2.   The proper construction of the "via" requirement

The parties proposed the following constructions for the "via" requirement at Markman.

CommScope has updated its construction to focus on the narrowed dispute about "switching":

| CommScope | Dali's rebuttal construction |
|---|---|
| The at least one digital access unit performs ~~the recited step of routing and~~ switching | routing and switching … [through the agency of/by means of] the at least one digital access unit." |

D.I. 104 at 35 (orginial construction), 38 (Dali rebuttal construction).

To be clear, CommScope is not contending *all* the routing and switching must be performed by the one digital access unit.  CommScope's construction does not say "all."  CommScope's point – and the critical point for the Court to resolve – is that the digital access unit must perform *at least some* of the switching.  The "at least one digital access unit" language

in CommScope's construction (which matches the claim language) allows for where (a) the DAU performs switching and (b) another device performs further switching. If further clarity is needed, CommScope suggests adding "at least some of the" to CommScope's construction, i.e., "The at least one digital access unit performs at least some of the switching."

As a threshold matter, Dali's rebuttal construction is unhelpful because it does not resolve the issue of whether the claim requires the DAU perform at least some switching. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (explaining the need to resolve disputes about claim scope). The parties do not agree how to interpret "through the agency of/by means of."

The intrinsic record supports CommScope's constructions. First, the specification teaches the digital access unit performs switching. As noted above, the specification teaches that the composite downlink input signals (107, 108) "enters" the DAUs and then these signals are "switched to the desired RRU." See Ex. 1 at 6:13-18, 8:24-32. The DAU switches (i.e., changes) how it outputs the packetized signals:



Ex. 1 at Fig. 1 (annotated).  This is a consistent teaching in the specification.  Every other figure

teaches the DAU has multiple outputs so it can switch the signals among the radio points.  *See*

Ex. 1 at Figs 2-6.  Figure 3, for example, shows three outputs for switching:



Ex. 1 at Fig. 3.

Second, the plain language of the claim suggests the digital access unit performs the

switching.  Claim 1 is a method claim.  The concept of "performing" the step is inherent in

method claims because method claims require performing the steps.  *Mirror Worlds, LLC v.*

*Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) ("To infringe a method claim, all steps of the

claimed method must be performed.").  The plain meaning of "via" signals that the digital access

unit is performing the recited action of switching.  To explain, the parties agree that the ordinary

meaning of "via" refers to "agency."  Dali's rebuttal construction listed above expressly refers to

agency. See also Ex. 9 at 1310 (definition of "via": "2. Through the medium or agency of"). Agency refers to the capacity to perform the action. Ex. 9 at 22. Thus, "switching . . . via the at least one digital access unit" refers to the capacity of the DAU to perform the switching, which is CommScope's point.

Third, the prosecution history shows Dali is not entitled to a broader scope where none of the switching is performed by the digital access unit. Dali's orginial claim did not contain the "via" limitation. It simply said:

> routing and switching the packetized signals among the one or more radio units and the at least one digital access units.

Ex. 2 at DCS2-00000028. This broader language covered where none of the switching was performed by the DAU. But Dali surrendered the broader scope when it amended the claim to add the "via" requirement:

> routing and switching the packetized signals among the one or more remote radio units [[and]] via the at least one digital access units unit according to a result of the reconfiguring.

Ex. 2 at DCS2-00000196. CommScope's proposed construction gives meaning to this amendment.

Finally, it would defeat the public notice function to interpret the "via" so broadly to cover where none of the switching is performed by the DAU and all the switching is performed by network switches. By criticizing network switches in the specification and narrowing the claim to require switching "via" the digital access unit, the reasonable inference is that the claim does *not* cover switching via other devices like network switches. The effect of interpreting the claim to cover where none of the switching is performed by the DAU and all the switching is performed by network switches would read "via" out of the claim.

23

████████████████████████████████████████████████████████████

████████████████████████    Dali contends CommScope's baseband controller is the claimed "digital access unit." SOF ¶6.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████    t.  SOF ¶7-8.  Dali's expert did not dispute CommScope's network switches perform the switching.  *See* Ex. 8 ¶¶14-27 (never disputing this).  By contrast, it is impossible for the accused digital access unit (the baseband controller) to perform the switching as it only has one output:



SOF ¶8; Acampora Decl. Tab C ¶127.  Switching requires multiple options (here outputs) to enable the device to change between the options.  Ex. 27 at 564 (Dictionary of Electrical and Computer Engineering) (explaining a switch involves "several alternative states"); Ex. 30 at 549

24

(Dictionary of Electronics) (explaining a switch selects from "two or more components"); Ex. 32 at 762 (Electronics Engineering Dictionary) (explaining switch refers to "change from one possibility. . .. to another"). Dali's expert did not dispute CommScope's baseband controller only has one output. *See* Ex. 8 ¶¶14-27 (never disputing this).

Second, Dali's expert did not identify any switching performed by digital access unit. Instead, he offered the bizarre opinion that the claim does not actually require any switching. He opined that the phrase "routing *and* switching" does not actually state two functions and merely means transporting packets from a source node to destination node through a network." Ex. 7 ¶151. The claim explicitly recites two functions ("routing and switching"). Further, the specification never says "routing and switching…" means "transporting…." Neither routing nor switching mean transporting. Acampora Decl. Tab C ¶113. The ordinary meaning of switching, for example, refers to *changing* (not transporting). *Id.* ¶117 (collecting dictionary definitions).[2] Dali's expert entirely omitted this concept of changing and read "switching" out of the claim.

### 3.    Dali's DOE theory is either moot or fails as a matter of law

Dali has no DOE argument in response to CommScope's first argument that the accused product does not perform the "routing and switching" step for uplink signal. SOF ¶9. Thus, DOE is moot if the Court agreed with CommScope on this issue.

Dali does have a DOE argument in response to CommScope's second argument about the "via" requirement. Dali contends CommScope's use of a separate Ethernet switch infringes

---

[2] Ex. 26 at 887 (defining switch: "to *change* suddenly or completely from one thing to another, or to exchange on person or thing with another."); Ex. 29 at 1758 (defining switch: "v. [with obj.] **1** *change* the position, direction, or focus of"); Ex. 32 at 762 (defining switching: "The opening, closing, connecting, disconnecting, making, or breaking of circuits, or the *changing of paths*, routes, settings, modes of operation, levels, or the like. Said especially when performed utilizing a switch.") (emphasis added all).

under the doctrine of equivalents (DOE). Ex. 8 ¶22. Dali's DOE theory, however, fails as a matter of law.

First, as a matter of law, Dali surrendered equivalents by narrowing the claim during prosecution. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003) ("[W]hether the presumption of surrender has arisen and whether it has been rebutted are questions of law for the court, not a jury, to decide.") CommScope is entitled to a presumption that Dali surrendered equivalents because Dali narrowed the claim during prosecution by adding the limitation "via" the DAU. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740 (2002) ("A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer. . . "). The orginial routing and switching step was broader and had no "via" limitation.

> routing and switching the packetized signals among the one or more radio units and the at least one digital access units.

Ex. 2 at DCS2-00000028; SOF ¶10. To overcome a prior art rejection, Dali narrowed the claim by adding the "via" requirement (and several other requirements):

> routing and switching the packetized signals among the one or more remote radio units [[and]] via the at least one digital access units unit according to a result of the reconfiguring.

Ex. 2 at DCS2-00000196; SOF ¶10. Thus, the presumption applies.

Dali's expert opinion does not rebut this presumption. To rebut the presumption, Dali bears the burden show (1) the equivalent was "unforeseeable," (2) the rationale underlying the amendment was "tangential" to the equivalent, or (3) there is "some other reason" showing the patentee could reasonably have been expected to have described the equivalent. Dali's expert submitted no evidence of (1) or (3). Dali's expert vaguely argues for the "tangential" exception.

This exception is "very narrow." *Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1358 (Fed. Cir. 2013). The tangential relation inquiry focuses on the patentee's "objectively apparent reason for the narrowing amendment," which requires the reason be "discernible from the prosecution history record." *Id.* Dali's expert opines that the claim amendment was "merely cosmetic" and made to "clarify and recite inherent features of the invention that were already required by the claim scope prior to the amendment." Ex. 8 ¶25. Dali's "cosmetic" theory, however, is not discernable from the prosecution history record. Dali's remarks accompany the claim amendment do not say the "via" requirement was cosmetic or inherent. Ex. 2 at DCS2-00000199-201. Thus, Dali's expert opinion fails.

Second, as a matter of law, the disclosure-dedication rule bars Dali from asserting the doctrine of equivalents to cover other external switches. *See Toro Co. v. White Consol. Indus.*, 383 F.3d 1326, 1331 (Fed. Cir. 2004) ("[W]e hold that the disclosure-dedication rule likewise presents a question of law"). Under the disclosure-dedication rule, a patentee cannot assert equivalents over subject matter it disclosed, but did not claim. *PSC Comput. Prods., Inc. v. Foxconn Int'l*, 355 F.3d 1353, 1355-56 (Fed. Cir. 2004). Dali's patent disclosed (and then criticized) systems with network switches:

> The second type of DAS is equipped with a type *of network switch* which allows the location and quantity of DAS remote units associated with any particular centralized base station to be changed manually.

Ex. 1 at 2:11-18 (emphasis added); SOF ¶11. Dali's expert testified that this "network switch" would include "an Ethernet switch that is used from communication between the DAU and RRU." Ex. 3 at 197:20-25; SOF ¶11. Having disclosed but not claimed network switches, Dali cannot now recapture them under DOE.

**C.    If the Court denies summary judgment, the Court should still strike Dali's expert testimony for the routing and switching step**

If the Court denies summary judgment, the Court should strike Dali's expert testimony for the routing and switching step because Dali's expert relies on untimely (and incorrect) claim construction arguments. *Intuitive Surgical, Inc. v. Auris Health, Inc.*, No. 18-1359-MN, 2021 WL 3033396, at \*4 (D. Del. July 19, 2021) ("Thus, Dr. Hooper's opinion that the Monarch does not have an 'end effector mounting formation' based on it not having an articulating wrist for mounting end effectors is stricken and excluded because it relies on belated claim construction arguments.")  Dali's expert explicitly relies on two claim constructions: (1) the routing and switching step only applies to downlink signals and (2) that "routing and switching" does not require two functions and merely refers to "transporting."  Ex. 7 ¶151, Ex. 8 ¶21.  Dali never disclosed these constructions at Markman or its infringement contentions.  See D.I. 67; Ex. 20 at 36-38.

## III.    The Court should grant summary judgment of no willful infringement

This District has emphasized: "[w]illfulness necessarily involves knowledge of the patent ***and*** of infringement." *Degussa v. Materia, Inc.*, 305 F. Supp. 3d 563, 577 (D. Del. 2018) (emphasis in original).  The Court should grant summary judgment for two reasons.

First, Dali's willfulness theory fails to identify any factual support showing CommScope had any knowledge of infringement.  Dali's theory merely identifies facts showing CommScope had pre-suit knowledge of the patent.  That is insufficient as a matter of law.  *Intuitive Surgical, Inc. v. Auris Health, Inc.*, No. 18-1359-MN, 2021 WL 3033396, at \*11 (D. Del. July 19, 2021) ("Intuitive has only presented evidence showing Auris's pre-suit knowledge of the asserted patents, which is legally insufficient to show willful infringement."); *Bayer HealthCare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021) (affirming JMOL of no willfulness: "Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness.").

28

Second, the case record refutes post-suit willfulness and renders Dali's claim of pre-suit willfulness implausible. Dali confirmed on the record during claim construction that the proper claim construction does require translating a downlink RF signal to base band, which is CommScope's non-infringement position. *See* D.I. 67 at 3-4. It cannot be said that CommScope was deliberately infringing during this case when Dali itself agreed to a non-infringing understanding of the claim. Dali's expert has belatedly changed to a new claim construction, but Dali cannot retroactively impute knowledge of this new theory to CommScope for willfulness.

### A. Dali's willfulness theory fails to allege any facts showing CommScope had any knowledge of infringement

Dali disclosed its factual support for willfulness in response to CommScope's Interrogatory 10. SOF ¶12. ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

None of these interactions show CommScope had knowledge the OneCell product allegedly infringed the '338 patent. In none of these interactions did the parties raise or discuss any alleged infringement of the '338 patent. SOF ¶13. In none of these interactions did the parties raise or discuss the OneCell product. SOF ¶14. Dali never took any steps prior to this lawsuit to notify CommScope of the alleged infringement of the '338 patent. SOF ¶15.

███████████████████████████████████████

███████e, the '338 patent did not exist, CommScope did not own the OneCell product, and Dali did not discuss any of its patents. Ex. 10 at 184:4-9. ███████████████████

███████████████████████████████ Ex. 10 at 182:6-15, 183:15-17.



The 2017 prior litigation is irrelevant.  The prior litigation did not involve the OneCell product or the '338 patent.  SOF ¶17.  It involved different patents and different accused products (CommScope's ION-E / Era product).  *Id.*

### B.  Dali's un-supported argument fails

Dali's interrogatory answer also includes the following unsupported argument about willfulness.

> U.S. Patent No. 8,682,338 predates and is in the same patent family as the '473 patent.  Indeed, the '473 patent terminally disclaims to the '338 patent and the '338 patent terminally disclaims to U.S. Patent 8,737,300. Through the previous litigation between the parties, and through CommScope's monitoring of Dali's patent portfolio, CommScope had notice of the '338 patent or was deliberately and willfully blind to its existence. Similarly, given CommScope's intimate

familiarity with the '473 patent family, including the '338 patent, and the similarities in the manner in which the ION-E/Era and the OneCell operate, specifically with regard to routing and switching signals in a remote antennae system, CommScope was on notice that the OneCell infringed the '338 patent or was deliberately and willfully blind to such infringement.

Ex. 21 at 10.  The first sentence argues CommScope had knowledge of the patent, which is insufficient as a matter of law.  The second sentence argues CommScope was "on notice" that the OneCell infringed the '338 patent because it operates similarly to CommScope's ION-E / Era product.  No reasonable juror could accept this.

First, Dali's "on notice" argument would only make sense if Dali had accused the ION-E / Era of infringing the '338 patent.  Dali has never done this.  SOF ¶19.  Thus, there is no notice. No reasonable juror could conclude CommScope knew it infringed the '338 patent because CommScope sells a product that is similar to a product Dali does *not* contend infringes the '338 patent.  Similarity to a product *not* accused of infringement of the '338 patent suggests there is *not* infringement.

Second, no reasonable juror could accept this "similarity" argument without factual support showing the similarity.  But Dali's answer identifies no factual support, and Dali's expert has provided no opinion about this alleged similarity.  SOF ¶20; Ex. 21 at 10 (failing to identify any factual support); Exs. 7-8 (failing to offer any expert opinion about any similarity).

### C.    The case record refutes willfulness

Dali undeniably confirmed on the record during claim construction that the proper claim construction does require translating a downlink RF signal to base band, which is CommScope's non-infringement position as explained *supra* in the non-infringement section.  D.I. 67 at 3-4. First, Dali stated the proper construction of the translating step was the following in the joint claim construction chart that Dali filed with the Court: "Down-converting *RF downlink signals to baseband downlink signals* and up-converting baseband uplink signals to the appropriate RF

frequency band." SOF ¶22; D.I. 67 at 3-4. This is a clear construction, and it clearly does not say the translating step is optional. Second, as quoted in first section of the brief, Dali repeatedly stated during the claim construction hearing that claim requires translating an RF downlink signal. *Supra* at 7; SOF ¶22. Dali never told CommScope any of these statements were errors. SOF ¶20

Regarding post-suit willfulness, it cannot be said that CommScope was deliberately infringing during this case when Dali itself agreed to a non-infringing understanding of the claim. It is oxymoronic. Willfulness requires knowledge of infringement. Dali's expert has now belatedly changed to a new claim construction, but Dali cannot retroactively impute knowledge of this new theory to CommScope. CommScope is aware of no case allowing that.

Regarding pre-suit willfulness, Dali has not identified any facts suggesting Dali ever notified CommScope before this case (or CommScope somehow anticipated) of Dali's theory that CommScope infringes because the translating step is optional. SOF ¶23; Ex. 21 at 8-10 (not mentioning any such facts). In this way, Dali has not identified any facts showing knowledge of infringement, which is a required element of willfulness.

## IV.    Claims 1-3 are Invalid

### A.    Dali's interpretation of "as appropriate" renders the claims indefinite.

CommScope's position is that no construction of the claim language "as appropriate" is needed to grant summary judgment of non-infringement as explained above because the term "as appropriate" cannot be construed to eliminate the requirement that the system is configured to be at least *capable* of translating a downlink RF signal to base band prior to packetizing it and routing that downlink signal to the remote units. If, however, the Court finds it necessary to construe the "translating … as appropriate," step, CommScope would construe the phrase as originally proposed by Dali to mean "down-converting RF downlink signals to baseband

32

downlink signals and up-converting baseband uplink signals *to the appropriate RF frequency band.*" (emphasis added).  D.I. 67 at 3-4; see also, e.g., Ex. 1 at 6:7-9 ("Data streams are then independently converted to the analog domain and up-converted *to the appropriate RF frequency band*.") (emphasis added).

CommScope opposes Dali's new claim construction of "as appropriate" to mean the entire step is optional, because such a construction is not supported by the specification and more fundamentally renders the claim indefinite.

A patent is invalid for indefiniteness if its claims, viewed in light of the specification and prosecution history, fails to inform those skilled in the art about the scope of the invention with reasonable certainty.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims.  *Id.* at 911 (emphasis in original).  The definiteness requirement mandates clarity, while recognizing that absolute precision is unattainable.  *Id.* at 910.  In addition, when there is an irreconcilable contradiction within a patent, then the claims subject to this contradiction are indefinite. *See Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002).  Where a patentee's proposed construction to resolve an ambiguous term contradicts the plain meaning of the actual claim language, the claim is indefinite.  *Network Appliance Inc. v. Sun Microsystems Inc.*, No. C-07-06053 EDL, 2008 U.S. Dist. LEXIS 76713, at *117-21 (N.D. Cal. Sept. 10, 2008).

Dali's interpretation contradicts the specification.  There is no description in the specification that the translating step is optional.  On the contrary, the specification asserts that "the present invention" relies on converting narrow "RF" bandwidths for transport and identifies benefits that follow from using this technique.  Ex. 1 at 7:5-24.  There is no embodiment in the specification where the step of translating a downlink signal from RF to base band is not

33

performed.  In the disclosed system and method, all downlink carrier signals that are packetized, routed and switched to the remote units entered the system at one of the DAUs *as RF signals* and were translated from RF to base band by one of the DAUs before distribution to the remote units. See, e.g., Ex. 1 at 5:64-6:9; 7:5-6 ("The present invention facilitates conversion and transport of … narrow RF bandwidths"); 7:18-22 ("transport…RF carriers or RF channels which are available at the respective <u>RF input port</u> of the DAUs")(emphasis added).  There is no disclosure that the translating step is optional, and there is no disclosure of an example embodiment which omits the translating step.  Dali's construction, therefore, contradicts the specification.

An even more fundamental flaw is that Dali's reinterpretation of the claim limitation to be "optional" contradicts the plain meaning of the claim language that expressly recites translating a downlink signal between RF and baseband.  Under Dali's theory, no translation of a downlink RF signal to base band is required at all.  Dali's interpretation is tantamount to erasing the limitation from the claim.  In other words, Dali's interpretation is in direct contradiction to the claim language's plain meaning which plainly calls for translating a downlink signal between RF and baseband.  By advancing an interpretation of "as appropriate" that contradicts the plain meaning of the claims, Dali is necessarily asserting that the claims must be held indefinite.  No person of skill in the art could determine with reasonable certainty the scope of a claim that recites a step but then includes other language that purportedly eliminates that very same step. This is an irreconcilable contradiction.  Dali's interpretation amounts to asserting that there is no step of translating a downlink RF signal to base band, which directly contradicts the plain language of the translating step.  Under these circumstances the claim is indefinite.  *Allen Eng'g*, 299 F.3d at 1349; *Network Appliance*, 2008 U.S. Dist. LEXIS 76713, at*117-21.

**B.      Dali derived the invention.**

An applicant is not entitled to a patent if he did not himself invent the subject matter sought to be patented, but only derived that invention from some other source.  35 USC §102(f). (pre-AIA).

The asserted claims of the '338 patent are also invalid because Dali's named inventors derived the invention from others. ███████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████  ███████████████████████████████████████

_____

█████████████████████████████████████████████████████████████████████████████████████████████████████████████.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

**Interrogatory No. 21**

If you deny that the named inventors of the '338 patent derived the invention claimed in the asserted claims of the '338 patent (see CommScope's final invalidity contentions), state the complete basis for your denial, including without limitation: identifying the aspects of the alleged invention you contend are not disclosed by the ███████ ████████████████████████████████████████████ and explaining Dali's factual support that it independently conceived of the alleged invention without reference to those ███████████████████████████████.

Ex. 17. On April 9, 2021 Dali answered this interrogatory as follows:

...████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

███████████████████████████. Dali later supplemented its response. Ex. 18 at 10-13.

████████████████████████████████████████████

████████████████████████████████████████

───────────────────────

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

"

Summary judgment of invalidity should be granted.  Dali's ███████████████

████████████████████████  Note that Dali's answer is an admission by its own

terms, "Dali readily <u>admits</u>…".  A party's answers to interrogatories can give rise to summary

judgment.  *See, e.g.*, *TQ Delta, LLC v. Adtran, Inc.*, No.1:14-cv-00954-RGA, 2018 WL 2298342,

at *5-7 (D. Del. May 18, 2018) (Plaintiff's response to contention interrogatory justified

summary judgment).  Not only does the interrogatory admit derivation, but the answer also fails

to identify any aspects of the claimed invention that are not taught by the ██████████████

*See also* Acapora Decl., Tab A at ¶¶384-386 (identifying where the elements of the asserted

claims were disclosed in the ██████████████

Dali's later-added excuse regarding its alleged use of a "conversational English" meaning

for "derived" is insufficient to avoid summary judgment.  Courts have rejected a party's after-

the-fact attempts to redefine a question's terms to avoid summary judgment, where the party

knew or should have known the meaning of the term at the time the question was asked.  *Kenexa*

*Brassring, Inc. v. Taleo Corp.*, 751 F. Supp. 2d 735, 747 (D. Del. 2010).  No reasonable juror

could believe the term "derived" was being used in any other way than its legal meaning relating

to a patent's validity.  The question was not posed in a conversation.  The question was posed in

a written interrogatory in a legal proceeding where the validity of the patent was at issue, and the interrogatory specifically referred to CommScope's <u>invalidity</u> contentions. Dali either knew or should have known that "derived" was being used in the context of evaluating the patent's validity. No reasonable juror could rely on or credit Dali's belated, flimsy excuse for making the admission.

Moreover, there is no meaning for "derived" as that word is defined and commonly used in "conversational English" that is different from its legal meaning. The word means to obtain from a source. See, for example, Ex. 25 at 93 (*derive*: "obtain from a source or parent," "come from a certain source."); Ex. 24 at 190 (*derive*: "obtain something from something else"); Ex. 9 at 311 (*derive*: "to take, receive, or obtain esp. from a specified source").

No reasonable juror could fail to find that ███████████████████████ ███████████████████████ that its inventors obtained and used as a reference during the project that formed the foundation of the '338 patent. Summary judgment of invalidity should be granted.

## V.    The Opinion of Dali's Damages Expert Must Be Excluded Because it is at Odds with Dali's Infringement Allegations, Unreliable, and Unsupported by Facts

Dali has proffered the opinion of James Donohue in support of its alleged damages in this case. Donohue's opinion is at odds with Dali's own infringement position, applies an unsound methodology, and is based on factors that have no bearing on the hypothetical negotiation in this case. The Court must exclude it.

### A.    Law

Dali bears the burden of proving by a preponderance of the evidence that Donohue's opinions are reliable. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). It is the Court's duty to act as a "gatekeeper" and exclude expert testimony that is irrelevant or

unreliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); Fed. R. Civ. P. 702. "[G]iven the great financial incentive parties have to exploit the inherent imprecision in patent valuation, courts must be proactive to ensure that the testimony presented—using whatever methodology—is sufficiently reliable to support a damages award." *Commonwealth Sci. & Indust. Research Organisation v. Cisco Sys., Inc.* (*CSIRO*), 809 F.3d 1295, 1301 (Fed. Cir. 2015). A "critical prerequisite is that the underlying methodology be sound." *VirnetX, Inc. v. Cisco Sys., Inc.,* 767 F.3d 1308, 1328 (Fed. Cir. 2014).

Patent infringement damages "must reflect the value attributable to the infringing features of the product, and no more." *CSIRO,* 809 F.3d at 1301. The Federal Circuit has "consistently explained that proof of damages must be carefully tied to the claimed invention itself." *Apple Inc. v. Motorola, Inc.,* 757 F.3d 1286, 1324 (Fed. Cir. 2014); *see also VirnetX,* 767 F.3d at 1327; *Uniloc USA, Inc. v. Microsoft Corp*., 632 F.3d 1292, 1317 (Fed. Cir. 2011). "[T]he essential requirement for reliability under *Daubert* is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *CSIRO,* 809 F.3d at 1301. Although a damages analysis is predicated on the assumption that the asserted patent is valid and infringed, the measure of damages "must reflect the value attributable to the infringing features of the product, and no more." *Id.*

**B.    Background**

**1.    One Cell, Smart Reuse/Cell Virtualization, and the Accused Functionality**

There is no question that the '338 patent does not cover One Cell or even the Smart Reuse/Cell Virtualization[4] feature of One Cell. At most, Dali has claimed a way to schedule the

---

[4] Smart Reuse and Cell Virtualization are interchangeable terms. (Ex. 35 (Deposition of James Donohue ["Donohue Dep."])), at 114:16-25.) According to Dr. Bims, Smart Reuse is a

allocation of resource blocks in a frequency reuse system.  Dali's infringement expert, Dr. Harry

Bims, testified that "the accused functionality of OneCell is *an excerpt of* the totality of the

Smart Reuse function in the source code."  (Ex. 3 (Deposition of Dr. Harry Bims ["Bims

Dep."]), at 191:14-193:24 (emphasis added).) ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████  ██████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

         ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████ )
<sup>5</sup> Dali and Dr. Bims are correct to recognize the narrow scope of the claimed invention.  As
originally filed, independent claim 1 did not recite determining a load percentage, and that claim
was rejected by the Examiner. (Acampora Decl., Tab A (Invalidity Report), at 224-26;
Acampora Decl., Tab C (Non-Infringement Report) at 25.)  Dr. Bims explained in his expert
report that "[d]uring prosecution, the examiner allowed the '338 patent claims for at least
including []reconfiguring each remote radio unit by: determining a load percentage for each
remote radio unit" and "increasing or decreasing the number of carriers based on the load
percentage."  (Ex. 7 (Bims Infringement Report), ¶ 52.)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████

**2.      Donohue's Damages Opinion**

In sharp departure from Dr. Bims, Donohue bases his damages opinion on the premise

that "the patented technology is the ████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

Donohue's royalty bases under his two theories overlap, in that they include both projected and

actual sales for the same period.  Donohue's total through 2021 is ██████████ (Ex. 33

(Donohue Opening Report), ¶ 7.) ███████████████████████████████████

██████

█████████████████████████████████████████████████████████████

██████████████████████████████ (*Id.* ¶ 108, Ex. 8A at row 5.)  After adjusting for

internal rate of return and net present value, Donohue calculates this ████████████████

████████ (*Id.* ¶ 108.)  According to Donohue, this part of the royalty represents

"hypothetical royalty payments that would be saved by owning the patented technology rather

than licensing it."  (*Id.* ¶ 105.)



Donohue's cost savings methodology is based on his comparison of projected One Cell

profits vs. the profit of competing small cell products that do not use what he deems to be the

"patented technology."  (*Id.* ¶ 95.) ██████████████████████████████████

████████████████████ (Ex. 33 (Donohue Opening Report), ¶ 102; Ex. 35 (Donohue Dep),

at. 92:10-21.)  This is despite Donohue's admission that the majority of One Cell's advantages

over its small cell competitors are not actually due to the '338 patent.  In his report, Donohue

lists advantages of One Cell over other small cell systems, including its "super cell" that has no

borders and less interference, simplified planning, dynamic capacity, frequency reuse and ability

to be upgraded.  (Ex. 34 (Donohue Reply Report), ¶ 30; *see also id.* ¶ 32.)  With respect to no

borders and less interference, Donohue testified, "I'm not suggesting in any way that the One

Cell with no borders infringes the [] '338 patent."  (Ex. 35 (Donohue Dep.), at 171:1-12.)  As to

simplified planning, he admitted that benefit is an attribute of small cell products generally that

does not relate to the '338 patent.  (*Id.* at 167:18-22.)  When asked about the relationship of

dynamic capacity to the '338 patent, Donohue said it would depend on context.  (*Id.* at 171:13-

24.)  And he admitted that "upgrades" can mean a lot of things and that the marketing of One

Cell's ability to be upgraded had nothing to do with Smart Reuse.  (*Id*. at 174:13-23.)  Donohue

also highlighted a CommScope document listing "One Cell Cost Advantages versus Small

Cells."  (Ex. 33 (Donohue Opening Report), ¶ 32, Fig. 8.)  He testified that he did not know

whether any of those advantages were covered by the '338 patent.  (Ex. 35 (Donohue Dep.), at

177:5-179:2.)  Donohue acknowledges that "the system has other inputs that contribute to

OneCell's success," including its single-cell architecture and ability to support multiple operators

on one system, ██████████████████████████████████████.  (Ex. 33 (Donohue Opening

Report), ¶¶ 154-156.)

     Donohue uses an Airvana document comparing OneCell to a competitive product ████

████████████████████████████.  (*Id.* ¶ 33, Fig. 9.) ██████████████████████████

████████████████████████████  (Ex. 20 (Third Amended Final Infringement

Contentions), Ex. A.)  ██████████████████████████████████████

43

████████████████████████████████████████████████████████. (*Id.*; Ex. 47 (Defendants' Objections and Second Supp. Responses to Plaintiff's Second Set of Interrogatories), at 4; Ex. 46 (Deposition of Matt Melester), 87:17-88:10, 90:17-91:4, 92:17-93:3.)  The cited Airvana document states that One Cell delivers the customer more than ████████ ██████████████████████████████████████. (Ex. 33 (Donohue Opening Report), ¶ 33, Fig. 9)  The Airvana document says nothing whatsoever about Cell Virtualization/Smart Reuse or any of its benefits.  (*Id.*)  Donohue goes on to extrapolate from other documents, to conclude that the price of One Cell for the customer ████████████████ ██████████████████████████████████████████" (Ex. 33 (Donohue Opening Report), ¶ 100.) ██████████████████████████████████████ ██████████████████

C.    **Argument**

1.    **Donohue's cost savings analysis is fundamentally unsound and must be excluded**

████████████████████████████████████████████████████████ ████████████████████████████████████████ Donohue bases his opinion on a wholly different premise: "***the entirety of Cell Virtualization***."  (Ex. 34 (Donohue Reply Report), ¶¶ 10, 30.)  Building on this flawed foundation, Donohue hyperextends his damages assessment far beyond any incremental value the '338 patent could possibly have, to seek damages for the entire cost savings CommScope realizes with One Cell over its competitors.  Specifically, Donohue concludes that every cent of cost savings that CommScope achieves with OneCell is attributable to the '338 patent—and that CommScope would agree to pay all of that cost savings to Dali in a hypothetical negotiation.  (Ex. 33 (Donohue Opening

---

[8] CommScope purchased Airvana October 1, 2015.  (Ex. 33 (Donohue Opening Report), ¶ 21.)

Report), ¶ 102; Ex. 35 (Donohue Dep.), at 92:10-21.)  His opinion is unreliable and must be excluded under Federal Rule of Evidence 702.

Even if the entirety of the Smart Reuse feature of One Cell were accused, Donohue's cost savings methodology is fundamentally flawed.  It is unreasonable and unreliable for Donohue to conclude that 100% of the profits associated with that technology would go to Dali in a hypothetical negotiation.  *Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-cv-04738-WHO, 2020 WL 5106845, at *13-15 (N.D. Cal. Aug. 31, 2020); *Looksmart Grp., Inc. v. Microsoft Corp.*, No. 17-cv-04709-JST, 2019 WL 4009263, at *3-5 (N.D. Cal. July 12, 2019).  "Authority holding that '[a] price for a hypothetical license may appropriately be ***based on consideration*** of the 'costs and availability of non-infringing alternatives' and the potential infringer's 'cost savings'' does not establish that the license price must ***equal*** the cost savings, or even that the parties' negotiation would start there."  *Looksmart Grp*, 2019 WL 4009263, at *4 (internal citations omitted).

Indeed, it would defy economic and common sense for CommScope to pay a royalty consisting ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  *See id.* at *10.  Even if Dali were the inventor, CommScope "was the maker, designer, marketer, seller, and undisputed market leader; it would not have left a hypothetical negotiation with zero profits derived from the infringing technology."  *Contour IP Holding*, 2020 WL 5106845, at *14.

Donohue's assertion that his cost savings analysis is conservative does not relieve him of the requirement to apply a reliable method to assign profits.  *Id*.  Regardless of whether the final analysis incorporates other considerations, "[b]eginning from a fundamentally flawed premise [as to the royalty rate] and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion" as to the ultimate royalty

figure. *Uniloc*, 632 F.3d at 1317.  Donohue was obligated to split profits with respect to the allegedly infringing feature itself. *Contour IP Holding*, 2020 WL 51068452020, at *14.

Having applied "a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation," Donohue's resulting testimony of an ███████████████████

████████████████ *Uniloc*, 632 F.3d at 1315.

### 2. Donohue's use of CommScope's Licensing Policy and the Kathrein License is Improper and Unreliable and Must Be Excluded

Unmoored from the facts or any legal authority or accepted methodology whatsoever, Donohue attempts to leverage a policy CommScope for licensing out ██████████████

█████████████████████████████████████████

██████████████ no fewer than fifteen times in his expert reports.  (Ex. 33 (Donohue Opening Report), ¶¶ 81, 114, 142-143, 167, 170; Ex. 34 (Donohue Reply Report), ¶¶ 21, 23-24.)

As an initial matter, the *Georgia-Pacific* factors embrace the licensing policy of the ***licensor, not the licensee***.  *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).[10]  *Georgia-Pacific* says nothing whatsoever about the licensee's out-licensing policy for its own patent portfolio.  That makes sense -- the licensee is not out-licensing anything from its own portfolio in the hypothetical negotiation.  Here, the policy that CommScope developed for ████████████████████████ has nothing to do with its preference or consideration of factors in a hypothetical negotiation where it must in-license Dali's '338 patent.

---

[9] CommScope proffered evidence about its licensing policy in an earlier case where Dali was found to willfully infringe CommScope's patents.  (Ex. 41 (Trial Tr. 3A), at 108:6-109:4, 116:25-117:17; Ex. 51 (Jury Verdict), Questions 1-3, 7-8; Ex. 50 (Judgment), ¶¶ 1, 5.)

[10] The Court already excluded Dali's licensing policy from this case.  (Ex. 52 (Aug. 2, 2021, Hearing Tr.), at 7:12-25.)

████████████████████████████████████████

████████████████ (Ex. 41 (Trial Tr. 3A), at 98:12-99:25.)  But CommScope was not willing

to license its DAS portfolio to others.  (*Id.* at 91:15-20, 93:1-6, 101:3-6.)  CommScope

eventually analyzed the value it would have to receive for it to make sense to license a

competitor and used that valve analysis to guide its licensing discussions.  (*Id.* at 91:21-25,

105:15-106:5, 107:4-108:9.)

Donohue does not equate CommScope's policy with a license at all, much less a

comparable license.  *Apple Inc. v. Wi-Lan, Inc.*, No. 14cv2235 DMS (BLM), 2019 WL 4253832,

at *2-3 (S.D. Cal. Mar. 26, 2019) (finding comparability of a license is a prerequisite to

admissibility).  Nor can he.  The dynamics leading to CommScope's policy are dramatically

different than the hypothetical negotiation here.  Unlike the facts underlying CommScope's

policy, Dali comes to this hypothetical negotiation as a willing licensor.  (Ex. 10 (Deposition of

Albert Lee), at 122:22-23; Ex. 44 (Anshasi Dep.), at 33:25-34:4.)  And unlike the history leading

to CommScope's policy, nobody has ever expressed interest in licensing the '338 patent.  (*See*

Ex. 44 (Anshasi Dep.), at 40:5-41:8, 43:7-44:3.)  Moreover, unlike CommScope, which develops

and uses its technology, Dali had never developed, much less incorporated the '338 patented

technology into any product.  *See supra* p. 40-41.  Dali's DAS products were not even available

under the law to compete against CommScope—because Dali willfully infringed CommScope's

patents with these products.  (Ex. 50 (Jury Verdict), Questions 1-3, 7-8; Ex. 49 (Judgment), ¶¶ 1,

5.)

---

[11] CommScope's digital DAS portfolio originated with ADC, which was later acquired by TE
Connectivity.  CommScope acquired the portfolio when it acquired that company.  (Ex. 53 (Joint
Pretrial Order), at 13-14; *id.* ¶ 7.)

Donohue's reliance on CommScope's out-licensing policy is not only methodologically unsound and entirely irrelevant, it is highly prejudicial, skewing Donohue's royalty analysis and the jury's baseline for determining damages in this case. *Apple*, 2019 WL 4253832, at *2-3 (*citing Uniloc*, 632 F.3d at 1320); *cf. Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012) ("Admission of [an entire product's revenues], which have no demonstrated correlation to the value of the patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is adequate to compensate for infringement.").

Nor can Donohue back-door CommScope's policy through the Kathrein license. The Kathrein license was based on CommScope's policy—and like CommScope's policy, the Kathrein license involved vastly different components, competitive dynamics and value considerations. (*See* Ex. 41 (Trial Tr. 3A), at 99:22-25, 109:9-111:4; Ex. 51 (Rebuttal Expert Report of Julie Davis), at 37-38 (describing Kathrein cross-license); Ex. 33 (Donohue Opening Report), ¶¶ 80-81, 114-116, 141-142 (same); Ex. 58 (Kathrein cross-license)). Among the many other reasons why it is not comparable, in contrast to CommScope's position going into the Kathrein cross-license, Dali had no market share to lose with respect to the '338 patent and it certainly would not lose pricing on a product it never made. Moreover, the hypothetical negotiation here would involve a single patent directed at "***an excerpt of*** the totality of the Smart Reuse function in the source code," and no cross-licensing dynamics.

The law does not support Donohue's reliance on CommScope's out-licensing policy or the Kathrein license and as such, his reliance on them, and resulting opinions, should be stricken.

## CONCLUSION

For the reasons given above, CommScope respectfully requests an order granting summary judgment (1) that CommScope has not infringed claims 1-3 the '338 patent, (2) that CommScope has not willfully infringed the asserted claims of the '338 patent, (3) that claims 1-3 are invalid, and an order excluding the opinions and testimony of Mr. James J. Donohue.

|  |  |
|---|---|
|  | */s/ Kelly E. Farnan* |
|  | Kelly E. Farnan (#4395) |
| OF COUNSEL: | Valerie A. Caras (#6608) |
|  | Richards, Layton & Finger, P.A. |
| Philip P. Caspers | One Rodney Square |
| Samuel A. Hamer | 920 North King Street |
| William F. Bullard | Wilmington, DE 19801 |
| Tara Norgard | (302) 651-7700 |
| Carlson, Caspers, Vandenburgh & Lindquist, P.A. | farnan@rlf.com |
| 225 South Sixth Street, Suite 4200 | caras@rlf.com |
| Minneapolis, MN 55402 | |
|  | *Attorneys for Defendants CommScope* |
|  | *Technologies LLC and CommScope* |
|  | *Holding Company, Inc.* |

Dated:  October 5, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2021, true and correct copies of the foregoing

document were caused to be served on the following counsel of record as indicated:

**BY E-MAIL**
David Ellis Moore
Bindu Ann George Palapura
Stephanie E. O'Byrne
Potter Anderson & Corroon, LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801

**BY E-MAIL**
Cristofer I. Leffler
Michael Saunders
David D. Schumann
Cliff Win, Jr.
S.H. Michael Kim
Steven T. Skelley
Palani P. Rathinasamy
Folio Law Group PLLC
14512 Edgewater Lane NE
Lake Forest Park, WA 98155

**BY E-MAIL**
Joseph M. Abraham
Law Office of Joseph M. Abraham PLLC
13492 Research Boulevard, Suite 120
No. 177
Austin, TX 78750

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)

50