## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DALI WIRELESS, INC.,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀C.A. No. 19-952-MN
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀**JURY TRIAL DEMANDED**
COMMSCOPE TECHNOLOGIES LLC, and⠀)
COMMSCOPE HOLDING COMPANY,⠀⠀⠀)⠀⠀**PUBLIC VERSION**
INC.,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀)

## DALI'S RESPONSE IN OPPOSITION TO COMMSCOPE'S
## MOTIONS FOR SUMMARY JUDGMENT AND
## <u>TO EXCLUDE THE OPINIONS AND TESTIMONY OF JAMES J. DONOHUE</u>

OF COUNSEL:

Cristofer I. Leffler
David Schumann
Michael Saunders
Cliff Win, Jr.
S.H. Michael Kim
Palani Pradeep Rathinasamy
Steven T. Skelley
Stefan Szpajda
FOLIO LAW GROUP PLLC
1200 Westlake Ave. N., Ste 809
Seattle, WA 98109
Tel: (206) 880-1802

Joseph M. Abraham
LAW OFFICE OF JOSEPH M. ABRAHAM PLLC
13492 Research Boulevard, Suite 120
No. 177
Austin, TX 78750
Tel: (737) 234-0201

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

*Attorneys for Plaintiff Dali Wireless, Inc.*

Dated: October 29, 2021
PUBLIC VERSION
Dated: November 10, 2021

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................................. 1

II.     COMMSCOPE'S ONECELL SYSTEM INFRINGES THE '338 PATENT.................... 2

    A.    CommScope Fails to Establish a Prima Facie Case of Noninfringement with Respect to the Steps of "Translating" and "Packetizing"........................................ 2

        1.    Claim 1 Does Not Require Translating a Downlink Signal from RF to Baseband ................................................................................................ 3

        2.    There is No Dispute that OneCell Packetizes Uplink and Downlink Baseband Signals .................................................................................. 6

        3.    The "translating the uplink and downlink signals between RF and baseband as appropriate" is a Conditional Limitation Met by OneCell ..... 8

            a.    The Phrase "translating the uplink and downlink signals between RF and baseband as appropriate" Should Be Given Its Plain and Ordinary Meaning in Light of the Court's Construction of "downlink signals." ........................................................................ 9

            b.    The "translating . . . as appropriate" Step is a Conditional Limitation Satisfied by OneCell. .................................................. 10

            c.    The Plain Meaning of Step D Does Not Render Claim 1 Indefinite. ........................................................................................ 11

    B.    CommScope Fails to Establish a Prima Facie Case of Noninfringement with Respect to the Step of "Routing and Switching" .................................................. 12

        1.    There is No Dispute that OneCell Performs the Step of Routing and Switching the Packetized Downlink Signals Among the One or More Remote Radio Units ...................................................................... 12

        2.    CommScope improperly writes "via" out of the "routing and switching . . . via the at least one digital access unit" limitation, and misconstrues "routing and switching." ........................................................................ 14

            a.    CommScope writes "via" out of the limitation............................. 15

            b.    CommScope rewrites "routing and switching."............................. 18

3.      Dali Did Not Surrender Any Equivalents or Narrow Claim Scope by Making Clarifying Claim Amendments with the Addition of the Word "via" During Prosecution ................................................. 19

4.      Dali Did Not Dedicate Equivalent Network Switches Under the Disclosure-Dedication Rule ........................................................ 22

5.      The Court Should Deny CommScope's Unspecified Motion to Strike.... 23

III.    THE RECORD SUPPORTS DALI'S WILLFULNESS ALLEGATIONS..................... 25

        A.      Legal Standards ................................................................................. 26

        B.      Argument ........................................................................................... 26

                1.      There are genuine disputes about CommScope's pre-suit knowledge of infringement. ....................................................... 26

                2.      There is a genuine dispute about CommScope's post-suit willful infringement. ..................................................................... 28

IV.     THE '338 PATENT IS VALID ................................................................... 29

        A.      Claims 1-3 Are Definite as a Matter of Law ..................................... 29

                1.      The Translating Step in View of the Court's Construction of "Downlink Signals" is Definite Under the *Nautilus* Test ........................... 29

                2.      CommScope's Indefiniteness Theory Should be Rejected as a Matter of Law .................................................................... 31

        B.      CommScope's Derivation Theory Fails as a Matter of Law ................ 33

V.      MR. DONOHUE'S DAMAGES OPINIONS ARE SUFFICIENTLY RELIABLE UNDER DAUBERT ............................................................................... 36

        A.      Factual Background ............................................................................ 36

                1.      Mr. Donohue's Methodology ....................................................... 36

                        a.      Mr. Donohue's Income Approach ................................. 36

                        b.      Mr. Donohue's Market Approach ................................. 37

                        c.      Mr. Donohue's Cost Approach .................................... 39

                2.      The Accused System ............................................................. 40

        B.      Legal Standards ................................................................................. 40

      C.      Argument ........................................................................................... 42

             1.       Mr. Donohue's Cost Savings Methodology Is Reliable ........................... 43

             2.       Mr. Donohue's Reliance on CommScope's Licensing Policy and the CommScope-Kathrein License Is Appropriate ......................................... 45

VI.    CONCLUSION ............................................................................................... 48

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*3G Licensing, S.A. v. Blackberry Ltd.*,
  No. 17-82-LPS-CJB, 2018 U.S. Dist. LEXIS 156099 (D. Del. Sep. 13, 2018) .......................7

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014), overruled on other grounds
  *by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ...........................42, 45

*Bus. Objects, S.A. v. MicroStrategy, Inc.*,
  393 F.3d 1366 (Fed. Cir. 2005)..................................................................................................20

*Cumberland Pharm. Inc. v. Mylan Institutional LLC*,
  846 F.3d 1213 (Fed. Cir. 2017)..................................................................................................33

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)...............................................................................................................40-41

*Eaton Corp. v. Rockwell Int'l Corp.*,
  323 F.3d 1332 (Fed. Cir. 2003)..................................................................................................33

*Endo Pharms., Inc. v. Mylan Pharms., Inc.*,
  No. 11-717, 2013 U.S. Dist. LEXIS 111004 (D. Del. Aug. 7, 2013)......................................25

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014)..................................................................................................42

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002)...................................................................................................................19

*Festo. Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  344 F.3d 1359 (Fed. Cir. 2003)..................................................................................................21

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F. 3d 1197 (Fed. Cir. 2010)................................................................................................45

*Finjan, Inc. v. Symantec Corp.*,
  2013 U.S. Dist. LEXIS 134030 (D. Del. Sept. 19. 2013).......................................................25

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970)..........................................................................................41

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  136 S. Ct. 1923 (2016)...............................................................................................................26

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983)................................................................................41

*Helios Streaming, LLC v. Vudu, Inc.*,
  No. 19-1792-CFC-SRF, 2020 U.S. Dist. LEXIS 82376 (D. Del. May 11, 2020) ..................27

*HSM Portfolio LLC v. Elpida Memory, Inc.*,
  160 F. Supp. 3d 708 (D. Del. 2016)................................................................................23

*HSM Portfolio LLC v. Elpida Memory, Inc.*,
  No. 11-770-RGA, 2016 U.S. Dist. LEXIS 16615 (D. Del. Feb. 11, 2016) ............................48

*In re Acacia Media Techs. Corp.*,
  NO. M 05-01665 JW, 2010 U.S. Dist. LEXIS 65297 (N.D. Cal. May 25, 2010) ..................12

*Intellectual Ventures II LLC v. Sprint Spectrum, L.P. et al.*,
  No. 17-cv-662-JRG-RSP, 2019 U.S. Dist. LEXIS 70674 (E.D. Tex. Apr. 26, 2019)............47

*Interdigital Technology Corp. v. Lenovo Holding Co.*,
  No. 19-1590-LPS, 2021 WL 1856937 (D. Del. May 10, 2021) ............................................10

*Intuitive Surgical, Inc. v. Auris Health, Inc.*,
  No. 18-1359-MN, 2021 U.S. Dist. LEXIS 133682 (D. Del. July 19, 2021) ....................24, 26

*Jang v. Boston Scientific Corp.*,
  493 Fed. App'x 70 (Fed. Cir. 2012)................................................................................31

*Kenexa Brassring, Inc. v. Taleo Corp.*,
  751 F. Supp. 2d 735 (D. Del. 2010)................................................................................35

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)................................................................................42

*LG Display Co. v. AU Optronics Corp.*,
  686 F. Supp. 2d 429 (D. Del. 2010)................................................................................12

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F. 3d 1301 (Fed. Cir. 2009)................................................................................42, 46

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014)................................................................................29

*Powell v. Home Depot U.S.A., Inc.*,
  663 F.3d 1221 (Fed. Cir. 2011)................................................................................41

*Primos, Inc. v. Hunter's Specialties, Inc.*,
  451 F.3d 841 (Fed. Cir. 2006)................................................................................20

*Ravgen, Inc. v. Ariosa Diagnostics,*
No. 20-1646-RGA-JLH, 2021 U.S. Dist. LEXIS 150731 (D. Del. Aug 11, 2021) ........... 26-27

*ResQNet.com, Inc. v. Lansa, Inc.,*
594 F.3d 860 (Fed. Cir. 2010) .................................................................................41

*RetailMeNot, Inc. v. Honey Sci. Corp.,*
No. 18-937-CFC-MPT, 2019 U.S. Dist. LEXIS 205723 (D. Del. Nov. 27, 2019) ...................8

*Strattec Sec. Corp. v. Gen. Auto. Specialty Co.,*
126 F.3d 1411 (Fed. Cir. 1997) ................................................................................32

*Summit 6, LLC v. Samsung Elecs. Co.,*
802 F.3d 1283 (Fed. Cir. 2015) ................................................................................41

*Sunoco Partners Marketing & Terminals L.P. v. Powder Springs Logistics, LLC,*
No. 17-1390-LPS-CJB, 2019 U.S. Dist. LEXIS 136738 (D. Del. Aug. 7, 2019) .............26, 27

*Uniloc USA, Inc. v. Microsoft Corp.,*
632 F.3d 1292 (Fed. Cir. 2011) ...........................................................................42, 47

*United States v. Mitchell,*
365 F.3d 215 (3d Cir. 2004) ....................................................................................41

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.,*
473 F.3d 1173 (Fed. Cir. 2006) ................................................................................32

*VirnetX, Inc. v. Cisco Sys., Inc.,*
767 F.3d 1308 (Fed. Cir. 2014) ...........................................................................42, 45

*Wellman, Inc. v. Eastman Chem. Co.,*
642 F.3d 1355 (Fed. Cir. 2011) ..................................................................................8

*WesternGeco LLC. v. ION Geophysical Corp.,*
837 F.3d 1358 (Fed. Cir. 2016) ................................................................................26

*Zimmer Surgical, Inc v. Stryker Corp.,*
365 F. Supp. 3d 466 (D. Del. 2019) ...........................................................................28

**STATUTES & RULES**

35 U.S.C. § 102(f) ............................................................................................... 33-36

35 U.S.C. § 284 ...................................................................................................41

Fed. R. Evid. 702 .................................................................................................41

## I.    INTRODUCTION

According to CommScope's brief in support of its Motions for Summary Judgment and to Exclude the Opinions and Testimony of James J. Donohue (D.I. 247, hereafter "Br."), not a single aspect of Dali's case against CommScope is fit to survive to trial. CommScope seeks summary judgment in full with respect to each of noninfringement, willfulness, and invalidity, and also seeks to exclude the opinions of Dali's damages expert in their entirety. CommScope's motions fall short in all respects.

As set forth in detail below, Dali has proffered sufficient evidence to prove that CommScope infringes every element of the asserted claims of the '338 patent. CommScope, in contrast, relies on re-fighting a claim construction battle that was, for the most part, settled months ago. Similarly, there is sufficient record evidence from which a reasonable jury could find evidence of CommScope's willful infringement of the '338 patent, both before and after Dali commenced this litigation.

Otherwise, CommScope moves for summary judgment of invalidity concerning two theories. But examination of the '338 patent specification reveals that a more-than-sufficient disclosure exists to defeat CommScope's indefiniteness theory. As to CommScope's theory of derivation under pre-AIA Section 102, CommScope does not point to evidence sufficient to disclose that each and every claim element of the '338 patent was actually communicated to Dali as of the relevant priority date. And perusal of the full record reveals that, notwithstanding CommScope's argument to the contrary, Dali never admitted to deriving the '338 patent.

Finally, the *Daubert*-related criticisms raised by CommScope concerning Mr. Donohue's damages opinions are the sort that both the Federal Circuit and this Court have consistently found go to the weight of the evidence, not to the threshold issue of admissibility.

CommScope's motions should be denied.

## II.    COMMSCOPE'S ONECELL SYSTEM INFRINGES THE '338 PATENT

CommScope does not dispute that its OneCell system performs the key claim steps of (1) translating downlink signals from baseband to RF or uplink signals from RF to baseband, (2) packetizing uplink and downlink baseband signals and (3) routing and switching packetized downlink baseband signals. Instead, CommScope advances various arguments that depend entirely on its rewriting of the claim language. The Court should deny CommScope's motion for summary judgment of noninfringement as to the claims of the '338 patent.

### A.    CommScope Fails to Establish a Prima Facie Case of Noninfringement with Respect to the Steps of "Translating" and "Packetizing"

CommScope's noninfringement argument is a three-pronged approach rooted in a wholesale redrafting of claim 1 of the '338 patent, beginning with the step of "translating the uplink and downlink signals between RF and baseband *as appropriate*." As detailed below, CommScope first argues that this step always requires the translation of downlink signals from RF to baseband, even when the downlink signal is already at baseband. CommScope then argues that because incoming downlink signals from the cellular operator's core network are ██████████████████ ███████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. CommScope then imports its additions to the "translating" step of claim 1 into the next step, arguing that the "packetizing the . . . downlink baseband signals" step requires "the translated downlink baseband signals" to be packetized, ██████████████████████████████████████████ ████████████████████████ CommScope's argument, however, suffers from two critical errors: (1) it ignores the operative phrase "as appropriate" and (2) it incorrectly restricts the antecedent basis for the term "downlink baseband signals" in the packetizing step to be "the translated downlink baseband signals" from the translating step. CommScope's non-infringement argument

entirely depends on the above-described rewriting of claim 1. Because CommScope's position is unsupportable both factually and legally, the Court should deny CommScope's motion.

      **1.**      **Claim 1 Does Not Require Translating a Downlink Signal from RF to Baseband**

Step D of Claim 1 recites "translating the uplink and downlink signals between RF and baseband *as appropriate*" (emphasis added). Crucially, this claim element does not—as CommScope argues—require a specific RF-to-baseband or baseband-to-RF translation at either the Digital Access Unit (DAU) or the Remoted Radio Unit (RRU). According to the plain language of the claim element, any of these translations may occur at either of these units, as appropriate. The specification makes clear that the purpose of this translation is to ensure that uplink and downlink signals are in the baseband format for cabled transport between the DAU and the RRU and the signals are at the RF format for over-the-air transmission between the RRU and the mobile devices as illustrated below. *See, e.g.*, CS Ex. 1 at 6:1-4, 6:42-51.[1]

---

[1] References to "CS Ex." refer to the respective-numbered exhibit submitted in support of CommScope's motion. *See* D.I. 252-253. Exhibits cited as "Supp. Ex." are attached to Dali's Supplemental Appendix filed herewith.



Claim 1 (excerpted)

A method for routing and switching RF signals comprising:

providing one or more remote radio units, each remote radio unit configured to transmit one or more downlink RF signals and to receive one or more uplink RF signals;

providing at least one digital access unit configured to communicate with the one or more remote radio units;

translating the uplink and downlink signals between RF and base band as appropriate;

packetizing the uplink and downlink base band signals, wherein the packetized signals correspond to a plurality of carriers;

. . .

'338 Patent, Figure 1 (excerpted and annotated)

In the exemplary system illustrated above, the specification discloses several possible translations that can take place as appropriate depending on the types of uplink and downlink signals present at the DAU and RRU and depending on the type of network operator equipment that interfaces with the DAU:

- Downlink baseband signals at the RRU are translated to downlink RF signals for over-the-air transmission to mobile devices.

- Uplink RF signals at the RRU are translated to uplink baseband signals for cabled transport to the DAU.

4

- Uplink baseband signals at the DAU are translated to uplink RF signals if the signals are transported to a network operator's base transceiver station. Otherwise, uplink baseband signals at the DAU do not need to be translated if the signals are intended to be transported to a network operator's packet core network, which readily accepts uplink signals in the baseband format.

- Downlink RF signals originating from a network operator's base transceiver station are translated at the DAU to downlink baseband signals for cabled transport to the RRU. *See* Ex. 8 [Bims Reply Report] ¶ 11 (downlink RF input signals are down-converted). Otherwise, downlink baseband signals originating from a network operator's packet core network do not need to be translated as they are already in the baseband format for cabled transport to the RRU. *See id.* (downlink baseband input signals are not down-converted).

*See, e.g.*, CS Ex. 8 [Bims Reply Report] ¶¶ 6-10 ("the claim step for translating signals between RF and baseband may occur at the DAU or the RRU depending on what is needed to ensure that the signals are in (1) the baseband format for transport between the DAU and RRU, (2) the RF format for downlink transmission between the RRU and the mobile phones, and (3) the appropriate format (RF or baseband) for uplink transport or transmission between the DAU and the operator network (core network or base transceiver station).").

Indeed, the claim language does not require that any particular translation occur at the DAU or RRU, much less a translation of a downlink signal from RF to baseband—as CommScope argues. The purpose of the claim's translation step is to ensure that the uplink and downlink signals are in their proper format at the proper place in the system. CommScope does not dispute that the signal format between the DAU and RRU must be baseband and that the signals between the RRU

and mobile devices must be at RF. *See, e.g.*, Br. At 5-6, 11 ("DAU then routes and switches those packetized baseband signals to the remote units," "downlink RF signals . . . will eventually be . . . wirelessly transmitted by the RRU output port"). Instead, CommScope's dispute is premised on reading in a nonexistent requirement that the claimed DAU always performs an RF-to-baseband translation on downlink signals *even when the downlink signal is already at baseband*. The express claim language, however, is clear that no such requirement exists. The claim limitation ("translating the uplink and downlink signals between RF and baseband as appropriate") does not specify which specific translation must occur and at which unit such translation must occur. The claim merely recites that some translation between RF and baseband should occur "as appropriate" so that the uplink and downlink signals are in the proper format at the proper place in the system.

To further contend that RF-to-baseband translation must always occur for downlink signals at the DAU, CommScope re-argues a claim construction (i.e., requiring all downlink signals to be RF signal) that the Court has already rejected. *See* Br. at 7. To support its argument, CommScope cherry-picks portions of the Claim Construction Hearing out of context where Dali's counsel had mentioned certain non-limiting examples and embodiments involving downlink RF signals. *See id*. But the Court ultimately agreed with Dali by explicitly ruling that "downlink signals" need not be RF signals (*see infra* II.A.3.a.)

### 2. There is No Dispute that OneCell Packetizes Uplink and Downlink Baseband Signals

CommScope does not dispute that OneCell packetizes uplink and downlink baseband signals as required by step E of claim 1. Neither does CommScope dispute that the uplink signals at the OneCell Radio Point (i.e., DAU) are at baseband prior to packetization and that downlink signals at the OneCell Baseband Controller (i.e., DAU) are also already at baseband prior to packetization. Instead, CommScope argues that ████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████. This is yet another red herring premised on CommScope's argument that "the uplink and downlink baseband signals" in the packetization step E find their antecedent basis in the translation step D, which CommScope insists requires the translation of downlink signals from RF to baseband, *even when the downlink signals are already at baseband*.

CommScope's non-infringement position fails because it is suspended from its effort to rewrite the claim. As discussed above, the translation step D does not require translation of downlink signals from RF to baseband at the DAU when the downlink signals are already at baseband. A POSITA reading the claim in light of the specification would reasonably understand that "the uplink and downlink baseband signals" in the packetizing step simply refer to signals in the baseband format at the DAU or RRU. *See, e.g.*, CS Ex. 8 [Bims Reply Report] ¶¶ 4-5 ("a POSA reading the claim in light of the patent specification would understand element E to include baseband signals that must be packetized for transport between the DAU and the RRU").) Indeed, nothing in the claim language requires that the packetization step refer to *translated* baseband signals.

Moreover, there is no other express recitation of "baseband signals" in the claim, much less the translating step D, which only recites "translating the uplink and downlink signals between RF as appropriate." It is well settled law that even in the absence of explicit antecedent basis, it can be present by implication such that the scope of a claim can be reasonably ascertainable by those skilled in the art when viewed in light of the specification and prosecution history. *3G Licensing, S.A. v. Blackberry Ltd.*, No. 17-82-LPS-CJB, 2018 U.S. Dist. LEXIS 156099, at *17 (D. Del. Sep. 13, 2018) (citing *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir.

2006)) ("A failure to provide antecedent basis does not necessarily render a claim indefinite"); *see also RetailMeNot, Inc. v. Honey Sci. Corp.*, No. 18-937-CFC-MPT, 2019 U.S. Dist. LEXIS 205723, at \*49, 53 (D. Del. Nov. 27, 2019) (noting "lack of antecedent basis, by itself, does not demand a finding of indefiniteness" and finding patentee "has shown antecedent basis is implied and that a POSITA reading the intrinsic record would understand the scope of the claims."). Defendants must prove by clear and convincing evidence that the lack of antecedent basis leaves a POSITA unable to discern the boundaries of the claim "based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011) (internal quotation marks omitted). CommScope has not even attempted to meet that high burden. And here, as discussed above, the '338 patent's specification informs a POSITA that the uplink and downlink signals transported between the DAU and the RRU are baseband signals, regardless of whether they are translated to baseband by those units. *See, e.g.*, CS Ex. 1 ['338 Patent] at 6:1-8, 7:25-31, 8:29-32. And CommScope does not dispute that ███████████████████████████████████████ ███████████████████████████████████████. Indeed, CommScope cannot escape infringement simply because it ██████████████████████████████████████████ ███████████████.

### 3. The "translating the uplink and downlink signals between RF and baseband as appropriate" is a Conditional Limitation Met by OneCell

Under the plain and ordinary meaning as understood by a POSITA—and the Court's construction of "downlink signal" (D.I. 122 at 9)—OneCell meets the "translating the uplink and downlink signals between RF and baseband as appropriate" limitation of claim 1 of the '338 patent. CommScope never disputes this. Instead, CommScope rewrites the claim.

a.   **The Phrase "translating the uplink and downlink signals between RF and baseband as appropriate" Should Be Given Its Plain and Ordinary Meaning in Light of the Court's Construction of "downlink signals."**

The "translating the uplink and downlink signals between RF and baseband as appropriate" limitation of claim 1 comprises several elements. To arrive at the plain meaning, a POSITA would consider each one.

First, a POSITA would consider the meaning of "downlink signals," which the Court construed as "'signals transmitted in the downlink direction' *without requiring those signals to be RF signals*." D.I. 122 at 9 (emphasis added). Because the Court's construction is explicit that "downlink signals" need not be RF signals, the Court rejected the premise on which CommScope's argument depends, i.e., that the downlink signals in step D must be RF: "Dali must show that when the baseband controller is presented with an RF downlink signal, the OneCell system is capable of and configured to translate that RF downlink signal to baseband for subsequent packetization and routing to remote units." Br. at 13-14. Under the Court's construction of "downlink signals," CommScope's argument fails because it improperly reads RF into downlink signals.

Second, a POSITA would interpret "translating . . . between RF and baseband as appropriate." Dali's technical expert, Dr. Harry Bims, explains that a POSITA would understand "translating . . . between RF and baseband as appropriate" to mean translating between RF and baseband when the signal is at RF and needs to be translated to baseband. *See* CS Ex. 7 [Bims Report] ¶ 107. This is consistent with the Court's construction of downlink signal because—like the Court's construction, and in contrast to CommScope's premise that the claim always requires translation from RF to baseband—it recognizes that downlink signals do not need to be in RF. And although the Court's construction of downlink signals is dispositive of the issue, CommScope does not mention or even cite it in its brief. Instead, CommScope devotes several paragraphs to an

inchoate claim construction argument, selectively citing extrinsic evidence for the meanings of "as" and "appropriate" in isolation from the rest of the limitation. Br. at 10. CommScope does so to distract from the fact that intrinsic evidence supports Dali. For example, the specification teaches that "[t]he DAUs then reroute the users to Internet VoIP, Wi-Fi or WiMAX as appropriate." CS Ex. 1 ['338 Patent] at 5:1-2. This is precisely the same meaning of "as appropriate" as in the "translating . . . as appropriate" step of claim 1.

Unable to dispute the meaning of the claim as written and as construed by the Court, CommScope attempts to rewrite it. CommScope mischaracterizes Dr. Bims's testimony as "the idea that translating or converting a downlink ***RF signal*** to baseband is optional or may not be performed." Br. at 11 (emphasis added). CommScope's choice of words—referring to "translating a downlink RF signal" when the claim reads "translating . . . downlink signals"—gives the game away; it shows that CommScope is ignoring the Court's ruling that "bare reference to downlink signals is not limited to RF signals and the patentee knew how to distinguish the two." D.I. 122 at 8.

### b.       The "translating . . . as appropriate" Step is a Conditional Limitation Satisfied by OneCell.

CommScope's argument fares no better when CommScope disputes that "translating . . . as appropriate" is a conditional limitation, and that even if it is OneCell does not practice it.

As both Dr. Bims and Dr. Foty made clear, a POSITA would understand that "translating the uplink and downlink signals between RF and baseband as appropriate" is a conditional limitation. Supp. Ex. 28 [Foty Report] ¶¶ 13, 404; CS Ex. 7 [Bims Report] ¶ 108. Thus, under *Interdigital Technology Corp. v. Lenovo Holding Co.*, OneCell must be capable of performing the "translating . . . as appropriate" step. *See* No. 19-1590-LPS, 2021 WL 1856937, at *6 (D. Del. May 10, 2021). It is.

Contrary to CommScope's argument—which again is premised on a misreading of claim 1—OneCell can perform the conditional step required by the "as appropriate" element of step D. CommScope argues that ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ Br. at 13. This reads a limitation into the claim by implying that translation must occur at the DAU for routing to the RRU. But the claim does not require the translation to occur in a particular part of the system, and Dr. Bims explains that the claim is agnostic as to whether translation occurs at the RRU or DAU. *See* CS Ex. 8 [Bims Reply Report] ¶ 6. Where the translation occurs depends on what is needed to ensure that the signals are in (1) the baseband format for transport between the DAU and RRU, (2) the RF format for downlink transmission between the RRU and the mobile phones, and (3) the appropriate format (RF or baseband) for uplink transport or transmission between the DAU and the operator network (core network or base transceiver station). *Id.* CommScope does not and cannot dispute that OneCell meets this element in the claim at least because it ████████████████████████████████ ████████████████████

### c.    The Plain Meaning of Step D Does Not Render Claim 1 Indefinite.

CommScope argues that "[d]uring claim construction briefing" Dali interpreted step D differently than it does now, and that this suggests claim 1 is indefinite. Br. at 12. That is both misleading as a factual matter and incorrect as a matter of law.

Dali initially proposed a construction for step D in the parties Joint Claim Construction Chart. *See* D.I. 67 at 3-4. But before claim construction briefing even began, Dali dropped the term from its list of terms that should be construed and acknowledged that it should be given its plain and ordinary meaning. The Court is aware of this history and took it into account when it construed

"downlink signals," noting: "Plaintiff's original proposal included 'radio frequency' signals, but at some point, apparently Plaintiff changed its mind. Here, I agree with Plaintiff[.]" D.I. 122 at 9.

Of course, there is nothing unusual about this. Parties routinely evolve their understanding of claim terms during litigation, and no adverse inference can be drawn from doing so. *See LG Display Co. v. AU Optronics Corp.*, 686 F. Supp. 2d 429, 440-41 (D. Del. 2010) ("As the Federal Circuit has recognized, the Court's task in claim construction is not to decide which of the adversaries is correct, but to independently determine the meaning of disputed claims . . . . For this reason, the Court does not take AUO's change in its claim construction position to be indicative of the merits of its current argument."); *In re Acacia Media Techs. Corp.*, NO. M 05-01665 JW, 2010 U.S. Dist. LEXIS 65297, at *17 (N.D. Cal. May 25, 2010) ("The Court finds that it would hinder litigation and the claim construction process to find a change in claim construction position to be vexatious or improper, since the Court's role is to determine the proper construction, which may entail an evolving understanding of the claim terms.") CommScope's argument that dropping a proposed construction and acknowledging that the term should be given its plain and ordinary meaning before claim construction briefing began supports an inference that the claim is indefinite is unsupported by any authority. In any event, the point is moot: since the Court has already construed the salient term, claim 1 is not indefinite.

### B.    CommScope Fails to Establish a Prima Facie Case of Noninfringement with Respect to the Step of "Routing and Switching"

#### 1.    There is No Dispute that OneCell Performs the Step of Routing and Switching the Packetized Downlink Signals Among the One or More Remote Radio Units

CommScope cannot refute the fact that OneCell ████████████████████████████ ██████████████████████████, and therefore attempts to rewrite Claim 1 to something that

OneCell does not do— ████████████████████████████████████████████.

*See* Br. at 14-16.

CommScope contends that the claim limitation in step H, "routing and switching *the packetized signals*" finds its antecedent basis in step E, "packetizing the uplink and downlink baseband signals," and thus step H purportedly requires routing and switching both uplink and downlink signals. But CommScope ignores other key parts of the claim element that would inform a POSITA as to which direction signals are routed and switched. The claim recites in part: "routing and switching the packetized signals *among the one or more remote radio units via the at least one digital access unit*." CS Ex. 1 at 13:23-25 (emphasis added). A POSITA would understand that the operative phrase "among the one or more remote radio units via the at least one digital access unit" means that the only packetized signals that must be routed and switched in this context are in the downlink direction towards the RRUs, not in the uplink direction from the RRUs towards the DAU, because routing and switching signals among the RRUs means transporting the signals to the RRUs. *See* CS Ex. 8 [Bims Reply Report] ¶ 21. This is also supported by the intrinsic evidence—"signals are digitized, packetized, routed and switched *to the desired RRU*." CS Ex. 1 at 8:30-32 (emphasis added). Only packetized signals in the downlink direction can be routed and switched via the DAU to the one or more RRUs as expressly recited in the claim. The claim does not require routing and switching the packetized *uplink* signals among the one or more remote radio units via the at least one digital access unit because uplink signals by definition are signals flowing from the RRUs towards the DAU, and there is no reason to route uplink signals from the RRUs back towards the RRUs. Thus, Step H is specifically directed to routing and switching in the downlink direction.

CommScope's rewriting of the claim is also unsupported by the intrinsic record. CommScope points to Figures 1 and 2 of the '338 Patent to suggest that the specification teaches routing and switching for both uplink and downlink signals. *See* Br. at 15. This, however, ignores that the claim limitation calls for routing and switching the packetized signals among the one or more RRUs via the at least one DAU. Nothing in the cited figures show routing and switching uplink signals from the RRUs back to the RRUs.

CommScope also points to the File History purporting that Dali distinguished prior art that only supported downlink traffic from the claimed invention that supports both uplink and downlink traffic. *See* Br. at 15. This is another red herring, as the distinction made with respect to the prior art in question during prosecution was whether the RRU could receive uplink or transmit downlink traffic, not whether uplink signals could be routed and switched among the RRUs via the DA— i.e., routed and switched from the RRUs back to the RRUs, which in any event would not make sense. *See* CS Ex. 2 at DCS2-00000200 ("The RDT 740 only supports downlink traffic . . . Thus, Kilfoyle's system contrasts with the system recited in amended claim 1, which recites, in part, 'configuring each remote radio unit to receive or transmit a respective subset of the plurality of carriers.'").

Further, CommScope argues that there is no principled reason in the plain language of the claim to conclude the routing and switching step only applies to downlink signals. *See* Br. at 15. Again, CommScope ignores the rest of the claim element (among the RRUs via the DAU) which necessarily requires routing and switching in the downlink direction.

### 2. CommScope improperly writes "via" out of the "routing and switching . . . *via* the at least one digital access unit" limitation, and misconstrues "routing and switching."

CommScope cannot dispute that under the plain and ordinary meaning of "routing and switching . . . via the at least one digital access unit," OneCell infringes claim 1. So to avoid

14

infringement, CommScope argues that "routing and switching . . . via the at least one digital access unit" should be construed as "[t]he at least one digital access unit performs switching," thereby writing "via" out of the claim and misconstruing "routing and switching." CommScope's proposed construction ignores intrinsic evidence and is inconsistent with the plain and ordinary meaning of the limitation. The Court should reject it.

### a. CommScope writes "via" out of the limitation.

During claim construction, the Court declined to construe the "routing and switching" limitation of claim 1 in part because the record did not allow the Court to determine the meaning of the term "via." D.I. 122 at 10. The Court instructed the parties to address the issue on summary judgment if it remained in the case. Now, CommScope asks the Court to delete "via" from the "routing and switching" limitation, and to construe the limitation to require the DAU itself to perform the "routing and switching" limitation. *See* Br. at 20. The Court should reject CommScope's proposed construction and adopt the plain and ordinary meaning instead.

The word "via" is a preposition. Prepositions express a relation between a noun or pronoun and another word or element in a clause. *See, e.g.*, Bryan A. Garner, Garner's Modern American Usage at 913 (3d ed. 2009). Here, "via" is expressing the relation between "routing and switching" and "the at least one digital access unit." The parties agree that the definition of "via" is "through the agency of" or "by means of." Br. at 21. Using this agreed definition, claim element G reads in relevant part: "routing and switching . . . [through the agency of/by means of] the at least one digital access unit." This plain and ordinary meaning is clear and easy to understand. This element needs no further construction.

Nonetheless, CommScope complains that "[t]he parties do not agree how to interpret 'through the agency of/by means of,'" and introduces a new proposed construction that simply reads the word "via," and the meaning of the word "via," out of the claim. CommScope's new

15

construction essentially replaces "via" with "is performed by" which, by CommScope's own admission (Br. at 21) is not the definition of "via."

Consider, when one votes *via* mail-in ballot, the mail-in ballot is not "performing" the voting. To the contrary, a human voter is voting "by means of" the mail in ballot; the human is voting, not the mail-in ballot. Similarly, if one communicates with a friend *via* the internet, the internet is not "performing" the communication; the human is communicating "by means of" the internet. Similarly, here, when the system of Claim 1 "routs and switches the packetized signals" *via* the "at least one digital access unit," it does not follow that the digital access unit "performs" the routing and switching. In all of these cases, the actions—voting, communicating, and routing and switching—are occurring "through the agency of" or "by means of" the object of the clause— mail-in ballot, internet, DAU—they are not being "performed by" the object of the clause. The DAU does not need to "perform" the actual "routing and switching"; rather, the "routing and switching" just needs to be accomplished "by means of" the DAU. The word "via" is ***repeatedly*** used in the '338 patent's specification in this same sense. *See* CS Ex. 1 at 4:31-33; 6:25-26; 6:50-51; 6:56-58; 6:59-60; 7:33-35; 9:39-43; 9:51-53; 10:8-10; 10:63-64; 11:28-32. CommScope ignores all of this.

Once CommScope deletes "via" from the claim, it is free to contort the limitation to serve its non-infringement argument. CommScope's expert, Dr. Acampora, admits that the OneCell system "routs and switches" downlink packetized signals among multiple radio points, (Br. at 24), but argues that the claim limitation is not met because the ██████████████████████████ ████████████████████████ In other words, Dr. Acampora argues that the DAU is not performing the "routing and switching." But as described above, and as explained in detail in Dr. Bims's reply report (*see* CS Ex. 8 24-25), nothing in the claim language nor the intrinsic record

requires that the DAU must have multiple output paths, or that the DAU must actually "perform" the "routing and switching." *See id*. As shown in the diagram below, the OneCell System meets transporting downlink packetized signals among multiple radio points *via* the Baseband Controller.



See [Bims Reply Report] ¶ 17. The OneCell Baseband Controller (DAU) acting as the central orchestrating hub of the system directs traffic by instructing the switch with packet header information as to where to send the downlink packets [Bims Report], ¶ 154-155; *see* [Bims Reply Report], ¶ 16 ("the OneCell Baseband Controller actuates the 'routing and switching' of the downlink packetized signals to the one or more OneCell Radio Points").

Consistent with the teachings of the specification and the plain language of the claim itself, all routing and switching in the DAS network of the '338 Patent are not necessarily performed *by* the DAU; rather, according to the plain and ordinary meaning of the claim terms themselves, "packetized signals" are routed and switched "among the one or more remote radio units" *by way of or through* "the at least one digital access unit." Indeed, there is not a single embodiment taught by the '338 Patent in which the DAU performs all of those functions.

17

**b.** **CommScope rewrites "routing and switching."**

Although CommScope admits that OneCell performs switching, it argues that it does not infringe because the switching occurs outside of the DAU. *See* Br. at 24. For the reasons detailed above, the Court should reject CommScope's argument because it hinges on CommScope's effort to read "via" out of the claim. When "via" is properly construed, the fact that the switching occurs outside the DAU is irrelevant, and fails to support CommScope's non-infringement position.

Unable to overcome this fatal shortcoming, CommScope's non-infringement argument depends on a further misreading of the "routing and switching" limitation of claim 1, namely that "routing" and "switching" are two separate, independent steps. *See* Br. at 25. They are not. *See* CS Ex. 7 [Bims Report] ¶¶ 151-52.) A POSITA would not understand the term "routing and switching" to necessarily be two separate steps: to route and to switch. *See* CS Ex. 8 [Bims Reply Report] ¶ 18. The Court did not construe "routing and switching," nor was a construction necessary. As Dr. Bims explains, a POSITA would understand the plain meaning of "routing and switching" as transporting packets from a source node to a destination node. CS Ex. 7 [Bims Report] ¶ 151. Dr. Bims's interpretation that "routing and switching" are not necessarily separate steps is directly supported in the patent specification:

> Although the description of some embodiments in the instant application refers to base station signals 107 and 108 as being on different frequencies, the system and method of the present invention readily supports configurations where one or more of the carriers which are part of base station signals 107 and 108 and are identical frequencies, since the base station signals are digitized, packetized, ***routed and switched*** to the desired RRU.

CS Ex. 1 ['338 Patent] at 8:24-32 (emphasis added). This passage provides a list of functions with routing and switching listed together as a single function. If the patentee had intended "routing and switching" to be read as separate functions, one would expect to see an Oxford or serial comma placed after the word "routed" to serve as the final comma in the listing if the routing function was

separate from the switching function. *See* CS Ex. 8 [Bims Reply Report] ¶ 18. There is nothing in the specification that indicates that "routing and switching" are two separate functions. To the contrary, the only support in the specification supports the view that routing and switching would be understood by a POSITA as transporting the digitized and packetized signals to the desired RRU. *See* CS Ex. 7 [Bims Report] ¶ 151; CS Ex. 1 ['338 Patent] at 8:30-32.

### 3. Dali Did Not Surrender Any Equivalents or Narrow Claim Scope by Making Clarifying Claim Amendments with the Addition of the Word "via" During Prosecution

CommScope contends that because Dali purportedly made narrowing claim amendments during prosecution, Dali's alternative DOE theory should be precluded. To support this illusory allegation, however, CommScope misrepresents the record by conflating two claim amendments: (1) a Preliminary Claim Amendment made on May 28, 2013 prior to examination of the '338 patent application (*see, e.g.*, CS Ex. 2 ['338 File History] at DSC2-00000149-152) and (2) and a claim amendment made on August 29, 2013 in response to an Office Action (*see, e.g.*, *id.* at DSC2-00000195-201).

Before examination of the patent application commenced, Dali made the following Preliminary Amendments to Claim 1 merely for clarification by adding the words "remote" and "via" and modified the original word, "units" to its singular form as shown below:

routing and switching the packetized signals among the one or more <u>remote</u> radio units [[and]] <u>via</u> the at least one digital access <del>units</del> <u>unit</u>.

*Id.* at DSC2-00000150. This claim amendment was not made to overcome any prior art rejection, contrary to CommScope's assertion. Indeed, the May 2013 Preliminary Amendments as highlighted above were not narrowing claim amendments that triggered estoppel under *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002). As demonstrated in the

File History (*see, e.g.*, CS Ex. 2 ['338 File History] at DSC2-00000149-152), these cosmetic and clarifying amendments were made before any Office Action Rejection and to merely recite inherent features of the invention that were already required by the preexisting claim, and thus, did not narrow the overall scope of the claimed subject matter. *See Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 849 (Fed. Cir. 2006) (finding that amendment clarifying that a claimed "plate" has a "length" was not narrowing because "every physical object has a length"); *Bus. Objects, S.A. v. MicroStrategy, Inc.*, 393 F.3d 1366, 1375 (Fed. Cir. 2005) ("Because the 'predetermined' limitation was implicitly contained in the original term, the amendment did not narrow the scope of the query engine means by expressly stating that the query language must be 'predetermined' in the amended term.") Accordingly, no claim scope was surrendered regarding the "routing and switching . . . via the at least one digital access unit" limitation during prosecution, and Dali's DOE theory should not be precluded.

Moreover, the claim amendments made on August 29, 2013 did not surrender all possible equivalents. There, Dali made the following amendments to multiple elements of the claim—only adding the phrase "according to a result of the reconfiguring" to this particular claim element at issue (the rest of the amendments to this element were made previously in the May 2013 Preliminary Amendment):

1. (Currently Amended) A method for routing and switching ~~operator~~ RF signals comprising:

    providing one or more remote radio units, each remote radio unit configured to ~~receive~~ transmit one or more downlink ~~radio frequencies~~ RF signals and to ~~transmit~~ receive one or more uplink ~~radio frequencies~~ RF signals[[,]];

    providing at least one digital access unit configured to communicate with ~~at least some~~ the one or more remote radio units[[,]];

    translating the uplink and downlink signals between RF and base band as appropriate[[,]];

    packetizing the uplink and downlink base band signals, wherein the packetized signals correspond to a plurality of carriers; [[and]]

    configuring each remote radio unit to receive or transmit a respective subset of the plurality of carriers, each respective subset of the plurality of carriers including a number of carriers;

    reconfiguring each remote radio unit by:

        determining a load percentage for each remote radio unit; and

        increasing or decreasing the number of carriers in the respective subset of the plurality of carriers based on the load percentage; and

    routing and switching the packetized signals among the one or more remote radio units [[and]] via the at least one digital access ~~units~~ unit according to a result of the reconfiguring.

CS Ex. 2 at DSC2-00000196.

    As demonstrated in the File History (*see* CS Ex. 2 at DSC2-00000200), these amendments including, *inter alia*, (1) "determining a load percentage for each remote radio unit" and (2) "increasing or decreasing the number of carriers in the respective subset of the plurality of carriers based on the load percentage" did not surrender the equivalent in question because the rationale underlying these amendments had nothing to do with the equivalent much less bore "a tangential relationship to the equivalent" under *Festo*. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1369 (Fed. Cir. 2003). The underlying rationale for the amendments here was

to distinguish the claimed invention from the *Kilfoyle* reference which failed to disclose altogether claimed features such as "reconfiguring each remote radio unit by: determining a load percentage of each remote radio unit; and increasing or decreasing the number of carriers in the respective subset of the plurality of carriers based on the load percentage." CS Ex. 2 at DSC2-00000199-200. As shown below, Dali's remarks to the Examiner made no mention at all of the specific amendment to the "routing and switching" claim element in its analysis distinguishing the *Kilfoyle* reference:



*Id.* As the *Kilfoyle* reference was entirely deficient in many of the claimed features including in particular determining the load percentage, the reason for the amendment was not to cede other functionally similar equivalents of the "routing and switching" claim limitation.

### 4.  Dali Did Not Dedicate Equivalent Network Switches Under the Disclosure-Dedication Rule

In yet a further futile attempt to foreclose Dali's DOE theory, CommScope presents a misplaced single paragraph argument based on the disclosure-dedication rule. CommScope does not dispute that OneCell ███████████████████ but appears to allege that the '338

Patent's mere mention of "network switches" in DAS systems somehow rises to the level of dedicating to the public ██████████████████ such as in OneCell. Br. at 27. The disclosure-dedication rule, however, does not provide "that any generic reference in a written specification necessarily dedicates all members of that particular genus to the public." *HSM Portfolio LLC v. Elpida Memory, Inc.*, 160 F. Supp. 3d 708, 724 (D. Del. 2016) (citations omitted). And "before unclaimed subject matter is deemed to have been dedicated to the public, that unclaimed subject matter must have been identified by the patentee *as an alternative to a claim limitation*." *Id*. at 723. Here, the '338 Patent simply mentioned a type of DAS equipped with a network switch, but did not specifically disclaim such network switches.[2] *See* CS Ex. 1 ['338 Patent] at 1:65-2:26. Also, the patent did not identify the use of network switches as an alternative or as mutually exclusive from e.g., an internal switch integrated in a DAU. Therefore, the disclosure-dedication rule does not apply. Moreover, Claim 1 of the '338 patent does not claim any particular type of switch per se. Rather, it recites the general functionality of routing and switching, the scope of which can cover switching by any type of switch including network switches, ethernet switches, or internal switches. Accordingly, the equivalent ethernet switches under Dali's alternative DOE theory is well within the claimed scope of the '338 Patent.

### 5.    The Court Should Deny CommScope's Unspecified Motion to Strike

CommScope's request to "strike Dali's expert testimony for the routing and switching step" must fail as not only is it procedurally improper, but it also totally lacks factual and legal

---

[2] The '338 Patent discusses two types of prior art DAS systems, one of which includes a network switch. To be clear, the patent did not describe two types of systems with disparate or alternative types of switches. A switch is only mentioned in the discussion of the second type of DAS. *See* CS Ex. 1 ['338 Patent] at 1:65-2:26. Moreover, the network switch mentioned here that Dali alleges was dedicated to the public is a switch that is "changed manually," which is different from the ethernet switches in the accused OneCell system.

support. Br. at 28. As far as Dali can tell, CommScope's one-paragraph argument appears to be a request to exclude some unspecified portion of the testimony offered by Dali's technical expert, Dr. Bims. But CommScope provides virtually no analysis in support of its request. Instead, CommScope cites a single inapposite case,[3] followed by a conclusory allegation that Dali's expert relies on two claim constructions that "Dali never disclosed." Br. at 28. CommScope's argument is so underdeveloped that Dali can only guess at what the alleged new claim constructions are, let alone what testimony CommScope asks the Court to exclude as a result. At bottom, CommScope's motion to strike is a reframing of its non-infringement position regarding the "routing and switching the packetized signals among the one or more remote radio units via the at least one [DAU]" limitation of claim 1 as a claim construction issue. CommScope's failure to specify any factual or legal basis for its request to strike Dr. Bims's testimony is reason enough to deny it.

CommScope's request must be denied for the additional reason that the Court deferred its ruling on an element of the limitation at issue, finding that it could not rule on the meaning of "routing and switching . . . via the at least one digital access unit" on the record before it because it lacked sufficient evidence regarding the meaning of "via." D.I. 122 at 10. But CommScope simply ignores that the Court expressly reserved judgment on this very issue, ruling that the Court "cannot decide this issue on the record" before instructing the parties that if this term remains in dispute, "you can use space in the summary judgment briefs to address this term and explain to me

---

[3] Although CommScope offers no analysis of *Intuitive Surgical, Inc. v. Auris Health, Inc.*, it is plainly distinguishable. *See* No. 18-1359-MN, 2021 U.S. Dist. LEXIS 133682 at *8-9 (D. Del. July 19, 2021). In *Intuitive Surgical*, the Court excluded expert testimony that attempted to limit the scope of a term "based on improper claim construction arguments, the '447 specification, and testimony of the named inventor" that sought to limit the element at issue "based on the exemplary embodiments and inventor testimony, a practice against which the Federal Circuit has cautioned." *Id.* at *9 (citations omitted). There are no analogous facts here, nor does CommScope allege there to be.

how the dispute is relevant to the issues in the case, so I can figure out if this is a claim construction dispute or an infringement issue." D.I. 122 at 10.

To the extent Dali can discern enough about CommScope's request to address the merits at all, it appears CommScope's request is directed to Dr. Bims's application of the plain and ordinary meaning of the limitation at issue. But it is well settled that—as here—if a term has not been construed by the Court, then parties may provide expert testimony as to a person of ordinary skill in the art's understanding of that term. *See Finjan, Inc. v. Symantec Corp.*, 2013 U.S. Dist. LEXIS 134030 at *117 (D. Del. Sept. 19. 2013) (affirming reliance on expert to explain plain and ordinary meaning of disputed term to jury); *Endo Pharms., Inc. v. Mylan Pharms., Inc.*, No. 11-717, 2013 U.S. Dist. LEXIS 111004 at *16-17 (D. Del. Aug. 7, 2013) ("the Court must determine what a person of ordinary skill in the art would expect 'treatment' to mean . . . the Court finds it useful to consult the parties' expert reports to determine the plain and ordinary meaning of 'treatment.'") Here, CommScope alleges that Dr. Bims concludes "(1) the routing and switching step only applies to downlink signals and (2) that 'routing and switching' does not require two functions and merely refers to 'transporting.'" Br. at 28. But the portions of Dr. Bims's expert report cited by CommScope in support of this argument merely show him doing exactly what he must do: applying the plain and ordinary meaning of a term that the Court has not construed to arrive at his opinion. For example, as explained above, the only way a POSITA would reasonably read claim 1 is for the routing and switching step to operate in the downlink direction.

## III.    THE RECORD SUPPORTS DALI'S WILLFULNESS ALLEGATIONS

CommScope's request for summary judgment of no willful infringement is improper because the record reflects material disputes of fact concerning whether CommScope (1) knew of the '338 patent and (2) knew of its infringement of that patent. The record provides ample support for a jury to find that CommScope knew or had reason to know of infringement from

25

CommScope's previous litigation with Dali in which CommScope's ION-E/Era was found to infringe a family member of the '338 patent. After being sued, CommScope did not cease its conduct, did not attempt to design around the '338 patent, and maintained unreasonable invalidity positions. Genuine issues of material fact preclude summary judgment.

### A.    Legal Standards

The Supreme Court has held that the issue of willfulness turns on the defendant's subjective beliefs. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933 (2016). A patentee need only prove "subjective willfulness alone — i.e., proof that the defendant acted despite a risk of infringement that was 'either known or so obvious that it should have been known to the accused infringer.'" *WesternGeco LLC. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) (*quoting Halo*, 136 S. Ct. at 1930). "A finding of willful infringement requires knowledge of both the patent and of its infringement." *Intuitive Surgical, Inc. v. Auris Health, Inc.*, No. 18-1359-MN, 2021 U.S. Dist. LEXIS 133682, at *29 (D. Del. July 19, 2021) (citations omitted).

### B.    Argument

#### 1.    There are genuine disputes about CommScope's pre-suit knowledge of infringement.

As an initial matter, CommScope appears to agree there is at least a genuine dispute over whether it had pre-suit knowledge of the '338 patent. *See* Br. at 30 ██████████████ ██████████████████████████████████ Whether CommScope had knowledge of infringement is the only issue that remains. Knowledge of infringement "may be inferred based on surrounding circumstances, taken collectively and in context." *Ravgen, Inc. v. Ariosa Diagnostics*, No. 20-1646-RGA-JLH, 2021 U.S. Dist. LEXIS 150731, at *7 (D. Del. Aug 11, 2021) (*citing 3Shape A/S v. Align Tech., Inc.*, No. 18-886-LPS, 2019 WL 1416466, at *2 (D. Del. Mar. 29, 2019)) (internal quotation marks omitted). In *Sunoco Partners Marketing & Terminals L.P. v.*

*Powder Springs Logistics*, *LLC*, this Court inferred pre-suit knowledge of infringement when the pleadings plausibly alleged defendants knew "(1) the substance of their competitor's new patents-in-suit; (2) how their own accused methods and systems worked . . . ; and (3) why it is that those methods and systems were actually infringing the claims of these patents." No. 17-1390-LPS-CJB, 2019 U.S. Dist. LEXIS 136738, at *4-5 (D. Del. Aug. 7, 2019).

Here, CommScope knew "the substance of [Dali's] patents-in-suit," *id.*, because it ████████████████████████████████████████████████. CS Ex. 21 at 9. CommScope knew how OneCell worked because it purchased the company who developed it. Finally, a reasonable juror could readily conclude that CommScope knew "why it is that [OneCell systems] were actually infringing the claims of these patents," because of its prior litigation with Dali in which a jury found the ION-E/Era to infringe the '473 patent. *Sunoco Partners Marketing & Terminals L.P.*, U.S. Dist. LEXIS 136738 at *4-5. During that litigation, CommScope became intimately familiar with the '473 patent family, which includes the '338 patent. CS Ex. 21 at 10. Because of the finding of infringement and because of the similarities between ION-E/Era and OneCell, CommScope was motivated to ensure OneCell did not also infringe the '473 patent or its relatives. Reasonable jurors could infer that "based on surrounding circumstances, taken collectively and in context[,]" *Ravgen*, U.S. Dist. LEXIS 150731 at *7, CommScope either learned of OneCell's infringement or held a subjective belief that there was a high probability of infringement and took deliberate actions to avoid learning of infringement. *See Helios Streaming, LLC v. Vudu, Inc.*, No. 19-1792-CFC-SRF, 2020 U.S. Dist. LEXIS 82376, at *20 (D. Del. May 11, 2020) (*citing Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011)).

**2.    There is a genuine dispute about CommScope's post-suit willful infringement.**

This Court has denied summary judgment of no post-suit willfulness when: (1) defendant continued to infringe, (2) defendant failed to undertake efforts to design around the asserted patent; and (3) defendant asserted defenses that it knew to be unreasonable. *Zimmer Surgical, Inc v. Stryker Corp.*, 365 F. Supp. 3d 466, 492 (D. Del. 2019). Here, Dali has alleged that CommScope continues to infringe and has "made no efforts to ensure that its current and future products did not infringe." D.I. 47 (Dali's Am. Compl.) ¶ 115. Moreover, CommScope continues to rely on a non-infringement theory that was foreclosed on by this Court's Claim Construction Order. Specifically, as addressed above, CommScope's non-infringement theory requires the translating step's signal sources to only be RF. *See* Br. at 2-8. CommScope presented arguments at claim construction to this effect, and they were expressly rejected by the Court. D.I. 122 (Claim Construction Order) ("the '338 Patent claims do not require the DAU to connect to a base station, and in fact, the patent includes dependent claims that further limit the DAU to connecting to a base station."). Because the non-infringement theory contradicts this Court's Claim Construction Order, it is unreasonable.

CommScope argues that Dali's initial claim construction position, which was later dropped by Dali as discussed *supra*, somehow helps their non-infringement theory be more reasonable. That CommScope's non-infringement position relies on Dali's withdrawn and non-operative reading of the "translating" step rather than this Court's Claim Construction Order supports unreasonableness, not reasonableness. Thus, the motion should be denied.

## IV.    THE '338 PATENT IS VALID

### A.    Claims 1-3 Are Definite as a Matter of Law

#### 1.    The Translating Step in View of the Court's Construction of "Downlink Signals" is Definite Under the *Nautilus* Test

Under *Nautilus*, the test to determine indefiniteness is whether "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). For the translating step of Claim 1—i.e., "translating the uplink and downlink signals between RF and base band as appropriate"—the Court agreed with Dali and construed "downlink signals" to mean "signals transmitted in the downlink direction" *without* requiring those signals to be RF signals. D.I. 122 at 9. Giving "as appropriate" its ordinary meaning, for "downlink signals," the translating step simply means translating downlink signals (signals transmitted in the downlink direction) between RF and base band when needed or necessary.[4] In its Opening Brief, CommScope fails to consider the scope of the claims in view of the embodiments of the '338 Patent that clearly support translating downlink signals between RF and base band when needed or necessary.[5] D.I. 247 at 32-34.

For example, downlink signal 107 containing Carriers 1, 2 and 4 can be transmitted in the downlink direction through DAU1 and DAU2 to RRU3 and RRU4 by way of optical cables (113,

---

[4] A general-purpose definition for "appropriate," concerning which the Court may take judicial notice, is "right or suited for some purpose or situation." *See* http://merriam-webster.com/dictionary/appropriate.

[5] CommScope's allegation that "Dali's new construction of 'as appropriate' to mean the **entire step is optional**" is a misrepresentation of Dali's position. Br. at 33 (emphasis added). Dali follows the ordinary meaning of "as appropriate" such that translating downlink signals between RF and base band is performed when needed or necessary as a step of the method of Claims 1-3.

115) as shown in the Flexible Simulcast Downlink Example of FIG. 1 (annotated below) of the '338 Patent. *See* CS Ex. 1 ['338 Patent] at 5:64-7:4; FIG. 1. Downlink signal 107 containing Carrier 2 is transmitted through DAU1 and DAU2 to RRU3 in base band through optical cables. *Id.* At RRU3, a translation of the downlink signal between RF and base band is necessary to output downlink signal 111 at its antenna 109 in RF to mobile users. *Id.* If RRU3 receives the downlink signal containing Carriers 1 and 4 destined for RRU4, a translation between RF and baseband is not needed because it would transmit the downlink signal containing Carriers 1 and 4 to RRU4 already in base band through optical cable 115. *Id.* At RRU4, a translation between RF and base band would be needed to output downlink signal 112 at antenna 106 in RF to mobile users.



Figure 1: Flexible Simulcast Downlink Example

In the embodiment of FIG. 1, DAU1 and DAU2 can receive downlink signals at its inputs in either RF or base band and translation between RF and base band occurs when needed or necessary. *See* CS Ex. 1 ['338 Patent] at 5:64-7:4; FIG. 1. For example, DAU2 can receive downlink signal 107 containing Carriers 1, 2 and 4 in base band from DAU1 through optical cable

30

113, and no translation is necessary to transmit the downlink signal 107 to RRU3. *See id.* At DAU 1, downlink signal 107 can be in RF such that a translation between RF and base band would be necessary and to output the downlink signal in base band on optical cable 113 to DAU2. CommScope fails to address these examples in FIG. 1 when translation between RF and base band is needed or necessary. Thus, in view of at least the embodiment of FIG. 1, a POSA would find support and clearly discern the scope of the step to mean translating downlink signals between RF and base band when needed or necessary under the *Nautilus*.

### 2. CommScope's Indefiniteness Theory Should be Rejected as a Matter of Law

In its Opening Brief, CommScope argues that the translating step requires "translating a **downlink RF signal** to base band." D.I. 247 at 32 (emphasis added). This requirement should be rejected as a matter of law for multiple reasons.

First, CommScope impermissibly rewrites the translating step and imputes "RF" into "downlink signals." Br. at 32. *See Jang v. Boston Scientific Corp.*, 493 Fed. App'x 70, 77 (Fed. Cir. 2012) (it was impermissible to import the "unattached" limitation into the claims based on examples in the specification). The translating step recites "translating . . . **downlink signals** between RF and base band as appropriate"—not "downlink RF signals," which would necessarily conflict with the Court's restriction that "downlink signals" are not required to be in RF signals. D.I. 122 at 9. Indeed, a RRU (e.g., RRU3) meets the translating step by translating a downlink signal between RF and baseband to output a downlink signal at its antenna in RF to mobile users. *See* CS Ex. 1 ['338 Patent] at 5:64-7:4; FIG. 1.

Second, by requiring translating a downlink RF signal to base band, CommScope is limiting the translating step to be performed by a DAU that receives a downlink signal in RF described in one embodiment, but ignores that the DAU can also receive a base band signal in

another embodiment. "[T]he mere fact that the [asserted] patent discloses [only certain] embodiments . . . does not in and of itself mean that the method claims at issue are limited to the disclosed embodiments." *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006). For example, in FIG. 1 of the '338 Patent, a DAU2 receives base band signals from DAU1 through optical cable 113. *See* D.I. 245 (Dali's Opening CSUF) ¶ 2. This DAU1-DAU2 embodiment is captured in Claim 4 of the '338 patent. *See* D.I. 245 (Dali's Opening CSUF) ¶ 25; CS Ex. 1 ['338 Patent] at 13:31-34. In this DAU1-DAU2 example, DAU2 receives downlink signals in baseband from DAU1, which would not require translation for output to RRUs 3-4. *See* D.I. 245 (Dali's Opening CSUF) ¶ 25; CS Ex. 1 ['338 Patent] at 3:51-67, 4:1-44, 5:52-9:31, 13:1-25, and 13:31-34. DAU2 may also receive a downlink signal 108 that can be in RF and would be translated to base band for output to DAU1 and, thus, depending on type of downlink signal received, DAU2 translates between RF and baseband when needed or necessary meeting the translating step. In other examples, however, an RRU can also meet the translating step such as RRU3 that can translate a downlink signal between RF and base band for output of the downlink signal on its antenna making the translating step agnostic on whether a DAU or RRU preforms the translating step. CS Ex. 1['338 Patent] at 5:64-7:4; FIG. 1.

*Third*, CommScope's requirement of "translating a **downlink RF signal** to base band" effectively ignores "as appropriate" as part of the translating step. *See Strattec Sec. Corp. v. Gen. Auto. Specialty Co.*, 126 F.3d 1411, 1417 (Fed. Cir. 1997) (it was legal error not to consider the claim term "sheet" as part of the claim). The '338 Patent teaches that a downlink signal can be in RF or in baseband, and depending on how the downlink signal is to be transmitted, translating a downlink signal between RF and baseband is performed when needed or necessary. Because a

downlink signal is not limited to be in RF, CommScope's indefiniteness theory should be rejected as a matter of law.

### B.    CommScope's Derivation Theory Fails as a Matter of Law

CommScope's derivation theory fails under 35 U.S.C. § 102(f). Under Section 102(f), CommScope must show (1) prior conception or (2) communication of the prior conception that would enable a person of ordinary skill to make the invention. *See Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1344 (Fed. Cir. 2003). The communication to Dali of the "entire conception" must encompass *all limitations* of the claimed invention. *Cumberland Pharm. Inc. v. Mylan Institutional LLC*, 846 F.3d 1213, 1218 (Fed. Cir. 2017) (emphasis added). CommScope refers to GSM Specification as the alleged communication, but does *not* explain or point to anything in the GSM Specification actually disclosing every limitation of the claims. *See* Br. at 34-38. Indeed, CommScope fails to show *anywhere* in the GSM Specification at least the "configuring" and "reconfiguring" steps based on "load percentage," rendering its derivation theory without the required limitation-by-limitation support required under Section 102(f).

Indeed, the inventors of the '338 Patent conceived of an inventive concept that was disruptive at the time—i.e., "the ability of distributed antenna system to be able to route capacity to where it's needed and when it's needed." D.I. 245 (Dali's Opening CSUF) ¶ 1; Ex. 2 [Stapleton Dep.] at 23:15-24:16; *see also* CS Ex. 1 ['338 Patent] at 6:34-39, 8:21-24, Figs. 1-2. This inventive concept is captured by the "configuring" and "reconfiguring" based on "load percentage" features. For example, to route capacity to a particular remote radio unit (RRU) where and when it is needed, the inventors conceived a reconfigurable DAS that determined "load percentage" for each RRU— i.e., "a value representing the portion of available capacity that is in use." Based on the load percentage, an RRU can be reconfigured to increase or decrease the number of carriers in a subset of carriers to use. D.I. 245 (Dali's Opening CSUF ¶ 5; Ex. 1 ['338 Patent] at 13:20-22 (emphasis

added). This use of "load percentage" is meaningful because it allows the reconfigurable DAS to know at a granular level when to provide more or take away radio resources at a particular RRU. CommScope does not even point to a "load percentage" in the GSM Specification. Accordingly, CommScope's derivation theory can summarily be dismissed.

In the absence of technical foundation establishing that every element of the '338 patent was previously disclosed to Dali, CommScope's derivation theory prominently relies on an alleged admission by Dali in response to CommScope's interrogatory that called on Dali to "state the complete basis for [Dali's] denial" "that the named inventors of the '338 patent derived the invention claimed in the asserted claims of the '338 patent." CS Ex. 18 at 10-11; Br. at 36. But— as CommScope expressly recites in its brief—Dali's supplemental response to that interrogatory expressly "denies . . . that the inventors 'derived' the inventions claimed in . . . the '338 patent . . . in the context of pre-AIA 102(f) prior art sense." CS Ex. 18 at 12; *see also* Br. at 37. Dali's denial alone is sufficient to create a disputed issue of material fact sufficient to defeat CommScope's motion.

CommScope's core argument relating to this issue—i.e., that "[n]o reasonable juror could believe the term "derived" was being used in any other way than its legal meaning relating to a patent's validity," and so Dali must have known what CommScope meant[6]—also ignores CommScope's own failures of proof during the discovery process. As shown in the context of prior discovery-dispute motion practice, CommScope did not even disclose its limitation-by-

---

[6] A common definition of "derived" is "to base a concept on a logical extension or modification of another concept." *See* Oxford Languages, https://www.google.com/search?q=define+derive. In this way, Dali derived its patents—Dali did not invent DAS out of whole cloth. It built on what came before. Immediately upon learning that CommScope's interrogatory was intended to specifically and narrowly focus on Section 102(f) derivation, Dali supplemented its response to accurately reflect that Dali did not derive its patent in the Section 102(f) prior-art sense.

limitation Section 102(f) invalidity theory with particularity until Dr. Acampora's June 23 opening report. *See* D.I. 221 at 2 n.1 & Ex. J at 3-4, 6-7 (containing, *inter alia*, Dali's May 21 objection to CommScope demanding that CommScope "set forth with particularity CommScope's invalidity theory under Section 102(f)"). When Dali served both its April 9 initial interrogatory response and its May 24 supplemental interrogatory response (*see* CS Exs. 17-18), CommScope had yet to tell Dali exactly how CommScope believed Dali had allegedly "derived" the invention of the '338 patent within the meaning of Section 102(f). CommScope's attempt to require that Dali rebut CommScope's Section 102(f) case before CommScope had even disclosed its theory with particularity was and remains improper burden-shifting.

The case law on which CommScope relies does not support CommScope's position. In *Kenexa Brassring*, the Court disallowed the accused infringer's attempt to distance itself from sworn 30(b)(6) testimony only where the record showed that the testimony at issue had clearly established the contextual definition of the disputed term at issue:

> Defendants' designees knew or should have known what plaintiff's attorneys meant by the "resume upload feature." The . . . designee had spent the prior 32 pages of deposition testimony describing the old system of uploading and parsing a resume that involved the use of a scanner, optical character recognition software, and an employee to extract the data and put it into the appropriate database fields. The designee was then shown a series of screen shots of defendants' product that plaintiff's lawyer called "the resume uploading feature."

*Kenexa Brassring, Inc. v. Taleo Corp.*, 751 F. Supp. 2d 735, 747 (D. Del. 2010). In contrast, here CommScope delayed in disclosing the details of its Section 102(f) theory; served an interrogatory calling on Dali to rebut that unspecified invalidity theory; and now seeks to use Dali's good-faith attempts to engage with CommScope's written discovery as literally phrased to Dali's detriment.

This is insufficient to carry CommScope's burden to prove an absence of any disputed material facts.[7]

## V.    MR. DONOHUE'S DAMAGES OPINIONS ARE SUFFICIENTLY RELIABLE UNDER DAUBERT

### A.    Factual Background

#### 1.    Mr. Donohue's Methodology

CommScope's summary of Mr. Donohue's opinions (*see* Br. at 41-44) mischaracterizes certain aspects of his methodologies, and also omits necessary context. Mr. Donohue's ultimate opinion as to Dali's damages in this case is that "a reasonable royalty based on a hypothetical negotiation in late 2015 for CommScope's infringement of the '338 Patent would include"— consistent with Dali's prior licenses and CommScope's own licensing policy—two components:

██████████████████████████████████████████████████████████ CS Ex. 33

[Donohue Report] ¶ 7. Through 2021, based on "CommScope's actual infringing sales through April 2021 and estimated infringing sales through the remainder of 2021," Mr. Donohue calculates running royalties of ████████, for total damages through 2021 of ████████. *Id.* Mr. Donohue reaches his conclusions via three independent, mutually-reinforcing approaches (which then inform his follow-on *Georgia-Pacific* analysis), the key points of which are briefly summarized here.

##### a.    Mr. Donohue's Income Approach

Mr. Donohue's income approach considers "the future economic benefits that are expected to accrue to [CommScope] as of the time infringement began," as measured by the accused OneCell product's "projected earning power over its entire life." CS Ex. 33 [Donohue Report]

---

[7] Dali also refers the Court to Dali's affirmative Motion for Partial Summary Judgment of No Invalidity with respect to the issue of Section 102(f) derivation. *See* D.I. 248 at 21-23.

¶ 85. As inputs to his income approach, Mr. Donohue analyzes "potential cash flows associated with the use of the ['338 patent] in the accused OneCell systems." *Id.* ¶¶ 87-88.

As inputs to his income approach, Mr. Donohue examines █████████████████ ████████████ prepared by CommScope contemporaneously with CommScope's 2015 corporate acquisition of Airvana, the company that originally developed the infringing OneCell system. *See id.* ¶¶ 43-49, 90-91. Mr. Donohue further considers ████████████████ ███████████████ enabled by OneCell's Smart Reuse feature (and thereby by the '338 patent). *See id.* ¶¶ 96-102. Mr. Donohue concludes that ███████████████ ███████████████████████████ ███████████████████████████ ████████████. ¶ 170. To calculate the upfront payment component dictated by the parties' respective licensing practices (*see infra*), Mr. Donohue applies that ████ rate to the ████████ ██████████████████████, and discounts that amount back to net present value for a total upfront payment of ████████. *Id.* ¶¶ 106-108.

### b.    Mr. Donohue's Market Approach

Mr. Donohue's market approach examines "price[s] at which . . . similar asset[s]" to the'338 patent "ha[ve] been exchanged between willing buyers and sellers in like or comparable circumstances." CS Ex. 33 [Donohue Report] ¶ 85. Mr. Donohue considers two licenses to which Dali is a party, one issued to Fiplex[8] and one issued to Texas Instruments. *See id.* ¶¶ 75-76, 118-123. Mr. Donohue notes that the Dali-Fiplex license was structured such that Fiplex paid royalties

---

[8] CommScope's damages expert Ms. Davis agrees that the Dali-Fiplex license is suitably comparable for purposes of her own reasonable royalty analysis. *See* CS Ex. 51 [Davis Report] at 53 ("the parties would find most relevant Dali's license with Fiplex . . ."); Supp. Ex. 29 [Davis Dep.] 24:15-20.

to Dali of "$200,000 upfront, $300,000 paid in 7 quarterly payments . . . , and an ongoing running 5.5% royalty on gross sales." *Id.* ¶ 76. Mr. Donohue also considers a license between CommScope and Kathrein-Werke KG ("Kathrein") concerning, *inter alia*, CommScope's portfolio of DAS-related patents, and related testimony of CommScope Vice President Trevor Smith concerning CommScope's licensing policy,[9] "which includes a ███████████████████████████████ *See id.* ¶¶ 79-82, 112-117. Finally, Mr. Donohue also considers Mr. Smith's testimony concerning CommScope's *a la carte* licensing policy, relating to licenses to "one or two patents that [licensees] think are the most important." CS Ex. 33 [Donohue Report] ¶¶ 143, 167. Here Mr. Donohue observes Mr. Smith's testimony that the "a la carte policy for the DAS bandwidth sampling feature" represented by ██████████████████████████████████████████████ ████████████████████████████████████████████████

*Id.* ¶ 167.

Mr. Donohue relies on Dali's technical expert Dr. Bims, who assesses the technical comparability between the '338 patent and the patents that are the subject of Dali-Fiplex, Dali-TI, and CommScope-Kathrein licenses. *See id.* ¶¶ 113 & n.230, 118 & n.232, 122 & n.233; *see also* CS Ex. 7 [Bims Report] ¶¶ 187-207. As to the CommScope-Kathrein license specifically, Dr. Bims reviews sixteen patents and applications with an eye towards assessing the claimed technologies compared to the '338 patent. *See* CS Ex. 7 ¶¶ 198-203. Based on his review of these several assets, Dr. Bims "conclude[s] that, in aggregate, the U.S. patents listed on the [CommScope-Kathrein license's] DAS Exhibit are technologically comparable to the '338 Patent." *Id.* ¶ 204. And in the

---

[9] CommScope's expert Ms. Davis confirmed at deposition that, ████████████████████████ ████████████████████████████ Supp. Ex. 29 [Davis Dep.] 61:21-24.

context of his application of CommScope's *a la carte* policy, Mr. Donohue also relies on Dr. Bims's conclusion that the '338 patent "is at least as important from a technical perspective to a distributed communication system as the bandwidth sampling feature claimed by CommScope's '747 Patent." CS Ex. 33 [Donohue Report] ¶ 143; CS Ex. 7 [Bims Report] ¶¶ 208-211. CommScope does not challenge any of Dr. Bims's opinions concerning technical comparability under *Daubert*. *See generally* Br.

In light of Dr. Bims's guidance (*inter alia*), Mr. Donohue ultimately concludes that "[t]he most relevant license agreements in this matter are . . . the CommScope-Kathrein and Dali-Fiplex licenses." *Id.* ¶ 140. CommScope's damages expert Ms. Davis, in concluding "that the hypothetical negotiators would have agreed to ███████████ for a license to the '338 patent," notes that such a ███████████████████████████████████████████████████ ███████████████████████████████ CS Ex. 51 [Davis Report] at 52.

### c.    Mr. Donohue's Cost Approach

Mr. Donohue's cost approach "quantif[ies] the amount of money that would be required to recreate or build a non-infringing substitute for the infringing asset . . . . based on the concept of replacement cost as an indication of fair value." CS Ex. 33 [Donohue Report] ¶ 85. But Mr. Donohue's "cost approach inherently assumes that the asset at-issue can be replaced or in the case of patents, designed around"—and so the cost approach is "only . . . viable if another method that does not infringe the patent would provide comparable benefits." *Id.* ¶ 126. Mr. Donohue reviews ████████████████████████████████████████████████, and concludes that CommScope itself both ████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████ *Id.* ¶ 127-129. Mr. Donohue also notes that ███████████████████████ ██████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████    *See id.* ¶ 130.

### 2.    The Accused System

CommScope's characterization of the accused product as limited to "a way to schedule the allocation of resource blocks in a frequency reuse system" (Br. at 39-40) also inappropriately cabins Dali's actual infringement case. As Mr. Donohue notes—in reliance on Dr. Bims (whose opinions, again, have not been challenged by CommScope under *Daubert*)—CommScope's framing "of the patented technology is incorrect and . . . the patented technology is OneCell's frequency reuse ability." CS Ex. 34 [Donohue Reply Report] ¶ 10. Dr. Bims specifically opines that the '338 patent delivers critical benefits to network operators, and that "if the patented features of the '338 Patent were removed from the OneCell system, the resulting system would have a less efficient distribution of resources resulting in less capacity for users and wasted resources." CS Ex. 7 [Bims Report] ¶ 80. Dr. Bims expressly "disagree[s] with [CommScope] that '[t]he '338 Patent does not cover or even disclose the concept of frequency reuse'"; rather, he opines, "the '338 Patent covers the dynamic and/or manual allocation of RRUs included in signal combining for the uplink and downlink for a given UE[, which] covers and discloses the *concept of* frequency reuse." CS Ex. 8 [Bims Reply Report] ¶ 61 (emphasis added). Dr. Bims further observes that the '338 patent's "claimed load percentage is critical to the frequency reuse feature in the Accused Products." *Id.* ¶ 62.

### B.    Legal Standards

The Federal Rules of Evidence and *Daubert* establish that this Court, in assessing expert testimony, must determine whether "the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993).The inquiry

envisioned by Rule 702 is . . . a flexible one." *Id*. at 594-95. "Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Id*. But "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. Mitchell*, 365 F.3d 215, 245 (3d Cir. 2004) (quoting Fed. R. Evid. 702 advisory comm. note) (internal quotation omitted). Rather, *Daubert* makes clear that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id*. (quoting *Daubert*, 509 U.S. at 596).

A party whose patent is infringed is entitled to recover "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the *use made of the invention by the infringer*." 35 U.S.C. § 284 (emphasis added). Under *Georgia-Pacific*, a patentee's reasonable royalty damages can be calculated based on "a hypothetical negotiation between the patentee and the infringer when the infringement began." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868-69 (Fed. Cir. 2010) (discussing *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). "[E]stimating a reasonable royalty is not an exact science." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

To measure the amount of the reasonable royalty, "a jury may consider . . . the value of the benefit conferred to the infringer by use of the patented technology." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240 (Fed. Cir. 2011) (citing *Monsanto Co. v. McFarling*, 488 F.3d 973 (Fed. Cir. 2007)). In measuring that benefit, "[r]eliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080-81 (Fed. Cir. 1983); *see also Powell*, 663 F.3d at 1240

41

(upholding methodology based on "evidence of cost savings that [defendant] could expect to achieve by reducing claims from employee accidents").

The Federal Circuit has also long recognized that "using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1325 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). A patentee relying on a prior license to establish a reasonable royalty must introduce evidence showing that the license at issue is "sufficiently comparable to the hypothetical license at issue in the suit." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (internal quotation omitted). The threshold for admissibility is low. There simply "must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (evidence showing that license is "drawn to related technology" is sufficient to show technological comparability); *Lucent*, 580 F.3d at 1329 (evidence must shows that the licensed technology "is in [some] way similar to the technology being litigated"). So long as an expert has some reliable basis for opining that the licenses are comparable, "whether the[] licenses are sufficiently comparable such that [the patentee's] calculation is a reasonable royalty goes to the weight of the evidence, not its admissibility." *Apple*, 757 F.3d at 1326; *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility").

## C.    Argument

Notwithstanding the many components of Mr. Donohue's opinions described in CommScope's motion, CommScope's only two formal objections are expressly directed to (1) Mr. Donohue's cost-savings analysis and (2) Mr. Donohue's reliance on CommScope's ███████

██ licensing policy and the CommScope-Kathrein license. *Compare* Br. at 41-44 *with id.* at 44-48. Dali addresses CommScope's specific objections in detail below.[10]

### 1.    Mr. Donohue's Cost Savings Methodology Is Reliable

CommScope argues that Mr. Donohue's cost-savings methodology is inappropriate because his opinions are based on "the entirety of Cell Virtualization,"[11] and because Mr. Donohue purportedly "seek[s] damages for the entire cost savings CommScope realizes with One Cell over its competitors." Br. at 44 (quoting, *inter alia*, CS Ex. 34 [Donohue Reply Report] ¶¶ 10, 30)).

As noted above, CommScope's motion does not present an agreed view of Dali's infringement case. Dali does not solely accuse ████████████████████████████ ████████████████████ Br. at 44 (emphasis removed). As Dr. Bims opines—and Mr. Donohue follows—the '338 patent is required to enable OneCell's "efficient distribution of resources," and the '338 patent's "claimed load percentage is critical to [OneCell's] frequency reuse feature." CS Ex. 7 [Bims Report] ¶ 80; CS Ex. 8 [Bims Reply Report] ¶ 62; *see also* CS Ex. 34 [Donohue Reply Report] ¶ 10. Simply put, CommScope cannot offer Smart Reuse, and thus achieve the benefits of that feature, without infringing the '338 patent. As Mr. Donohue notes (citing to testimony of CommScope 30(b)(6) witness Mr. Gatehouse), ████████████████

---

[10] The relief that CommScope's *Daubert* motion seeks—that the Court "exclude the opinions and testimony of Dali's damages expert James J. Donohue" in their entirety—is drastic. Br. at 1; *see also id.* at 38, 49. Even if the Court is inclined to give any credence to either of CommScope's two primary criticisms (and it should not), CommScope makes no showing that Mr. Donohue's *entire report* is defective. CommScope's motion does not actually challenge the other inputs to Mr. Donohue's methodology, as summarized above and detailed in Mr. Donohue's expert reports. *See* CS Exs. 33 [Donohue Report], 34 [Donohue Reply Report]. For this reason alone, CommScope's requested relief should be denied.

[11] As Mr. Donohue made clear at his deposition, his reply report's reference to "the entirety of Cell Virtualization" expresses his understanding "that cell virtualization infringes the '338 patent and that CommScope does not have an alternative, some lesser cell virtualization that would provide the same benefits without infringement." CS Ex. 35 [Donohue Dep.] at 312:20-318:4.

████████████████████████████████████████████████████████████████████

██████████████████████████████ CS Ex. 33 [Donohue Report] ¶ 54. And Dr. Bims specifically "disagree[s] with [CommScope expert] Dr. Acampora's opinion that the benefits of frequency reuse can be obtained . . . by amending the algorithm." CS Ex. 8 [Bims Reply Report] ¶ 62.

As to CommScope's allegation that Mr. Donohue inappropriately captures all cost savings enabled by Smart Reuse as Dali's royalty damages (i.e., leaving nothing for CommScope), Mr. Donohue does not, as CommScope states, simply "assert[] that his cost savings analysis is conservative." Br. at 45. Rather—as CommScope's motion utterly neglects to acknowledge—Mr. Donohue's reply report expressly engages with, disputes, and rebuts this specific criticism:

> The Davis Report also incorrectly suggests that my royalty rate is "giving the entirety of the supposed cost savings to Dali." As explained in my Opening Expert Report, CommScope documents indicated that projected cost savings based on the use of Cell Virtualization could range from a ████████████████████ ██████████. The ███ royalty rate that I have calculated is based solely on the lowest cost savings estimated by CommScope— ███—meaning that any excess cost savings are left entirely with CommScope. My cost savings approach also assumes every building could be outfitted with the additional equipment required by competing solutions, which I understand is not always feasible due to building constraints. Further, my cost savings approach does not adequately capture the value associated with the ability to increase throughput without interference and therefore optimize user experience. Since the ███ royalty rate is based on the minimum cost savings and does not adequately capture additional, significant benefits, CommScope would be left with the majority of the expected cost savings or value provided by the patented technology.

Ex. 35 ¶ 35 (footnotes omitted). Mr. Donohue therefore does not actually issue the opinion that CommScope ascribes to him—i.e., he does not maintain that CommScope would "pay a royalty consisting ████████████████████████████████" of the '338 patent. Br. at 45. And because Mr. Donohue's methodology does not actually capture all the cost savings realized

via the '338 patent, the cases that CommScope cites in support of the premise that a methodology that captures 100% of cost savings is unreliable are thus totally inapposite. *See id.*

### 2.    Mr. Donohue's Reliance on CommScope's Licensing Policy and the CommScope-Kathrein License Is Appropriate

CommScope also objects that Mr. Donohue inappropriately "attempts to leverage a policy CommScope for licensing out ███████████████████████" in a manner allegedly "[u]nmoored from the facts or any legal authority or accepted methodology whatsoever." Br. at 46. CommScope's objections on this front are belied by the actual record evidence, and are unsupported by law.

It is black-letter law that "using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent." *Apple*, 757 F.3d at 1325. CommScope's expert Ms. Davis expressly agreed at deposition that "███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████" Supp. Ex. 29 [Davis Dep.] 23:13-24:14. CommScope takes issue that its own out-licensing policy and the CommScope-Kathrein license based thereon are "sufficiently" comparable. But CommScope cannot credibly argue that Dali has not crested the Federal Circuit's required threshold, especially given that CommScope *has not challenged* the foundational technical analyses performed by Dali's expert Dr. Bims. When a patentee has carried its burden to show that the licenses on which it relies are "drawn to related technology" (*VirnetX*, 767 F.3d at 1330), a damages expert then must simply "account for differences in the technologies and economic circumstances" between that comparable license and the hypothetical negotiation. *Finjan, Inc. v. Secure Computing Corp.*, 626 F. 3d 1197, 1211 (Fed. Cir. 2010). Mr. Donohue does so, as detailed in his expert report—*e.g.*, in observing that CommScope's *a la carte* licensing

45

policy and Dr. Bims's comparison of the '338 patent against CommScope's '747 patent dictate a ███████████ of CommScope's base licensing-policy rate, and thus "███████████ ███████████." CS Ex. 33 [Donohue Report] ¶ 167.[12]

CommScope's argument that "the *Georgia-Pacific* factors embrace the licensing policy of the ***licensor, not the licensee***" (Br. at 46, emphasis original) displays a lack of understanding of *Georgia-Pacific*.[13] It is true that *Georgia-Pacific* Factor No. 1 addresses the patentee's licensing policy—but Factor No. 12 concerns "the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." Not to mention that the scope of Factor No. 15—concerning "the amount that a prudent licensee . . . would have been willing to pay as a royalty and yet be able to make a reasonable profit, and which amount would have been acceptable by a prudent patent owner who was willing to grant a license"—is broad, and common sense alone dictates that the hypothetical negotiators would have been aware of and would have considered CommScope's established licensing policy. Here, Dr. Bims has confirmed that the CommScope-Kathrein license encompasses, at least in part, such "analogous inventions" as contemplated by Factor No. 12. *See* CS Ex. 7 [Bims Report] ¶¶ 198-204. And CommScope does not point to any CommScope policy for in-licensing patents that actually contradicts its out-licensing policy. *See* Supp. Ex. 29 [Davis Dep.] 61:21-24.

CommScope's "for me, but not for thee" attitude towards its own licensing policy—i.e., reliable when seeking compensation for use of CommScope's own patents, but not when Dali

---

[12] CommScope's motion does not address Mr. Donohue's opinions relating to CommScope's *a la carte* licensing policy. *See generally* Br.

[13] *Georgia-Pacific* is also not the only proper methodology to determine reasonable royalty damages. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F. 3d 1301, 1324 (Fed. Cir. 2009).

seeks compensation for infringement of Dali's patents—is both inequitable and contrary to law. Importantly, CommScope cites no countervailing authority in support of its argument that an accused infringer's own outbound licenses and/or related policies cannot be considered under *Georgia-Pacific*. Nor can CommScope do so, as courts have previously approved of methodologies in which an expert calculated royalty damages based on a defendant's licenses for its own patents. *See, e.g.*, *Intellectual Ventures II LLC v. Sprint Spectrum, L.P. et al.*, No. 17-cv-662-JRG-RSP, 2019 U.S. Dist. LEXIS 70674, at *14-17 (E.D. Tex. Apr. 26, 2019) ("Defendants fail to show how Bratic's Ericsson licenses analysis is actually unreliable.").

Instead CommScope levies several objections concerning alleged ways that "[t]he dynamics leading to CommScope's policy are dramatically different than the hypothetical negotiation here" and that "the [CommScope-]Kathrein license involved vastly different components, competitive dynamics and value considerations":

- "Dali comes to this hypothetical negotiation as a willing licensor";

- "[N]obody has ever expressed interest in licensing the '338 patent";

- "Dali had never developed, much less incorporated the '338 patented technology into any product";

- "Dali's DAS products were not even available . . . to compete against CommScope"; and

- "Dali had no market share to lose with respect to the '338 patent and it certainly would not lose pricing on a product it never made."

Br. at 47-48. But even if accepted *arguendo* as true, none of these criticisms rise to the level that the Federal Circuit has found to justify excluding an expert's testimony for relying on a non-comparable license. Such exclusions are reserved for instances in which there is *no* "basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc*, 632 F.3d at 1317. Here, such a basis exists—and to the extent

CommScope takes issue with the foundations of Mr. Donohue's opinions on that score, "the objections [CommScope] raise[s] are not 'methodological' objections in the *Daubert* sense, and [CommScope's] criticism of [Mr. Donohue's] analysis can be brought out on cross-examination." *HSM Portfolio LLC v. Elpida Memory, Inc.*, No. 11-770-RGA, 2016 U.S. Dist. LEXIS 16615, at *7 (D. Del. Feb. 11, 2016).

## VI.    CONCLUSION

For the foregoing reasons, Dali respectfully requests that the Court deny CommScope's Motions for Summary Judgment and to the Exclude the Opinions and Testimony of Mr. Donohue.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  */s/ Bindu A. Palapura*

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Stephanie E. O'Byrne (#4446)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
sobyrne@potteranderson.com

Cristofer I. Leffler
David Schumann
Michael Saunders
Cliff Win, Jr.
S.H. Michael Kim
Palani Pradeep Rathinasamy
Steven T. Skelley
Stefan Szpajda
FOLIO LAW GROUP PLLC
1200 Westlake Ave. N., Ste 809
Seattle, WA 98109
Tel: (206) 880-1802

*Attorneys for Plaintiff Dali Wireless, Inc.*

Joseph M. Abraham
LAW OFFICE OF JOSEPH M. ABRAHAM PLLC
13492 Research Boulevard, Suite 120
No. 177
Austin, TX  78750
Tel: (737) 234-0201

Dated:  October 29, 2021
PUBLIC VERSION
Dated:  November 10, 2021

48